## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARCIA G. FLEMING, CASEY FREEMAN, DAVID GUYON, ANTHONY LOSCALZO, PATRICK ROSEBERRY, and JULIO SAMANIEGO individually, on behalf of the Rollins, Inc. 401(k) Savings Plan and on behalf of all similarly situated participants and beneficiaries of the Plan,** | **CIVIL ACTION FILE NO:** |
|       **Plaintiffs,** | |
| **v.** | |
| **ROLLINS, INC.; THE ADMINISTRATIVE COMMITTEE OF THE ROLLINS, INC. 401(k) SAVINGS PLAN; ALLIANT INSURANCE SERVICES, INC.; ALLIANT RETIREMENT SERVICES, LLC; LPL FINANCIAL LLC; PAUL E. NORTHEN, JOHN WILSON, JERRY GAHLHOFF, JAMES BENTON and A. KEITH PAYNE in their capacities as members of the Administrative Committee; and John and Jane Does 1-10,** | |
|       **Defendants.** | |

## CLASS ACTION COMPLAINT

1

# TABLE OF CONTENTS

I.   OVERVIEW ................................................................................3

II.  PARTIES .................................................................................4

III. JURISDICTION AND VENUE ...............................................7

IV. CLASS ACTION ALLEGATIONS ..........................................8

V.  PLAINTIFFS' ADMINISTRATIVE CLAIMS .............................10

VI. FACTUAL ALLEGATIONS ..................................................10

  A.   Rollins and the Rollins Plan ..................................................10

  B.   The Rollins' Administrative Committee ....................................11

  C.   Rollins and the Administrative Committee's Fiduciary Duties and
  Obligations Under ERISA ......................................................12

  D.   Rollins and the Administrative Committee's Violations of ERISA ...........15

    i.   Rollins and the Administrative Committee Failed to Investigate and Select
    Qualified Covered Service Providers ...............................................17

    ii.  Rollins and the Administrative Committee Failed to Properly Monitor
    Covered Service Providers ......................................................25

    iii.   Rollins and the Administrative Committee Failed to Properly Oversee
    Payments to the Covered Service Providers ....................................37

    iv.   Rollins and the Administrative Committee Allowed Revenue Sharing and
    Non-Uniform Revenue Sharing Allocations Among Participants/Beneficiaries
    in the Plan, Failed to Make Alternative Lower Cost Investments, And Failed to
    Disclose Alternative Lower Cost Investments to the Plan's
    Participants/Beneficiaries ......................................................41

    v.  Rollins and the Administrative Committee Failed to Select Less Costly
    Investments and Failed to Monitor Plan Investments Under 29 U.S.C. §§
    1132(A)(2) and (3)............................................................47

  E.   Damages Caused by Defendants' Violations .............................52

VII.    CAUSES OF ACTION .......................................................52

COME NOW Plaintiffs Marcia G. Fleming, Casey Freeman, David Guyon, Anthony Loscalzo, Patrick Roseberry, and Julio Samaniego (collectively "Plaintiffs"), by and through the undersigned counsel, and individually, on behalf of the Rollins, Inc. 401(K) Savings Plan (the "Rollins Plan") or (the "Plan"), and on behalf of all similarly situated participants and beneficiaries of the Rollins Plan, bring this action against Defendants Rollins, Inc., the Administrative Committee of the Rollins Plan (the "Administrative Committee"), Alliant Insurance Services, LLC ("AIS"), Alliant Retirement Services, Inc ("ARS"), LPL Financial LLC ("LPL"), , and Paul E. Northen, John Wilson, Jerry Gahlhoff, James Benton and A. Keith Payne, in their capacities as members of the Administrative Committee (collectively, the "Administrative Committee"), and John and Jane Does 1-10 (collectively, "Defendants") for equitable relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et. al* ("ERISA"), and allege as follows:

## I.    OVERVIEW

1.    This class action seeks damages as a result of Defendants' alienation of the trust of the Rollins Plan's participants/beneficiaries, and dissipation of the Rollins Plan assets in violation of ERISA 29 U.S.C. § 1001, *et. al*, the Plan's documents, and Defendants' fiduciary duty to the Plan's participants and beneficiaries which required them to act "solely in the interest of the plan's participants" and "for the exclusive purpose of providing benefits to participants,"

29 U.S.C. 1104(a)(1)(A).

2.     The participants/beneficiaries are filing this action as representatives of the Plan and Trust under ERISA § 502 and they are all similarly situated with the (1) same fiduciaries, (2) the same trust, (3) same covered service providers (CSP), (4) same list of investment choices, (5) for every year of their employment and (6) based on the Defendants' Annual Return/Report of Employee Benefit Plan for plan years 2009 to 2020 (based on Defendants' government reports to U.S. Departments of Treasury and Labor at www.efast.dol.gov).

3.     The Plan is a trust and the holder of all assets. The individual participants and beneficiaries merely hold a bookkeeping record, not the individual investments themselves. The decisions on what investments are held in the trust are voted on and made solely by the Administrative Committee members and while these decisions were made on behalf of the trust, they affected all participants and beneficiaries.

## II.    PARTIES

4.     Plaintiff Marcia G. Fleming ("Fleming") was an employee of Rollins, Inc. between 2017 and 2019.  Despite leaving her employment with Rollins in February 2019, Fleming remains a participant/beneficiary in the Rollins Plan. Fleming is, and was at all times relevant to this Complaint, a resident of the state of Georgia.

5.     Plaintiff Casey Freeman ("Freeman") was, an employee of Rollins, Inc. between 2013 and 2019 and a participant/beneficiary in the Rollins Plan.

6.     Plaintiff David Guyon ("Guyon") was, an employee of Rollins, Inc. between 2008 and 2020 and a participant/beneficiary in the Rollins Plan.

7.     Plaintiff Anthony Loscalzo ("Loscalzo") was an employee of Rollins, Inc. between 2012 and 2020 and a participant/beneficiary in the Rollins Plan.

8.     Plaintiff Patrick Roseberry ("Roseberry") was an employee of Rollins, Inc. between 2010 and 2016 and a participant/beneficiary in the Rollins Plan.

9.     Plaintiff Julio Samaniego ("Samaniego") was an employee of Rollins, Inc. between 2007 and 2018 and a participant/beneficiary in the Rollins Plan.

10.     Defendant Rollins, Inc. ("Rollins") is, and was at all times relevant to this Complaint, a corporation formed under the laws of the State of Delaware and having its principal place of business at 2170 Piedmont Road NE, Atlanta, Georgia, 30324.

11.     Defendant, the Administrative Committee of the Rollins Plan (the "Administrative Committee") is responsible for the administration of the Rollins Plan, including determining the eligibility for participation and for benefits, directing the Rollins Plan's trustee to pay benefits, and interpreting provisions of the Rollins Plan, determining what constitutes a reasonable expense of administering the Rollins Plan, determining whether such expenses shall be paid from the Rollins Plan's Trust,

charging against Rollins Plan accounts such reasonable administrative fees as may be established from time to time, and interpreting the Rollins Plan. The Rollins Committee is a fiduciary to the Rollins Plan to the extent it was delegated the function of Plan Administrator and both had and exercised discretionary authority, control, and/or responsibility respecting the management and/or administration of the Rollins Plan and control over Rollins Plan assets. 29 U.S.C. §1002(21)(A).

12.   Defendant, the Administrative Committee is also responsible for the selection, monitoring, and retention of Rollins Plan investment options, and has express discretionary authority and control respecting management of the Rollins Plan and Rollins Plan assets.

13.   Defendants Paul E. Northen, John Wilson, Jerry Gahlhoff, James Benton and A. Keith Payne (collectively, the "Committee Members") were members of the Administrative Committee during the Class Period, or successors of those who were members during the Class Period, and, as such, were fiduciaries of the Plan under ERISA under 29 U.S.C. §1002(21)(A) to the extent that they exercised discretionary authority or discretionary control respecting the administration or management of the Plan, or exercised authority or control respecting the management or disposition of the Plan's assets.

14.   Defendant Alliant Insurance Services, Inc. is, and was at all times relevant to this Complaint, a foreign corporation licensed to do business in Georgia

6

and its registered agent is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

15.     Defendant Alliant Retirement Services, LLC is, and was at all times relevant to this Complaint, a foreign corporation licensed to do business in Georgia and its registered agent is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

16.     Defendant LPL Financial LLC is, and was at all times relevant to this Complaint, a foreign corporation licensed to do business in Georgia and its registered agent is CT Corporation System, 289 S Culver St, Lawrenceville, GA, 30046.

17.     Defendants John and/or Jane Does 1-10 as members of the Administrative Committee during the Class Period, are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A).

### III.   JURISDICTION AND VENUE

18.     This Court has original and exclusive jurisdiction over the subject matter of this ERISA action under 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1).

19.     Venue is proper in this District under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where at least one Defendant (Rollins) resides.

## IV.   CLASS ACTION ALLEGATIONS

20.     Plaintiffs bring this action on their own behalf and, pursuant to the provisions of the Federal Rules of Civil Procedure, on behalf of a class of all others similarly situated, defined as follows:

> All current and former employees of Rollins who participated in the Rollins Plan on or after January 1, 2008 through the date of judgment, including their beneficiaries but excluding Defendants.

21.     The requirements for maintaining this action as a class action under Rule 23(b)(l) and (b)(2), Federal Rules of Civil Procedure, are satisfied in that:

(a) the Class is large in number; the exact number and identities of all members of the Class are currently unknown to Plaintiffs but are well known to Defendants. The number of members of the Class is believed to be no less than 100;

(b) The members of the Class are so numerous that joinder of all members is impracticable;

(c) There are questions of law common to all members of the Class, including

but not limited to whether Defendants violated and continue to violate ERISA by, inter alia: (i) failing to prudently select, monitor, and retain Plan fiduciaries, Plan service providers, and Plan investments; (ii) failing to follow the terms of the Plan and ERISA; (iii) engaging or causing the Plan to engage in transactions prohibited by ERISA; and (iv) failing to diversify Plan investments.

(d) Plaintiffs are a member of the Class as defined above; their claims are typical of the claims of the members of the Class and they will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are coincidental with, and not antagonistic to those of the remainder of the Class, and they are represented by experienced ERISA counsel.

(e) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants, and a risk of adjudications which as a practical matter would be dispositive of the interests of other members of the Class who were not parties; and

(f) Defendants have acted and/or refused to act and are likely to act and/or refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and other equitable relief with respect to the Class as a whole.

22.     All conditions precedent to bringing this action have been satisfied or waived.

23.     The identity and precise number of the Class Members should be readily available from the Rollins, Inc. 401(K) Savings Plan's records.

24.     Given the composition and size of the Class, its members may be informed of the pendency of this action directly *via* U.S. mail and electronic mail.

## V.     PLAINTIFFS' ADMINISTRATIVE CLAIMS

25.     On December 10, 2020, Plaintiffs filed administrative claims under Section 11.7 of the Plan. (the "Administrative Claims").

26.     On March 1, 2021, the Administrative Committee denied Plaintiffs' Administrative Claims.

27.     On March 9, 2021, Plaintiffs filed an appeal of their Administrative Claims under Section 11.7(c) of the Plan.

28.     On May 6, 2021, the Administrative Committee provided a final denial of Plaintiffs' Administrative Claims and provided the right to bring this suit under the terms of the Plan.

## VI.     FACTUAL ALLEGATIONS

### A.     <u>Rollins and the Rollins Plan</u>

29.     Defendant Rollins is a leading, global company that provides residential and commercial pest control services through more than 900 subsidiaries

and franchises worldwide and generates more than $1.8 billion in annual revenue.

30.    Defendant Rollins offers the Rollins Plan to its employees, the Rollins Plan participants/beneficiaries, as a way to save for retirement.

31.    The Rollins Plan participants/beneficiaries fund their individual Plan accounts through a portion of their wages.

32.    The Rollins Plan participants/beneficiaries control the investment of all contributions to their Plan accounts by directing them into one or more of a menu of available investment options pre-selected by Rollins and the Administrative Committee.

33.    The available investment options for the Rollins Plan change over time based on selections made by Rollins and the Administrative Committee.

34.    For the Rollins Plan participants/beneficiaries who do not wish to make their own investment decisions, the Plan offers a service, GoalMaker, that automatically invests the participants/beneficiaries' funds in a portfolio of available investment options pre-selected by Rollins and the Administrative Committee tailored to the participants/beneficiaries' investment goals, including time to retirement and risk preference.

### B.  The Rollins' Administrative Committee

35.    The Rollins Plan permits the sponsor (Rollins) to delegate certain functions, including selecting and monitoring investment options, and hiring and

monitoring service providers, to the Administrative Committee. **Exhibit 1**, Rollins Plan, at § 12.1-12.7.

36.     The Rollins Plan states that "The Administrative Committee will fulfill the duties of 'administrator' as set forth in ERISA Section 3(16) and will have complete control of the administration of the Plan hereunder, with all powers necessary to enable it properly to carry out its duties as set forth in the Plan and the Trust Agreement." **Exhibit 1**, Rollins Plan, at § 12.3(a) Fiduciary Responsibilities.

37.     The Rollins Plan further provides that: "The Administrative Committee, acting in its role as a Named Fiduciary, will have the following duties and responsibilities: (1) To construe the Plan and to determine all questions that arise hereunder; (2) To have all administrative powers elsewhere herein conferred upon it; (3) To decide all questions relating to the eligibility of Employees to participate in the benefits of the Plan; (4) To determine the benefits of the Plan to which any Participant or Beneficiary may be entitled; [and] (5) To make factual findings with respect to claims for benefits…." *Id.* at § 12.3(a). *Id.*

## C.  Rollins and the Administrative Committee's Fiduciary Duties and Obligations Under ERISA

38.     The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001 et seq., protects "the interests of participants in employee benefit plans and their beneficiaries," 29 U.S.C. 1001(b), by imposing trust-law duties of loyalty,

prudence, and diligence on plan fiduciaries. 29 U.S.C. 1104(a)(1).

39.    ERISA broadly defines fiduciaries as anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary        authority        regarding        plan        administration. https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf

40.    ERISA's broad definition of fiduciaries covers Rollins and the Administrative Committee.

41.    ERISA's "exclusive benefit rule" commands the fiduciary to act for the exclusive purpose of providing benefits to participants and their beneficiaries; this broad obligation, informed by the common law of trusts, entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful, including a duty to disclose any and all conflicts of interest.    ERISA §§ 404(a)(1)(A), 502(a)(2), 29 U.S.C.A. §§ 1104(a)(1)(A), 1132(a)(3); Restatement (Second) Trusts § 173 comment.  The Law of Trusts. Austin W. Scott, § 199, p. 1638 (1967).

42.    Specifically, ERISA Section 404(a)(1) provides that "[a] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and: (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of

administering the Plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter."

43.     An ERISA fiduciary must discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. 1104(a)(1)(B).

44.     If the fiduciary fails to do so, a plan participant, beneficiary, or fiduciary, or the Secretary of Labor, may sue on the plan's behalf to remedy the breach of fiduciary duty.  29 U.S.C. 1132(a)(2).

45.     A fiduciary is "personally liable to make good to such plan any losses to the plan resulting from each such breach."  29 U.S.C. 1109(a); *see also* Restatement (Third) Trusts § 100(a) (2012) ("A trustee who breaches his or her duty could be liable for loss of value to the trust or for any profits that the trust would have accrued in the absence of the breach.").

14

### D. **Rollins and the Administrative Committee's Violations of ERISA**

46.     Rollins and the Administrative Committee, as responsible Plan fiduciaries (functioning and responsible for controlling and managing the operation and administration of the Rollins Plan), breached and alienated the trust of the Plan's participants/beneficiaries and dissipated the Plan's assets in violation of the Plan's documents.

47.     Rollins and the Administrative Committee's actions violated ERISA's "sole and exclusive" rule, which requires fiduciaries to act "solely in the interest of" and "for the exclusive purposes" of a plan's participants and beneficiaries.  29 U.S.C. §§1103(a), (c)(1), 1104(a)(1) and (2).

48.     Rollins and the Administrative Committee breached their ERISA fiduciary duties by: (i) allowing excessive recordkeeping fees; (ii) selecting high cost and poor performing investments compared to available alternatives; (iii) failing to monitor the Plan's investments generally.

49.     Rollins and the Administrative Committee also repeatedly violated ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (the duty to act in accordance with the documents and instruments governing the plan).

50.     Rollins and the Administrative Committee's actions and conduct as fiduciaries of the Plan were not a result of a reasoned and principled process.

51.     Rollins and the Administrative Committee's actions and conduct as

fiduciaries of the Plan were inconsistent with prior interpretations by the Plan's administrator(s).

52.    Rollins and the Administrative Committee's actions and conduct as fiduciaries of the Plan were not consistent with the purpose(s) of the Plan.

53.    Rollins and the Administrative Committee's actions and conduct amounted to a breach of fiduciary duty under ERISA.

54.    Rollins and the Administrative Committee's repeated actions directly violated the Rollins 401k Plan document's terms at "ARTICLE XVI Section 16.1 Nonalienation of Benefits and Spendthrift Clause," which states:

> Except to the extent permitted by law…none of the Accounts, benefits, payments, proceeds or distributions under the Plan will be subject to the claim of any creditor of a Participant or beneficiary or to any legal process by any creditor of such Participant or beneficiary; and neither such Participant nor beneficiary will have any right to alienate, commute, anticipate or assign any of the Accounts, benefits, payments, proceeds or distributions under the Plan except to the extent expressly provided herein.

**Exhibit 1**, Rollins Plan, at § 16.1.

55.    Rollins and the Administrative Committee's repeated actions also directly violated the Internal Revenue Service's ("IRS") determination letter

requiring Rollins and the Administrative Committee to abide by the "terms" to maintain the plan's tax-exempt status.

### i.      Rollins and the Administrative Committee Failed to Investigate and Select Qualified Covered Service Providers

56.     The Rollins Plan required a number of service providers to operate the Plan, including but not limited to investment management.

57.     Rollins and the Administrative Committee had a duty to prudently select service providers by investigating and reviewing their backgrounds and qualifications.

58.     During the relevant time period, Rollins and the Administrative Committee retained Prudential to serve as the Plan's administrator.

59.     In or before 2009, Rollins and the Administrative Committee retained Defendants LPL Financial, LLC ("LPL"), Alliant Insurance Services, LLC ("AIS"), Alliant Retirement Services, LLC ("ARS") and their affiliates and representatives: Sean P. Waggoner ("Waggoner"), and James E. Bashaw & Co. ("Bashaw") (collectively "Covered Service Providers" or "CSP") to provide services to the Plan, including but not limited to advising the Administrative Committee on registered securities under the Securities Act of 1933 and drafting the Plan's Investment Policy Statement.  **Exhibit 2,** Meeting Minutes, pp. 89-90, "Ms. Smith has suggested that it would be time to review the Investment Policy Statement and make sure that it

specifically addresses the Waltham Group. ACTION ITEM: *Alliant will provide a draft Investment Policy Statement* to the Committee for review at the next meeting. This document will include the Waltham Plan."

60.    Additionally, according to the Administrative Committee's Meeting Minutes, the Prudential Services Agreement and Forms 5500, Rollins and the Administrative Committee directed that Waggoner, LPL, AIS and ARS be direct recipients of alienated Rollins Plan's cash assets over multiple Plan years. *See, generally*, **Exhibit 2**, Meeting Minutes; **Exhibit 3**, Prudential Services Agreement; and IRS Forms 5500 at Part II Basic Plan Information, Line 2a.

61.    Rollins and the Administrative Committee did not possess a viable, documented process and methodology for prudent and skilled selection and monitoring of both: (i) the Plan's investments and related expenses, and (ii) the CSP and/or their associated cost(s). *See, generally,* Meeting Minutes, **Exhibit 2.**

62.    Based on the Administrative Committee's Meeting Minutes, Rollins and the Administrative Committee failed to prudently investigate the CSP, including Waggoner, Alliant Insurance Services, and Alliant Retirement Services, before retaining the CSP and/or making payments to CSP from the Plan's trust.  *See, generally,* Meeting Minutes, **Exhibit 2**.

63.    Defendants Alliant Insurance Services, Inc., Alliant Retirement Services, LLC and LPL Financial LLC alienated trust assets by receiving fees

though they were merely serving as "pass-through" entities and not necessary for the operation of the plan. Further, despite receiving revenue from the Rollins 401(k) plan, they failed to supervise the actions of Sean Waggoner who acted as an investment advisor to the Plan, especially in light of disclosure events that would cause Waggoner to be terminated by LPL.

64.   Rollins and the Administrative Committee reported to the IRS and the Department of Labor that, between 2009 and present, Sean Waggoner and his payee "supervisory firms LPL/AIS/ARS" acted, and were paid, as "SERVICE CODE 27" ("Investment Advisory (Plan)").

65.   AIS sells insurance to retail and institutional clients.

66.   AIS was never licensed as a Registered Investment Adviser ("RIA") with the U.S. Securities and Exchange Commission ("SEC").

67.   Alliant Retirement Consulting (CRD #167970) ("ARC") was approved as an advisory firm by the SEC in 2013.

68.   Waggoner     joined     ARC     in     July     2013. https://adviserinfo.sec.gov/individual/summary/2748574

69.   Between 2009 and mid-2013, Waggoner was not working for ARC in an     investment     advisor     or     broker     capacity. https://adviserinfo.sec.gov/individual/summary/2748574

70.   Between 2009 and 2013, Waggoner was not licensed as an investment

advisor with Alliant, the firm he represented himself to the Administrative Committee as working with. https://adviserinfo.sec.gov/individual/summary/2748574

71.    Between 2009 and mid-2013, Waggoner was licensed to offer investment advice through NFP Securities, LPL Financial and James E. Bashaw & Co. https://adviserinfo.sec.gov/individual/summary/2748574

72.    Rollins and its Administrative Committee's Meeting Minutes did not reflect the correct Registered Investment Adviser (RIA) firm for which Waggoner's Series 65 license applied between at least 2009 and mid-2013. https://adviserinfo.sec.gov/individual/summary/2748574

73.    Based on the https://adviserinfo.sec.gov/individual/summary/2748574 timeline of Waggoner's employment, between 2008 and 2009, Waggoner's investment advisor status was at "NFP SECURITIES, INC. (CRD #42046)."

74.    From 2009 to 2015, Waggoner's investment advisor license changed to LPL. https://adviserinfo.sec.gov/individual/summary/2748574

75.    As responsible Plan fiduciaries, Rollins and the Administrative Committee knew or should have known that their "SERVICE CODE 27" ("Investment Advisory (Plan)") representative was not adequately licensed with the firm he claimed to be representing.

76.    Rollins and the Administrative Committee should have investigated

Waggoner's investment advisor license, especially after reviewing the investment advisory payees in the Form 5500 record.

77.    Had   Rollins   and   the   Administrative   Committee   investigated Waggoner's investment advisor license, they would have discovered that between 2006 and mid-2013, Waggoner was never licensed as an investment advisor for AIS and/or ARS.

78.    Specifically, the SEC records show that, between March 2010 and May 2016,  Waggoner  participated  in  eight  private  securities  transactions  without providing notice to his firm, in violation of NASD Rule 3040 and FINRA Rules 3280  and  2010.  **Exhibit 4**, Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 2017054826001, p. 2.

79.    The SEC records also show that, between June 2014 and January 2017, Waggoner  failed  to  provide  prior  written  notice  to  his  firm  about  eight  personal brokerage accounts, in violation of NASD Rule 3050(c) and FINRA Rule 2010. *Id.*

80.    Waggoner was investigated for wrongdoing beginning in 2010 and was terminated from LPL on June 30, 2017, due to "loss of management's confidence." **Exhibit 4**, Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 2017054826001, p. 1.

81.    Following his termination from LPL, Waggoner transferred his license to Cetera Advisor Networks, LLC ("Cetera").

82.    Cetera is a dually registered investment adviser and broker-dealer (CRD #13572) that first registered as an investment adviser with the SEC in 1988.

83.    On August 14, 2020, while he was with Cetera Advisor Networks, Waggoner was suspended by FINRA and the Insurance Commissioner of the State of California for failure to "report an administrative action taken by FINRA to the California Insurance Commissioner." https://adviserinfo.sec.gov/individual/summary/2748574.

84.    Based on Waggoner's record of NASD and FINRA rules violations, Waggoner was not qualified to serve as a CSP to the Plan and/or to recommend investments affecting tens of thousands of workers' assets in the Plan.

85.    Waggoner was also not qualified to serve as a CSP to the Plan because Waggoner failed to register as an investment advisor with the State of Georgia, in violation of the mandatory registration required under O.C.G.A. § 10-5-33.

86.    Rollins and the Administrative Committee failed to investigate and/or review Waggoner.

87.    Although Waggoner was retained by the Administrative Committee in 2006, Administrative Committee Meeting Minutes indicate that the first time the Administrative Committee acted to review Waggoner was late in 2016 or early 2017, ten years after his hiring. **Exhibit 2**, Meeting Minutes, p. 144.

88.    Rollins and the Administrative Committee also failed to investigate

and/or review Waggoner's conflicts of interest.

89.   Had Rollins and the Administrative Committee reviewed the funds' prospectuses and fee disclosures, they would have discovered multiple instances of conflicts of interest through finder's fees from arrangements with his broker-dealers and fund companies.

90.   Rollins and the Administrative Committee also imprudently selected another investment fiduciary/covered service provider, James Bashaw and Bashaw & Co. (CRD #129320).

91.   Specifically, had Rollins and the Administrative Committee investigated James Bashaw, they would have discovered that he had a record of disciplinary actions, including alleged breach of fiduciary duty in June 1988. https://brokercheck.finra.org/individual/summary/1251491.

92.   Had Rollins and the Administrative Committee investigated James Bashaw, they would have also discovered that he was terminated from LPL on September 24, 2014 for "(A) participating in private securities transactions without providing written disclsoure to and obtaining written approval from the firm, (B) borrowing from a client, and (C) engaging in a business transaction that created a potential conflict of interest without providing written disclosure and obtaining written approval from the firm." https://adviserinfo.sec.gov/individual/summary/1251491.

93.     Rollins and the Administrative Committee failed to exercise due care in selecting and retaining the CSP.

94.     The CSP selected and retained by Rollins and the Administrative Committee had a publicly available record of serious regulatory and disciplinary matters, including those described in Paragraphs 78-84, *supra*.

95.     Rollins and the Administrative Committee failed to investigate and/or review the CSP's background and regulatory and disciplinary record(s).

96.     Had Rollins and the Administrative Committee investigated and/or reviewed the CSP's background, they would have discovered that the CSP had a publicly available record of serious regulatory and disciplinary matters, including those described in Paragraphs 77-83 *supra*.

97.     Rollins and the Administrative Committee could have easily discovered the CSP's regulatory and disciplinary matters, including those described in Paragraphs 77-83, *supra*, by making a phone call to FINRA or the SEC, or by running a simple Google search for "Sean P. Waggoner."

98.     The CSP's regulatory and disciplinary record(s), including those described in Paragraphs 77-83, *supra*, which Rollins and the Administrative Committee failed to investigate and/or review, violate the Plan's Investment Policy Statement, which provides that "[m]anagers must have had no ongoing regulatory investigation relating to a specific fund in the Plans." **<u>Exhibit 5</u>**, Investment Policy

Statement,.

99.    Rollins and the Administrative Committee's failure to exercise due care in selecting and retaining the CSP is a breach of the Committee's fiduciary duties as the Plan's trustees.

100.    Rollins and the Administrative Committee's failure to exercise due care in selecting and retaining the CSP is also a violation of the Department of Labor guidelines, which provide that: (i) when selecting a service provider, "a plan fiduciary must engage in an objective process"; (ii) such a process must be "designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided"; and (iii) "such process should be designed to avoid self-dealing, conflicts of interest or other improper influence." *See* https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03.

## ii.    Rollins and the Administrative Committee Failed to Properly Monitor Covered Service Providers

101.    As an appointing fiduciary, Rollins and the Administrative Committee had a continuing duty to monitor and review the performance of the CSP, including Waggoner, to ensure that the CSPs' performance complied with the terms of the Plan and statutory standards, and satisfied the needs of the Plan.

102.   When relying on Waggoner and his payee supervisory firms LPL/AIS/ARS "expert advice" to make investment decisions, Rollins and the Administrative Committee should have conducted a thorough investigation and ensured that Waggoner and LPL/AIS/ARS  offered independent and impartial advice.

103.   Rollins and the Administrative Committee failed to conduct a thorough investigation to ensure that Waggoner and LPL/AIS/ARS offered independent and impartial advice.

104.   Based on the Administrative Committee's Meeting Minutes, Waggoner performed work for the Plan from 2006 through at least 2020.

105.   Based on the Administrative Committee's Meeting Minutes, the Rollins Plan (with an approved IRS Determination Letter), and Forms 5500 for Plan years 2009-2020, Waggoner and his payee "supervisory firms LPL/Bashaw & Co./AIS/ARS" misrepresented his employers and also "trust payees." *See, generally,* **Exhibit 2**, Meeting Minutes; Forms 5500 for Plan years 2009-2020.

106.   Between 2006 and 2017, Waggoner failed to disclose to Rollins and the Administrative Committee, and Rollins and the Administrative Committee failed to investigate, Waggoner's relationship with LPL and Bashaw & Co.

107.   Waggoner reported and represented that his employer between 2006 and May 2015 was AIS, and that thereafter his employer was ARS, and Rollins and

the Administrative Committee failed to investigate Waggoner's relationship with either entity.

108.    In fact, based on SEC records, Waggoner's employer between 2009 and his termination on June 30, 2017, was LPL. *See* https://www.carlsonlaw.com/sean-waggoner-ex-lpl-broker-suspended-over-alleged-private-transactions/        ("Sean Waggoner was associated with LPL financial as an Investment Company and Variable Contracts Products Representative from 2009 until June 2017, when the firm filed notice of his termination in connection to a 'loss of confidence' from management.").

109.    Upon information and belief, Waggoner failed to disclose his relationship with LPL to continue to receive LPL's broker-dealer related securities revenue held at Prudential (e.g., finder's fees, SEC Rule 12b-1 and/or "sub-transfer agency" fees, and soft dollar pay, including potentially a large bonus for selling certain American Funds.

110.    Between 2006 and 2017, Waggoner also failed to disclose to Rollins and the Administrative Committee, and Rollins and the Administrative Committee failed to investigate, that his Investment Adviser Representative ("IAR") license was held by: (i) LPL (CRD #6413); (ii) James Bashaw at Bashaw & Co. (CRD #129320); (iii) Alliant Retirement Consulting (CRD #167970); and (iv) Cetera Advisors Networks, LLC (CRD #13572).

111.   Rollins and The Administrative Committee's failure to investigate Waggoner's IAR license violated the Plan's Investment Policy Statement, which provided that "[t]he Administrative Committee will evaluate investment managers" and "manager[s] will be reevaluated [in case of] [m]isconduct, misrepresentation or lapse in integrity").   **Exhibit 5**, Investment Policy Statement, p. 2-3.

112.   Rollins and the Administrative Committee failed to engage in systematic and regular monitoring of the CSP.   Instead, any purported monitoring by Rollins and the Administrative Committee only occurred as a result of class action lawsuits against other plans.   **Exhibit 2**, Meeting Minutes, pp. 149, 158-9 and 176-7.

113.   Rollins and the Administrative Committee failed to investigate adverse interests and/or conflicts of interest between Waggoner and his supervisory firms, LPL, AIS, ARS and Cetera Advisors Networks, LLC.

114.   Rollins and The Administrative Committee authorized Waggoner to negotiate the revenue sharing agreement with Prudential, which allowed Prudential to further profit from the reduced crediting rate of the Prudential Guaranteed Income Contract.

115.   According to the March 22, 2010, Administrative Committee Meeting Minutes, Waggoner used Rollins and the Administrative Committee's authorization to increase revenue sharing from five to twenty basis points, and thereafter reduced

the crediting rate of Prudential Guaranteed Income Contract for the Plan's trust and participants/beneficiaries at least through 2017.  **Exhibit 2**, Meeting Minutes, pp. 25 and 28 ("Mr. Waggoner addressed this arrangement with Prudential and was able to negotiate an increase of revenue sharing on the Prudential Guaranteed Fund (GIC) to 0.20%, up from 0.05%.")

116.   The increase from five to twenty basis points resulted in costs on the Prudential Guaranteed Income Contract (GIC) rising from $24,000 in 2009 to $100,000 in 2010. By 2017, the fee increased to over $175,000 simply due to the increase in assets held by the GIC.

117.   In the June 28, 2013, meeting, it was noted that 229 participants were using the Prudential Guaranteed Fund as their sole investment. These participants were therefore designated to bear an inequitable burden from the 15 basis point increase. **Exhibit 2**, Meeting Minutes, p. 93.

118.   The Prudential Guaranteed Income Contract's increased revenue sharing reduced the crediting rate to every one of the approximately seven thousand participants/beneficiaries invested in the GoalMaker program. **Exhibit 2**, Meeting Minutes, pp.152 (As of June 28, 2017, there were 6,988 participants or 62.8% of the participants in the Plan utilizing the GoalMaker program, with assets of $116,498,822).

119.   Rollins and the Administrative Committee's failure to prudently

investigate the increased revenue sharing on the Prudential Guaranteed Income Contract was a violation of ERISA Section 204(g)(1), which prohibits amendments that decrease defined contribution plan participants' future account balances.

120.   In 2016, Rollins and the Administrative Committee, relying on Waggoner's advice, added the Victory Sycamore Established Value A ("VETAX") fund to the Plan's portfolio solely because it paid revenue sharing fees of 0.35% per year.  **Exhibit 2**, Meeting Minutes, pp. 137-8, 140-1, (showing the available Victory Sycamore Established, Value I ("VEVIX") fund, with the same holdings, the same management, etc. and a higher annual yield).

121.   Rollins and the Administrative Committee should have investigated the VETAX and VEVIX funds.

122.   Had Rollins and the Administrative Committee investigated the VETAX and VEVIX funds, it would have learned that the VEVIX fund was a less costly, better performing fund.

123.   Had Rollins and the Administrative Committee investigated the VETAX and VEVIX funds, it would have realized that the only reason Waggoner recommended the more costly VEVAX fund was due to the fact that CSP pay was predicated on selling funds with SEC Rule 12b-1 fees and the VEVAX fund contained SEC Rule 12b-1 fees (whereas the VEVIX fund did not).

124.   Rollins and the Administrative Committee's choice of the VEVAX

fund resulted in a compounded loss of at least fifty-one basis points (0.51%) in annual returns that would have been generated by the VEVIX fund.

125.   In the June 28, 2017, meeting, the committee discussed fund revenue reduction. "There are funds on the lineup that have multiple share classes that provide for lower revenue share. The Guaranteed Income Fund is flexible in the revenue share that can be generated, the fund currently provides for 20 basis points ($195,000). This could be reduced to 10 basis points, and this would provide a direct increase in crediting rate to the participants who utilize this fund, 2.63% to 2.73%." Additionally, the Committee highlighted six funds, including the Victory Sycamore Established Value fund, that offered opportunities for reducing expense/revenue share. This shows the Committee was aware of the availability of cheaper share classes and the adverse effect the increase in costs had on returns. **Exhibit 2**, Meeting Minutes p. 151.

126.   Rollins and the Administrative Committee authorized Waggoner to draft and/or modify the Plan's Investment Policy Statement.

127.   With the approval of Rollins and the Administrative Committee, Waggoner drafted and/or modified the Plan's Investment Policy Statement to allow the primary criteria for selection and removal of a registered security in the Plan to be "past performance." **Exhibit 5**, Investment Policy Statement, p. 2 ("the Administrative Committee will generally apply the following applicable

31

performance standards…. Equity and fixed-income actively managed funds should rank in the top 50% of the applicable Morningstar Category in either a three- or a five- year time period.")

128.  Rollins and the Administrative Committee's approval of the Plan's Investment Policy Statement to rely on "part performance" was a violation of SEC Rule 156, which states that it is misleading to convey to an investor that a mutual fund's past performance can predict future performance.  *See* 17 CFR § 230.156.

129.  Rollins and the Administrative Committee's approval of the Plan's Investment Policy Statement to rely on "part performance," and its reliance on "part performance" was a breach of its fiduciary duty.

130.  Rollins and the Administrative Committee's reliance on "part performance" resulted in a cycle of: (i) repeatedly approving/adding new funds; (ii) forcing participants/beneficiaries' money into the new funds; (iii) watching the fund underperform; (iv) adding the new fund to the "Watch List"; and (v) making excuses for their lagging returns or ultimately removing the fund from the Plan's portfolio. *See, generally,* **Exhibit 2**, Meeting Minutes (showing that the following funds were placed on the "Watch List" at various times: Alger Mid Cap Growth Fund, American Funds Capital World Growth and Income Fund, American Funds EuroPacific Growth Fund, American Funds Growth Fund of America R4 Fund, Franklin Growth Fund, Goldman Sachs Mid Cap Value Fund (GCMAX), Hartford MidCap Y Fund,

Metropolitan West Total Return Bd Plan, Morgan Stanley Inst Discovery I, Oakmark Equity and Income, T. Rowe Price New Horizons, Victory Diversified Stock A, and Victory Sycamore Established Value A).

131.   Rollins and the Administrative Committee's reliance on "past performance" caused at least $7 million in damages to the Plan's trust and participants/beneficiaries by their 2009 decision to replace the Dodge and Cox Balanced with the Oakmark Equity and Income Fund.

132.   On April 1, 2009, Rollins and the Administrative Committee adopted Waggoner's recommendation to remove the Plan's default investment fund, Dodge & Cox Balanced. **Exhibit 2**, Meeting Minutes, p. 1.

133.   On April 1, 2009, Rollins and the Administrative Committee executed a corporate resolution to direct Prudential to sell all of the Dodge & Cox Balanced Fund's assets (representing the entire trust corpus' shares of this security worth an estimated $18,929,283 of the participants'/beneficiaries' accounts) and put the resulting cash into lower-yielding, more costly Oakmark Equity and Income Fund. *Id.*

134.   Rollins and the Administrative Committee replaced the Dodge & Cox Balanced Fund, yielding 2.36%, with the Oakmark Equity and Income Fund, yielding 1.15%, or 105% less than the Dodge & Cox Balanced Fund. **Exhibit 2**, Meeting Minutes, pp. 18-19.

135.   Rollins and the Administrative Committee replaced the Dodge & Cox Balanced Fund with the significantly lower-yielding Oakmark Equity and Income Fund which paid 300% more in revenue sharing than the Dodge & Cox Balanced Fund. *See Id*. and 2009 Form 5500

136.   Immediately following its selection, the Oakmark fund's top ranking performance upon which it was selected began reverting to the mean. "The fund was defensively positioned in 2008 and is now having a little difficulty keeping pace in the rally. The fund is at 14.66% year to date which ranks that in the 85th percentile." **Exhibit 2**, Meeting Minutes, p. 19.

137.   With respect to the year-to-date performance, "Mr. Waggoner noted that the criteria used in the Investment Policy Statement (IPS) for fund analysis is the 3 and 5 year time frames." **Exhibit 2**, Meeting Minutes, p. 26.

138.   While referencing the fund's top quartile annualized three- and five-year returns, the participants did not benefit from the past performance relied on for its selection and only experienced the bottom-quartile year-to-date returns.

139.   On January 6, 2012, the Committee failed to place the fund on the Watch List despite "not meeting IPS Standards." *See* paragraph 137, *supra* and **Exhibit 2**, Meeting Minutes, p. 65.

140.   In the following Committee meeting, the fund was again not placed on watch despite "not meeting IPS Standards" in violation of ERISA §1104(a)(1)(d)

and its high-quality bond portfolio is emphasized as "a relatively strong down side protector." **Exhibit 2**, Meeting Minutes, p. 71.

141.   The fund was finally placed on the watch list in the October 5, 2012, meeting for bottom quartile returns in the one- and three-year performance periods. **Exhibit 2**, Meeting Minutes, p. 79-80.

142.   In the February 5, 2013 meeting, the Administrative Committee acknowledged that "[i]f the Committee were to grade the fund, it would receive an 'F.'" **Exhibit 2**, Meeting Minutes, p. 84.

143.   Despite nearly four years of bottom-quartile returns, the Administrative Committee failed to act by maintaining the fund's watch list status rather than reevaluating its selection and monitoring process. *Id.*

144.   In the following two quarters, Waggoner reviewed alternatives with the Committee, however, they sought more information about one alternative fund which they subsequently decided not to use. **Exhibit 2**, Meeting Minutes, pp. 88, 89 and 93.

145.   After a brief reprieve from the watch list in 2014, on February 26, 2015, the Administrative Committee's Meeting Minutes note that "[t]he third quarter information was reviewed.  The Oakmark Equity and Income Fund is currently underperforming for the three and five-year time frames….The equity position has grown to 75%, which has caused Morningstar to classify this an aggressive fund."

**Exhibit 2**, Meeting Minutes, p. 111.

146.   It became clear in the August 9, 2019 meeting that the fund's strategy and risk profile had dramatically shifted. **Exhibit 2**, Meeting Minutes, p. 175.

147.   In 2014, nearly the entire 40% fixed income portion of the portfolio was invested in highly rated U.S. Bonds, however, by 2019, up to 20% of the fund's portfolio could be invested in high yield (junk) bonds, a decision that proved to be detrimental. **Exhibit 2**, Meeting Minutes, pp. 103, 198.

148.   Waggoner and the Administrative Committee failed to address the significant shift in investment strategy and risk as mandated by the IPS: "A fund will be reevaluated if the fund experiences: a real or perceived change in investment style or discipline **Exhibit 5**, Investment Policy Statement, pp. 2-3.

149.   The decision to finally remove the Oakmark Equity and Income Fund from the Plan occurred on September 14, 2020, after a decade with significant periods on the watch list, bottom-quartile returns, and investment style and risk profile changes, all of which repeatedly failed the Plan's IPS monitoring standards. **Exhibit 2**, Meeting Minutes, p. 198-9.

150.   In 2016, relying on the fund's past performance, Rollins and the Administrative Committee added to the Plan's portfolio a costly, lower-yielding (0.95%) version of the Victory Sycamore Established Value A fund, even though an otherwise identical, but less costly and higher-yielding (1.28%) version was

available.

### iii. **Rollins and the Administrative Committee Failed to Properly Oversee Payments to the Covered Service Providers**

151.   None of the CSP retained by Rollins and the Administrative Committee added value to the Plan.

152.   Instead, these CSP harmed the Plan's trust and the Plan's participants/beneficiaries by failing to comply with ERISA § 408 to be "necessary for the operation of the plan" to receive "reasonable compensation."

153.   Between 2009 and present, the CSP were paid by Rollins and the Administrative Committee from the Rollins Plan's trust assets.

154.   According to Administrative Committee Meeting Minutes and Forms 5500 from 2009 to 2020, Rollins and the Administrative Committees directed Prudential to deduct more than $1 million from the Plan's trust's assets and wire the proceeds to unnecessary and conflicted functional fiduciaries (i.e., Waggoner and his payee "supervisory firms" LPL, AIS and ARS).

155.   For example, between 2014 and present, ARS was paid $80,752 per each plan year.

156.   The cost of $80,750 per each plan year was set by Waggoner as his and ARS compensation via the Prudential Services Agreement signed by Rollins and the Administrative Committees. **Exhibit 3**, Prudential Services Agreement, p. 72.

157.   Rollins and the Administrative Committee failed to investigate the reasonableness of the $80,750 per each plan year fee paid to ARS.

158.   There was no evidence in the Administrative Committee Meeting Minutes that the Administrative Committee ever researched Alliant Insurance Services' other clients at www.efast.dol.gov and compared the Plan's direct compensation to ARS of $80,750 each plan year to other AIS/ARS clients.

159.   Had Rollins and the Administrative Committee conducted a prudent investigation into the reasonableness of the $80,750 per each plan year fee paid to ARS/AIS, Rollins and the Administrative Committee would have discovered that the fee was excessive.

160.   Rollins and the Administrative Committee should have known that $80,750 per each plan year paid to ARS was excessive because, based on ARS's other clients' Forms 5500, ARS's median pay for the same services under the same agreements was only $24,216 per year.

161.   Rollins and the Administrative Committee's failure to prudently investigate the reasonableness of the $80,750 per each plan year fee paid to ARS/AIS was a breach of their fiduciary duty and duty of loyalty to the Plan's trust and participants/beneficiaries.

162.   In 2012, Rollins and the Administrative Committees filed an annual report (Schedule C, Form 5500) with the DOL and IRS stating that both Bashaw &

Co. and LPL were compensated $50,000 and $47,000 respectively for the same services provided to the Rollins Plan.

163.   The next plan year, Rollins and the Administrative Committees directed Prudential to pay the Plan's trust assets directly to both Bashaw & Co. and ARS for the same services provided to the Rollins Plan.

164.   Upon information and belief, Bashaw & Co. was a flow through or "shell" company that served as a pass-through firm to pay both James Bashaw and Waggoner individually.

165.   Rollins and the Administrative Committee's approval of compensation paid to multiple CSP for the same services was a breach of fiduciary duty to the Plan's trust and participants/beneficiaries.

166.   There is no evidence in any of the Administrative Committee Meeting Minutes that LPL, James Bashaw or James E. Bashaw & Co. provided any services to the Rollins Plan.

167.   Rollins and the Administrative Committee's approval of compensation paid to LPL, James Bashaw or James E. Bashaw & Co. when no services were provided by these CSP to the Plan was a breach of fiduciary duty to the Plan's trust and participants/beneficiaries.

168.   Rollins and the Administrative Committee's approval of compensation paid to LPL, James Bashaw or James E. Bashaw & Co. when no services were

provided by these CSP to the Plan was also a violation of ERISA § 408(b)(2).

169.   Based on the Forms 5500, the total amount paid directly from the Rollins Plan's trust to CSP for unnecessary services between 2009 and present was $1,007,613.

170.   The Code 27 advisor CSPs were paid $1,007,613 by Rollins and the Administrative Committee from the Rollins Plan's trust assets despite the fact that the CSP had a publicly available record of serious regulatory and disciplinary matters.

171.   The $1,007,613 paid to CSP for unnecessary services between 2009 and present was paid in violation of ERISA and the Internal Revenue Code § 4975, thereby jeopardizing the tax-exempt status of the Plan's participants/beneficiaries previously tax-exempt contributions and untaxed investment earnings for many years.

172.   Under the Plan's documents, to restore the lost value to the Plan from the $1,007,613 paid to CSPs for unnecessary services between 2009-present using an estimated "Recovery Date" of November 25, 2021, an additional $530,995.72 would need to be deposited into the Plan's as an IRS Restorative Payment.

iv.   **Rollins and the Administrative Committee Allowed Revenue Sharing and Non-Uniform Revenue Sharing Allocations Among Participants/Beneficiaries in the Plan, Failed to Make Alternative Lower Cost Investments, And Failed to Disclose Alternative Lower Cost Investments to the Plan's Participants/Beneficiaries**

173.   Between 2006 and present, Prudential has served as a sub-accounting firm for the mutual funds in the Rollins Plan.

174.   Between 2006 and present, Prudential has been compensated for its services as a sub-accounting firm for the mutual funds in the Rollins Plan through SEC Rule 12b-1 and/or "sub-transfer agency" fees (the "Prudential Expenses").

175.   Under the Rollins Plan's Prudential Services Agreement, executed by Rollins and the Administrative Committee, Prudential then allocated certain provider "pay deductions from the trust" in the form of revenue sharing to the participants'/beneficiaries' sub-accounts.

176.   Upon information and belief, the Plan's revenue sharing agreement provided that the Plan does **not** credit the affected participants' original fund from which the SEC Rule 12b-1 and/or "sub-transfer agency" fees are taken, but instead credits "future dollar" investment allocations.

177.   Upon information and belief, Rollins and the Administrative Committee acknowledged in writing that they received information to determine the imprudence of the revenue sharing approach.

178.   The revenue sharing approach knowingly and deliberately selected by

Rollins and the Administrative Committees is widely known as "the dirty little secret of the mutual fund industry," and accounts for more than $2 billion annually by the industry. *See, e.g.,* John P. Freeman, <u>The Mutual Fund Distribution Expense Mess</u>, 6/28/2007, The Journal of Corporation Law.

179.   This revenue sharing approach knowingly and deliberately selected by Rollins and the Administrative Committees was an investment expense that adversely affected the Plan's mutual funds' performance and income (yields).

180.   Specifically, the Prudential expenses were taken daily from each of the Plan's mutual funds based on the prospectus (commensurately reducing each mutual fund's net asset value).

181.   Because trading in a 401(k) plan is done on an omnibus, not individual level, the mutual fund companies then sent their collected, aggregated revenue sharing amounts back to the recordkeeper (Prudential, in this case) for each specific fund on a daily basis.

182.   However, the *affected* individual participants in the Plan only received their "credits" more than 90 days later and their "credits" were only "estimates," which prevented the "credits" from compounding as quickly as those of cheaper equivalent funds (the "Missed Monthly Yields").

183.   Fund yields on the more expensive share classes were often depleted by more than thirty percent (>30%), so the Missed Monthly Yields also directly

harmed every investor in the affected mutual fund dramatically more than the revenue sharing credit's true worth.

184.   Furthermore, upon information and belief, if and/or when Plan participants/beneficiaries changed their investment elections and/or separated from service, they did not receive any "credits" at all.

185.   The Plan's participants/beneficiaries' revenue-sharing deductions and crediting amounts also varied dramatically by each fund chosen and kept by Rollins and its Administrative Committee.

186.   This lack of uniformity violated ERISA's uniform benefits, rights and features requirements.  26 CFR § 1.401(a)(4)-4.

187.   From 2009 to 2014, two of the 12 mutual funds on the menu selected by Rollins and the Administrative Committee paid zero SEC Rule 12b-1 and/or "sub-transfer agency" fees.

188.   From 2009 to 2014, in violation of the Plan Document's uniform and non-discrimination provisions, participants/beneficiaries in the remaining 10 out of 12 funds shouldered the lion's share of the Prudential recordkeeping burden by paying the SEC Rule 12b-1 and/or "sub-transfer agency" fees, which were used primarily to compensate Prudential for recordkeeping.

189.   From 2015 to 2017, five of 15 funds on the menu selected by Rollins and the Administrative Committee paid zero SEC Rule 12b-1 and/or "sub-transfer

agency" fees.

190.   From 2015 to 2017, in violation of the Plan Document's uniform and non-discrimination provisions, participants/beneficiaries in the remaining 10 out of 15 funds shouldered the lion's share of the Prudential recordkeeping burden by paying the SEC Rule 12b-1 and/or "sub-transfer agency" fees, which were used primarily to compensate Prudential for recordkeeping.

191.   Upon information and belief, those participants/beneficiaries in the funds that paid the SEC Rule 12b-1 and/or "sub-transfer agency" fees paid more than $54 per participant in such fees in violation of 26 CFR § 1.401(a)(4)-4(a), which requires all optional forms of benefits, rights and features provided under the Plan to be made available to Plan beneficiaries in a nondiscriminatory manner.

192.   As the participants/beneficiaries in the funds that paid the SEC Rule 12b-1 and/or "sub-transfer agency" fees' accounts increased in size (and they doubled every five to six years from biweekly contributions and reinvested dividends and interest), the SEC Rule 12b-1 and/or "sub-transfer agency" fees to Prudential also increased, even though the benefits provided by Prudential remained the same.

193.   The payment, and compounding, of the SEC Rule 12b-1 and/or "sub-transfer agency" fees paid to Prudential resulted in additional lost opportunity costs to the Plan's participants/beneficiaries.

194.   Specifically, the payment, and compounding, of the SEC Rule 12b-1 and/or "sub-transfer agency" fees paid to Prudential, decreased the net asset value ("NAV") or price of the affected funds.

195.   Rollins and the Administrative Committee hid the true share cost of the Plan's funds from the Plan's participants/beneficiaries.

196.   Had Rollins and the Administrative Committee disclosed the true costs to Plan participants, the participants likely would have demanded that Rollins and its Administrative Committee take different, less-costly actions.

197.   Rollins and the Administrative Committee should have been more transparent in how it allocated Prudential's recordkeeping expenses to the Plan's participants/beneficiaries.

198.   Rollins and the Administrative Committee should have allocated Prudential's recordkeeping expenses equally across all Plan participants/beneficiaries.

199.   Rollins and the Administrative Committee should not have allowed compounding of Prudential's recordkeeping expenses.

200.   By allowing the SEC Rule 12b-1 and/or "sub-transfer agency" fees to Prudential to be paid by only some of the Plan's participants, and by allowing the SEC Rule 12b-1 and/or "sub-transfer agency" fees paid to Prudential to compound as the participants' accounts increased in size, the Administrative Committee

breached its duty as a fiduciary of the Plan.

201.   Rollins and the Administrative Committee's repeated, deliberate decisions and actions in allowing the SEC Rule 12b-1 and/or "sub-transfer agency" fees to Prudential to be paid by only some of the Plan's participants and allowing the SEC Rule 12b-1 and/or "sub-transfer agency" fees paid to Prudential to compound as the participants' accounts increased in size, prevented participants/beneficiaries' access to an investment menu of faster compounding and cheaper yet identical mutual funds.

202.   In December 2009, Prudential's recordkeeping fee was $56.37 per participant. Because the Committee approved their revenue sharing payment model, by June 2017 that fee increased to $67 per participant. After being required to compete for the business, Prudential agreed to reduce their fee 36% to $43 per participant. "The reduction of fees from the current $67.00 per account to $43.00 per account will result in a decrease of approximately $253,000. This will result in a direct impact to plan participants: this will allow the reduction in expense ratios for the funds in the lineup." **Exhibit 2**, Meeting Minutes, pp. 28 and 151.

203.   The Committee's lack of oversight and inappropriate delegation of CSP compensation to Waggoner allowed for the overcharging of recordkeeping expenses for years and enabled the continued use of expensive and imprudent funds and share classes.

**v.**   **Rollins and the Administrative Committee Failed to Select Less Costly Investments and Failed to Monitor Plan Investments Under 29 U.S.C. §§ 1132(A)(2) and (3)**

204. In devising and implementing strategies for the investment and management of trust assets, Rollins and the Administrative Committee, as trustees of the Plan, had a duty to minimize costs. Restatement 3d of Trusts, § 90 (2012).

205. Rollins and the Administrative Committee had a duty to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." *Id.*

206. Adherence to this duty required the regular performance of an "adequate investigation" of existing investments in the Plan to determine whether any of the Plan's investments were "improvident" or if there was a "superior alternative investment" to any of the Plan's holdings. *Id.*

207. The Goldman Sachs Mid Cap Value A fund held a large portion of the Plan's, trust's and participants'/beneficiaries' assets.

208. The Goldman Sachs Mid Cap Value A fund was one of the most discussed funds in the Administrative Committee Meeting Minutes (appearing more than 60 times).

209. In 2009, Rollins and the Administrative Committee maintained the Goldman Sachs Mid Cap Value A fund even though an identical, less costly, and higher-yielding fund was available and would have been a more prudent choice for

the Plan's trust and participants/beneficiaries. **Exhibit 2**, Meeting Minutes, pp. 4.

210. Rollins and the Administrative Committee ignored an identical, less costly, and higher-yielding fund available as an alternative to the Goldman Sachs Mid Cap Value A fund more than 60 times, even though the alternative fund appeared on the same page as the Goldman Sachs Mid Cap Value A fund's prospectus, was run by the same management company and had the same managers with the same start dates.

211. Rollins and the Administrative Committee failed to choose the lower-cost, higher-yielding and better performing identical and related fund share class (Goldman Sachs Mid Cap Value Instl) with cost 0.74% vs. 1.14% and yield 0.80% vs. 0.43% (data in prospectuses from www.sec.gov/edgar for 2016).

212. Rollins and the Administrative Committee followed Waggoner's advice when it chose the more costly Goldman Sachs Mid Cap Value A fund to generate revenue sharing, instead being directly billed by Prudential for its services. **Exhibit 2**, Meeting Minutes, pp. 13-14.

213. Rollins and the Administrative Committee's reliance on Waggoner's advice was not reasonably justified under the circumstances.

214. Rollins and the Administrative Committee should have conducted an independent, thorough, and impartial investigation into the basis for the decision to invest in the more costly Goldman Sachs Mid Cap Value A fund.

215.    Had Rollins and the Administrative Committee investigated the basis for the decision to invest in the more costly Goldman Sachs Mid Cap Value A fund, Rollins and the Administrative Committee would have known that the decision to invest in the more costly Goldman Sachs Mid Cap Value A fund was not in the best interest of the Plan's participants and beneficiaries.

216.    In choosing the more costly Goldman Sachs Mid Cap Value A fund, Rollins and the Administrative Committee breached their duty to act with a degree of care that could be expected under all circumstances by reasonable beneficiaries and participants.

217.    In choosing the more costly Goldman Sachs Mid Cap Value A fund, Rollins and the Administrative Committee failed to adhere to the DOL regulations mandating that a decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

218.    Rollins and the Administrative Committee's decision in choosing the more costly Goldman Sachs Mid Cap Value A fund cost the Plan's trust, and thus the Plan's participants/beneficiaries at least $168,000 annually.

219.    Furthermore, the identical "True No-Load" Goldman Sachs Mid Cap

Value Instl fund made 27.81% more (1.854% per year) over 15 years than Rollins and the Administrative Committee's selected fund.

220.   This means that Rollins and the Administrative Committee's choice of the more costly Goldman Sachs Mid Cap Value A fund caused the Plan's participants/beneficiaries to lose a chance to make the net difference of 1.604% each year. On average, this cost the participants/beneficiaries $168,144.42 each year ($1,177,010.93 in total).

221.   In failing to consider and select the less costly Goldman Sachs Mid Cap Value Instl fund, Rollins and the Administrative Committee acted imprudently.

222.   Rollins and the Administrative Committee's failure to consider and select the less costly Goldman Sachs Mid Cap Value Instl fund was a breach of its fiduciary duty.

223.   Rollins and the Administrative Committee also failed to disclose the existence of the less costly Goldman Sachs Mid Cap Value Instl fund to the Plan's participants/beneficiaries.

224.   Rollins and the Administrative Committee's failure to disclose the existence of the less costly Goldman Sachs Mid Cap Value Instl fund to the Plan's participants/beneficiaries was a breach of the Administrative Committee's duty to disclose.

225.   Rollins and the Administrative Committee failed to switch from the

American Funds Growth Fund of Amer A to the identical, but less costly alternative R6 shares of this fund, even though the A share class was mentioned more than 26 times in the Administrative Committee Meeting Minutes.

226.    Between 2009 and 2018, Rollins and the Administrative Committee failed to timely switch from the American Funds Europacific Growth R4 to the identical, but less costly R6 Fund.

227.    Rollins and the Administrative Committee did not switch to the R6 Fund until after reviewing the Nordstrom lawsuit in 2018, even though the R6 Fund was mentioned more than 20 times in the Administrative Committee Meeting Minutes.

228.    Rollins and the Administrative Committee did not switch from the Victory Sycamore Established Value A to the identical, but less costly R6 Fund until after reviewing two lawsuits in 2017.  **Exhibit 2**, Meeting Minutes, pp. 149-150.

229.    The Administrative Committee failed to timely add less costly index funds to the Plan.  *See, e.g.* **Exhibit 2***,* Meeting Minutes, p. 32 (index funds were not added despite one Committee member's proposal to do so; "Mr. Anthony recommended that the Committee consider adding an index fund to the bond category. The index option has low expense ratios and will give the baby boomers another option in the category.") The Committee failed to act for five years until 2015 when the Vanguard Total Bond Market Index fund was finally added.

## E.  Damages Caused by Defendants' Violations

230.   Rollins and its Administrative Committees actions described above cause the Plan's trust more than an estimated $50,000,000 in damages.

231.   In addition to damages described *supra*, Rollins and the Administrative Committee's votes and actions in retaining and following the advice of Waggoner and his AIS team members caused more than $7,000,000 in damages due to the selection of the Oakmark Equity and Income fund to replace the Dodge & Cox Balanced fund.

232.   Rollins and its Administrative Committees wasted the Plan's participants/beneficiaries' biweekly contributions into funds with unnecessary fund managers charging more than 1% in expense ratios and transaction costs every year, which cost an estimated $3,091,939 in lost opportunity annually.

## VII.   CAUSES OF ACTION

## COUNT I

**Action under 29 U.S.C. §§ 1132(a)(2) and (3) for Breach of Duties of Loyalty and Prudence for Imprudent and Disloyal Monitoring of Plan Investments during the Class Period, which Caused Losses to the Plan and Plaintiffs (Violation of 29 U.S.C. § 1104 by Rollins, the Administrative Committee and the Committee Members)**

233.   Plaintiffs restate and incorporate in Count I the allegations contained in paragraphs 1 through 232.

234.   At all relevant times, Rollins, the Administrative Committee and the Committee Members were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. §1102(a)(1), or de facto fiduciaries within the meaning of ERISA, § 3(21)(A), 29 U.S.C. §1002(21)(A), or both, who exercised authority and control with respect to the management of the Rollins Plan and Plan assets.

235.  Rollins, the Administrative Committee and the Committee Members were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

236.   Rollins, the Administrative Committee and the Committee Members were obligated to, among other things, select prudent investment options, eliminate imprudent options, evaluate the merits of the Plan's investments on an ongoing basis, monitor Plan investments and remove any investments that they determined were not prudent, defray reasonable expenses of administering the Plan, and take all necessary steps to ensure that the Plan assets were invested prudently.

237.   In making investment decisions for or on behalf of the Plan, Rollins, the Administrative Committee and the Committee Members were required to consider all relevant factors under the circumstances, including without limitation

alternative investments that were available to the Plan, the CSP's financial interest in placing the Plan assets in funds that paid out revenue sharing, and whether the higher costs of actively managed funds were justified by a realistic expectation of higher returns.

238.   Rollins, the Administrative Committee and the Committee Members breached their duties of loyalty and prudence by failing to implement a prudent procedure for evaluating, selecting, and monitoring Plan investment options.

239.   Rollins, the Administrative Committee and the Committee Members breached their duties of prudence and loyalty by failing to monitor Plan investment options during the Class Period, in particular the : Alger Mid Cap Growth Institutional I; American Funds Capital World Gr&Inc R4; American Funds EuroPacific Growth R4; American Funds Growth Fund of Amer R4; Franklin Growth Adv; Goldman Sachs Mid Cap Value A; Hartford MidCap Y; Metropolitan West Total Return Bd Plan; Morgan Stanley Inst Discovery I; Oakmark Equity and Income Investor; T. Rowe Price New Horizons; Victory Diversified Stock A; Victory Sycamore Established Value A; Victory Sycamore Small Company Opp I.

240.   Rollins, the Administrative Committee and the Committee Members breached their duties of loyalty and prudence by selecting and maintaining Plan investment options despite the fact that they knew or reasonably should have known that said Plan investment options were unreasonably expensive when compared to

readily available less expensive comparable and better performing fund options and included fees that were not incurred solely for the benefit of Plan participants and beneficiaries.

241. Rollins, the Administrative Committee and the Committee Members knew or should have known that revenue sharing and other kickback payments were paid by the Plan to Prudential and the CSPs, that such payments were not reasonable compensation for any actual services provided by Prudential and the CSPs, but rather were merely *quid pro quo* kickback payments for including Plan investment options (including funds listed in Paragraph 237) in the menu of funds made available to Plan participants and beneficiaries.

242. Defendants' preferential treatment and improper monitoring processes during the Class Period included but were not limited to:

> A. Allowing Prudential and other conflicted CSPs to improperly influence fund selection and retention decisions.
>
> B. Adopting a monitoring process that relied upon subjective opinions of conflicted fiduciaries and CSPs to determine whether to remove a fund,
>
> C. Selecting and retaining for years Plan investment options with unreasonable expenses and poor performance relative to other investment options that were readily available to the Plan such

as low cost passively managed funds or the least expensive available share class of actively managed funds with a long-standing history of outperformance.

D. Including investment funds with expense ratios far in excess of other options available to the Plan, such as institutional share class mutual funds and collective trust funds, and

E. Providing numerous actively managed funds with much higher fees compared to index funds, which resulted in significant underperformance to lower-cost higher-performing investment alternatives that were readily available and appropriate.

243. Rollins, the Administrative Committee and the Committee Members failed to adequately, prudently, and loyally consider alternatives that were identical (same manager, same management company, same holdings; the only difference is the daily costs levied that burdens the trust and participants/beneficiaries) to the funds listed in Paragraph 239, *supra,* at all relevant times during the Class Period.

244. By their actions and omissions in causing these funds listed in Paragraph 239, *supra,* to be added and retained as options in the Plan, Rollins, the Administrative Committee and the Committee Members breached their duties of loyalty and prudence.

245.   Rollins, the Administrative Committee and the Committee Members further breached their duties of loyalty and prudence by selecting and continuing to offer Plan investment options despite the fact that they knew or reasonably should have known that the performance of the Plan investment options was inferior to the performance of both actively and passively managed funds within the same stated indices that were significantly less expensive.

246.   An appropriate investigation into the merits of the funds listed in Paragraph 237, in particular the impact of excessive fees charged by the funds listed in Paragraph 237 had on the Plan participants' and beneficiaries' retirement savings, would have shown the ready availability of far less expensive options with comparable and often better performance.   Such an investigation would have revealed to a reasonably prudent fiduciary that the funds listed in Paragraph 237 were imprudent and were causing the Plan to waste tens of millions of dollars of the Plan's participants' and beneficiaries' retirement savings.

247.   But for Rollins, the Administrative Committee and the Committee Members' breaches, different funds with better performance and lower fees would have been selected for the Plan.

248.   Rollins, the Administrative Committee and the Committee Members' breaches in the selection and retention of the funds listed in Paragraph 237 caused millions of dollars in losses to the Plan and Plaintiffs.

249. Had Rollins, the Administrative Committee and the Committee Members not breached their duties of loyalty and prudence, the losses suffered by the Plan and Plaintiffs would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and Plaintiffs and other Class Members lost tens of millions of dollars of retirement savings.

250. Total losses will be determined at trial after complete discovery in this case and are continuing.

251. Each Committee Member is personally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Committee Member also is personally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(3) to make good to Plaintiffs the losses they suffered as a result of Rollins, the Administrative Committee and the Committee Members' breach of fiduciary duty.

252. Rollins, the Administrative Committee and the Committee Members knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to

remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of his/her co-fiduciary duties under 29 U.S.C. §1105(a).

## COUNT II

**Action under 29 U.S.C. §§ 1132(a)(2) and (3) for Breach of Duties of Loyalty and Prudence for Imprudent and Disloyal Monitoring of Plan Service Providers during the Class Period, which Caused Losses to the Plan and Plaintiffs (Violation of 29 U.S.C. § 1104 by Rollins, the Administrative Committee and the Committee Members)**

253.   Plaintiffs restate and incorporate in Count II the allegations in paragraphs 1 through 232.

254.   At all relevant times, Rollins, the Administrative Committee and the Committee Members were fiduciaries within the meaning of ERISA, 29 U.S.C. §1002(21)(A), by exercising authority and control with respect to the management of the Plan and Plan assets.

255.   As fiduciaries to the Plan, Rollins, the Administrative Committee and the Committee Members were required to administer the Plan and manage Plan assets for the sole and exclusive benefit of Plan participants and beneficiaries, defray reasonable expenses of administering the Plan, and to act with the care, skill, diligence, and prudence required by ERISA.

256.   Rollins, the Administrative Committee and the Committee Members had an ongoing duty to loyally and prudently select and periodically monitor Plan CSPs, to solicit bids from other providers to ensure that the fees and costs incurred

by the Plan were competitive and reasonable, and to replace any CSPs that they determined were not prudent.

257.   Rollins, the Administrative Committee and the Committee Members breached their duty ongoing duty to loyally and prudently select and periodically monitor Plan service providers, to solicit bids from other providers, and to replace any providers that they determined were not prudent.

258.   More specifically, Rollins, the Administrative Committee and the Committee Members breached their fiduciary duties by failing to engage in a prudent process for selecting and retaining Prudential as the Plan's recordkeeper. Rollins, the Administrative Committee and the Committee Members failed to: monitor the amount of the revenue sharing and other sources of compensation received by Prudential, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Rollins, the Administrative Committee and the Committee Members failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plan's assets grew, the asset-based revenue sharing payments to Prudential grew accordingly, even though the services provided by Prudential did not increase at a similar rate. This caused the recordkeeping compensation paid to Prudential to exceed a reasonable fee for the services provided, which continues to date.

259.   Rollins, the Administrative Committee and the Committee Members' breach of their duties caused them to unreasonably overpay for recordkeeping services to the Plan, to increase costs for the Plan and Plaintiffs, and to significantly reduce the retirement benefits in Plaintiffs' accounts. This conduct was a breach of fiduciary duty.

260.   Total losses will be determined at trial after complete discovery in this case and are continuing.

261.   Each Committee Member is personally liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Committee Member also is personally liable under 29 U.S.C. §§ 1132(a)(3) and 1109(a) to make good to the Plaintiffs the losses they suffered due to the excessive fees as alleged above.

262.   Rollins, the Administrative Committee and the Committee Members knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

**Action under 29 U.S.C. §§ 1132(a)(2) and (3) for Breach of Duties of Loyalty and Prudence for Imprudent and Disloyal Monitoring of Plan Fiduciaries during the Class Period, which Caused Losses to the Plan and Plaintiffs (Violation of 29 U.S.C. § 1104 by Rollins, the Administrative Committee and the Committee Members)**

263.   Plaintiffs restate and incorporate in Count II the allegations in paragraphs 1 through 232.

264.   At all relevant times, Rollins, the Administrative Committee and the Committee Members were fiduciaries within the meaning of ERISA, 29 U.S.C. §1002(21)(A), by exercising authority and control with respect to the management of their respective Plan and Plan assets, by exercising authority and control with respect to appointment, removal (if necessary) of other Plan fiduciaries, and monitoring those fiduciaries.

265.   Under ERISA, 29 U.S.C. §1104, an appointing fiduciary has an ongoing obligation to monitor the actions of fiduciaries which he or she appoints to ensure that the appointed fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets and the administration of the plan, and to take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the other fiduciaries with accurate information in its possession that it knows or

reasonably should know that the other fiduciaries must have in order to prudently manage the plan and its assets.

266.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

267.   To the extent any of the Rollins, the Administrative Committee and the Committee Member Defendants' fiduciary responsibilities were delegated to another fiduciary, and/or to the extent that any of the Rollins, the Administrative Committee and the Committee Members Defendants acted in lieu of or with the authorization of an appointing fiduciary, their monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and in the exclusive interest of participants.

268.   Rollins, the Administrative Committee and the Committee Members breached their fiduciary monitoring duties by, among other things:

   a. Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.  Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees in violation of ERISA;

c.  Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative and investment management fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's service providers and the amount of any revenue sharing payments;

d.  Failing to have a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same;

e.  Failing to have a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

f.  Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments;

g. Failing to perform sufficient due diligence in selecting and retaining James Bashaw and Sean Waggoner as a Code 27 Investment Advisors to the Plan; and

h. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

269.    As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly Plaintiffs and other participants, lost tens of millions of dollars.

270.    Total losses will be determined at trial after complete discovery in this case and are continuing.

271.    Each Committee Defendant is personally liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Committee Defendant also is personally liable under 29 U.S.C. §§ 1132(a)(3) and 1109(a) to make good to the Plaintiffs the losses they suffered due to the excessive fees as alleged above.

272.    Rollins, the Administrative Committee and the Committee Members knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to

lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Liability for Failing to Remedy Breach of Predecessor Fiduciaries
### (against Committee Members)

273. Plaintiffs restate and incorporate in Count IV the allegations in paragraphs 1 through 232.

274. At all relevant times, Committee Members were fiduciaries within the meaning of ERISA, 29 U.S.C. §1002(21)(A), by exercising authority and control with respect to the management of the Plan and Plan assets, by exercising authority and control with respect to appointment, removal (if necessary) of other Plan fiduciaries, and monitoring those fiduciaries.

275. A fiduciary has a continuing duty to remedy breaches of predecessor fiduciaries, including breaches in the selection of investments and service providers.

276. Prior to the inception of the Class Period, Plan fiduciaries selected the following funds for the Plan: Alger Mid Cap Growth Institutional I; American Funds Capital World Gr&Inc R4; American Funds EuroPacific Growth R4; American Funds Growth Fund of Amer R4; Franklin Growth Adv; Goldman Sachs Mid Cap Value A; Morgan Stanley Inst Discovery I; Oakmark Equity and Income Investor;

T. Rowe Price New Horizons; Victory Diversified Stock A; Victory Sycamore Small Company Opp I.

277.   These funds were imprudently disloyally selected. They were chosen because their presence in the Plan financially benefited Prudential and its affiliates. They were also chosen with no consideration of alternatives, despite the fact that Plan fiduciaries knew at the time that there were many better performing and lower cost alternatives that were superior choices for the Plan and Plan participants. The Plan's fiduciaries, thus, breached their duties in selecting these funds for the Plan.

278.   One or more of the Committee Members are successor fiduciaries to those fiduciaries who selected those funds.

279.   The Committee Members were aware that their predecessor fiduciaries had breached their duties in selecting the funds.

280.   The Committee Members breached their duties under ERISA by failing to take adequate steps to remedy, within the Class Period, their predecessors' breaches in selecting the funds referenced in this Count. Such steps could have included a full, unbiased, review of the suitability of the funds for the Plan, and consideration of replacing them with appropriate alternative investments.

281.   As a result of the Administrative Committee Members' breaches, the Plan, Plaintiff, and other participants lost tens of millions of dollars.

282.   Total losses will be determined at trial after complete discovery in this case and are continuing.

283.   Each Committee Member is personally liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Committee Member Defendant also is personally liable under 29 U.S.C. §§ 1132(a)(3) and 1109(a) to make good to the Plaintiffs the losses they suffered due to the excessive fees as alleged above.

284.   Each Committee Member knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT V

**Action Based on Prohibited Transactions Between the Plan and Party in Interest (Violation of 29 U.S.C. § 1106 by Committee Members)**

285.   Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 232.

286.   ERISA prohibits transactions between a plan and a "party in interest," and provides as follows: "[A] fiduciary with respect to a plan shall not cause the plan

to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect – …furnishing of goods, services, or facilities between the plan and a party in interest[.]" 29 U.S.C. §1106(a)(1).

287. Congress defined "party in interest" to include employers, other fiduciaries, and service providers.

288. As a service provider to the Plan, Prudential is a party in interest. 29 U.S.C. §1002(14)(B). So, too, are broker dealers and investment advisors to the Plan.

289. Committee Members were involved in causing the Plan to use conflicted service providers which recommended investments that were detrimental to the Plan and trusts and harmed participants.

290. By causing the Plan to use these investment advisors from year to year, whose services were not necessary and whose fees taken directly from the trusts were not reasonable, Committee Members caused the Plan to engage in transactions that they knew or should have known constituted the transfer to, or use by or for the benefit of a party in interest, assets of the plan, in violation of 29 U.S.C. §1106(a)(1)(D).

291. By causing the Plan to use these investment advisors from year to year, Committee Members failed to monitor appointees at least quarterly and caused the Plan to offer inappropriate share classes and investments while also failing to diversify the Plan's investments so as to minimize the risk of large losses, in

violation of 29 U.S.C. §1104(a)(1)(C).

292.   Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and to disgorge or provide restitution of all revenues received by Prudential and their subsidiaries from the fees and revenue sharing payments paid by the Plan to these entities, as well as other appropriate equitable or remedial relief.

293.   Each Committee Member knowingly participated in these transactions, enabled the other Defendants to engage in these transactions on an ongoing basis, and failed to make any reasonable effort under the circumstances to remedy or discontinue these prohibited transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT VI

**Action Based on Prohibited Transactions Between the Plan and Party in Interest (Violation of 29 U.S.C. § 1106) (Against Defendants Alliant Insurance Services, LLC; Alliant Retirement Services, Inc.; LPL Financial LLC)**

294.   Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 232.

295.   ERISA prohibits transactions between a plan and a "party in interest," and provides as follows: "[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect – …furnishing of goods, services, or facilities between the plan and a party in interest[.]" 29 U.S.C. §1106(a)(1).

296.   Congress defined "party in interest" to include employers, other fiduciaries, and service providers.

297.   As service providers to the Plan, Prudential is a party in interest. 29 U.S.C. §1002(14)(B). So, too, are broker dealers and investment advisors to the Plan like Alliant Insurance Services, LLC, Alliant Retirement Services, Inc., and LPL Financial LLC.

298.   Defendants Alliant Insurance Services, LLC Alliant Retirement Services, Inc. and LPL Financial LLC were involved in causing the Plan to use conflicted service providers which recommended investments that were detrimental to the Plan and trusts and harmed participants.

299.   By causing the Plan to use these investment advisors from year to year, whose services were not necessary and whose fees taken directly from the trusts were not reasonable, Defendants Alliant Insurance Services, LLC Alliant Retirement Services, Inc. and LPL Financial LLC caused the Plan to engage in transactions that they knew or should have known constituted the transfer to, or use by or for the benefit of a party in interest, assets of the plan, in violation of 29 U.S.C. §1106(a)(1)(D).

300.   By causing the Plan to use these investment advisors from year to year,

Defendants Alliant Insurance Services, LLC Alliant Retirement Services, Inc. and LPL Financial LLC failed to monitor appointees at least quarterly and caused the Plan to offer inappropriate share classes and investments while also failing to diversify the Plan's investments so as to minimize the risk of large losses, in violation of 29 U.S.C. §1104(a)(1)(C).

301.   Under 29 U.S.C. §1109(a), Defendants Alliant Insurance Services, LLC Alliant Retirement Services, Inc. and LPL Financial LLC are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and to disgorge or provide restitution of all revenues received by Prudential and their subsidiaries from the fees and revenue sharing payments paid by the Plan to these entities, as well as other appropriate equitable or remedial relief.

302.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to engage in these transactions on an ongoing basis, and failed to make any reasonable effort under the circumstances to remedy or discontinue these prohibited transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## VIII.  <u>PRAYER FOR RELIEF</u>

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that this Court:

a)  Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint Paul J. Sharman, Esq. of The Sharman Law Firm LLC as Class Counsel;

b)  Issue an order removing Defendants from their positions of fiduciary responsibility with respect to the Plan;

c)  Issue an order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' fiduciary breaches, including lost return on investments and payment of investment management fees;

d)  Order equitable restitution, disgorgement of all fees paid, and other appropriate equitable monetary relief against Defendants;

e)  Award Plaintiffs and the class their attorneys' fees and costs pursuant to ERISA, 29 U.S.C. §1132(g) and/or the Common Fund doctrine; order the Defendants to pay to the Plan the amount equaling all sums received by Prudential as a result of recordkeeping, revenue sharing, and investment management fees;

f)  award a surcharge against Defendants and in favor of the Plaintiffs under § 502(a)(3) and the Plan under § 502(a)(2) based on their breaches of fiduciary duty;

g)   order the payment of interest to the extent it is allowed by law; and

h)  grant such other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted this 31st day of December 2021.

/s/ *Paul J. Sharman*
PAUL J. SHARMAN
Georgia State Bar No. 227207

The Sharman Law Firm LLC
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Phone: (678) 242-5297
Fax: (678) 802-2129
Email: paul@sharman-law.com

Jon D. Pels, Esq. (*pro hac vice* pending)
Email: jpels@pelslaw.com
Katerina M. Newell, Esq.
(*pro hac vice* pending)
Email: knewell@pallaw.com
The Pels Law Firm
4845 Rugby Avenue,
Third Floor
Bethesda, MD 20814
Phone: (301) 986-5570
Fax: (301) 986-5571


Counsel for Plaintiffs