# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARCIA G. FLEMING, CASEY FREEMAN, DAVID GUYON, ANTHONY LOSCALZO, PATRICK ROSEBERRY, and JULIO SAMANIEGO individually, on behalf of the Rollins, Inc. 401(k) Savings Plan, and on behalf of all similarly situated participants and beneficiaries of the Plan,** | **CIVIL ACTION FILE NO: 1:21-cv-05343-ELR** |
|      **Plaintiffs,** | |
| **v.** | |
| **ROLLINS, INC.; THE ADMINISTRATIVE COMMITTEE OF THE ROLLINS, INC. 401(k) SAVINGS PLAN, BOTH INDIVIDUALLY AND AS THE *DE FACTO* INVESTMENT COMMITTEE OF THE ROLLINS, IC. 401(K) SAVINGS PLAN; EMPOWER RETIREMENT, LLC F/K/A PRUDENTIAL INSURANCE AND ANNUITY COMPANY; PRUDENTIAL BANK & TRUST, FBS, AS DIRECTED TRUSTEE OF THE ROLLINS, INC. 401(K) PLAN TRUST; ALLIANT INSURANCE SERVICES, INC.; ALLIANT RETIREMENT SERVICES, LLC; LPL FINANCIAL LLC; PAUL E. NORTHEN, JOHN WILSON, JERRY GAHLHOFF, JAMES BENTON and A. KEITH PAYNE, and JOHN AND JANE DOES 1-10, as members of the Administrative Committee,** | |
|      **Defendants.** | |

1

## FIRST AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.   OVERVIEW .................................................................................................6

II.  JURISDICTION AND VENUE ...............................................................11

III. THE PLAN, TRUST, PARTIES, AND STANDING ...................................12

    A.   The Plan and Plan Sponsor, Trust, and Trustee .............................12

    B.   The Named Plaintiffs ....................................................................16

    C.   The Administrative Committee .....................................................20

    D.   Defendant Investment Fiduciaries ...............................................24

    E.   The Recordkeeper and Asset Allocation Manager .......................25

IV.  CLASS ALLEGATIONS, TIMELINESS, AND EXHAUSTION .............25

    A.   Class Action Allegations ...............................................................25

    B.   Timeliness .....................................................................................30

V.   SPECIFIC FACTUAL ALLEGATIONS ...................................................33

    A.   The Investment Menu ...................................................................33

    B.   Conflicted Named Plan Fiduciaries Selected and Retained High Fee, Poorly Performing, Imprudent Investments in GoalMaker. ..........34

        1.   Named Plan Fiduciaries' Active Management Strategy in GoalMaker ...............................................................................36

        2.   Named Plan Fiduciaries Failed to Use Expense Ratios to Understand Investment Fees and Costs in GoalMaker .................39

        a.   Distribution ("12b-1") fees ........................................44

        b.   Transaction Costs ........................................................45

        3.   A Prudent Fiduciary Would Have Considered Adding Index Funds to GoalMaker. ..................................................................48

        4.   High-Priced Share Classes. ..........................................................50

        a.   Franklin Growth Fund .................................................53

        b.   Metropolitan West Total Return Bond ........................54

        c.   Victory Sycamore Established Value A Fund ..............54

**d. Other Funds** ................................................................**55**

**5. Named Plan Fiduciaries Failed to Appropriately Select and Monitor the Stable Value Fund in GoalMaker.** ..............................**55**

**6. Wasting Participants' Money through GoalMaker** ................**62**

**a. "Revenue sharing" Hid the Plan's True Costs** ........................**64**

**b. Investment Advisory Expenses** ..................................................**67**

**c. Recordkeeping expenses** ..........................................................**67**

**7. The Why: Defendants' Conflicts of Interest** .............................**73**

**C. Named Plan Fiduciaries Also Selected and Retained High Fee, Poorly Performing, Imprudent Investments Outside of GoalMaker.** .....**89**

**1. Oakmark Equity and Income Fund** ..........................................**89**

**2. Goldman Sachs Mid Cap Value A Fund** ....................................**91**

**3. Hartford MidCap fund** ...............................................................**92**

**D. Named Plan Fiduciaries Did Not Hire Competent Professionals to Provide Investment Advice or Asset Allocation Services.** ........................**93**

**1. Named Plan Fiduciaries, in Selecting and Retaining Defendant Investment Fiduciaries, Did Not Follow the Plan's Investment Policy Statement.** ..............................................................................**95**

**2. Incompetence of Defendant Investment Fiduciaries** ...............**96**

**3. Defendant Investment Fiduciaries and Prudential Breached Their ERISA Obligations to the Plan.** .............................................**99**

**E. Named Plan Fiduciaries Failed to Disclose to Participants the Information They Needed to Make Informed Investment Decisions.** ...**100**

**F. The Damage Done** ........................................................................**106**

**VI. CAUSES OF ACTION** ....................................................................**107**

**Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105** ....................**107**

**Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105** ....................**114**

**Failure to Monitor Other Named Plan Fiduciaries** .................**119**

**Failure to Follow Terms of the Plan in Violation of 29 U.S.C. § 1104(a)(1)(D)** ..................................................................................**122**

**Action Based on Prohibited Transactions in Violation of 29 U.S.C. §§ 1106(a)(1)(C), (D)**........................................................................**125**

**Action Based on Prohibited Transactions in Violation of 29 U.S.C. §§ 1106(b)**.............................................................................................**127**

**Breach of Fiduciary Duty by Omission** ...............................................**129**

**VII.**    **ENTITLEMENT TO RELIEF** ............................................................**132**

**VIII.**   **PRAYER FOR RELIEF** .....................................................................**133**

COME NOW Plaintiffs Marcia G. Fleming, Casey Freeman, David Guyon, Anthony Loscalzo, Patrick Roseberry, and Julio Samaniego (collectively "Plaintiffs"), by and through the undersigned counsel, and individually, on behalf of the Rollins, Inc. 401(K) Savings Plan (the "Plan"), and on behalf of all similarly situated participants and beneficiaries of the Plan, bring this action for relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et. al* ("ERISA") against Defendants Rollins, Inc.; the Plan's Administrative Committee, both individually and as the *de facto* Investment Committee of the Plan and the Administrative Committee's members, Paul E. Northen, John Wilson, Jerry Gahlhoff, James Benton and A. Keith Payne, and John and Jane Does 1-10 (collectively, the "Administrative Committee"); Empower Retirement, LLC f/k/a Prudential Insurance and Annuity Company ("Prudential"); Prudential Bank & Trust, FSB, as directed trustee of the Rollins, Inc. 401(k) Plan Trust (the "Trustee"); and Alliant Insurance Services, LLC ("AIS"), Alliant Retirement Services, Inc ("ARS"), and LPL Financial LLC ("LPL") (collectively, the "Defendant Investment Fiduciaries") (collectively, "Defendants"). Plaintiffs filed this lawsuit on December 31, 2021. Defendants filed their Motions to Dismiss on March 28, 2022. Plaintiffs are filing this Amended Complaint as a matter of course under Fed. R. Civ. P. 15(a)(1)(B) within 21 days of the responsive pleading.

## I.    OVERVIEW

1.    At all relevant times during the Class Period defined below, Plaintiffs were participants in an ERISA defined contribution retirement plan sponsored by Rollins (the "Plan").    As of December 31, 2020, the Plan had assets of $1,050,698,968 and had 14,109 participants.

2.    "[I]n a defined contribution plan, … the retirees' benefits are typically tied to the value of their accounts," *Thole v. U.S. Bank,* 140 S. Ct. 1616, 1618 (2020), and "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). Therefore, "benefits can turn on the plan fiduciaries' particular benefit decisions." *Thole,* 140 S. Ct. at 1618.

3.    Indeed, Plan participants bear not only the investment risk of Plan administrators' decisions but also the costs of any excessive investment and administrative expenses as well.

4.    For financial services companies like Prudential and the Defendant Investment Fiduciaries, the potential for imprudent and disloyal conduct is especially high, because a Plan's fiduciaries are in a position to benefit the company through the selection of the Plan's investments by, for example, filling the plan with proprietary and other investment products that an objective and prudent fiduciary would not choose.

5.     The effect of such Plan fiduciaries' imprudence and disloyalty on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794.00 to fees and lost returns over a 40-year career. *See* Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (June 1, 2014), *available at* http://money.cnn.com /2013/03/27/retirement/401k-fees.

6.     A fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that were paid.

7.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). *Accord* Restatement (Second) of Trusts § 2 cmt. b (1959).

8.     In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. Fiduciaries must prudently select initial investment options they make available to plan participants, then must continue to monitor the prudence of each investment option and must remove imprudent investment options within a reasonable time.

9.     Defined contribution plans with billions of dollars in assets, like the Plan here -- -which are among the largest 0.06% of defined contribution plans in the United States -- have tremendous bargaining power in the marketplace for retirement plan services and can demand high-quality administrative and investment management services at low cost.

10.     Plan fiduciaries must limit the Plan's expenses to a reasonable amount, to ensure that each fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan, and to analyze the costs and benefits of alternatives for the Plan's administrative and investment structure. This Plan fiduciaries must do for the exclusive benefit of participants, and not for the benefit of conflicted third parties.

11.     Instead of using the Plan's bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plan, Rollins and the Administrative Committee (collectively, the "Named Plan Fiduciaries") squandered that leverage by allowing the Plan's conflicted third party service providers – Prudential and Defendant Investment Fiduciaries – to dictate the Plan's investment lineup, to link its recordkeeping services to the placement of investment products which paid high revenue sharing fees and illicit kickbacks, and to collect unlimited asset-based compensation from such products.

12.     ERISA required the Named Plan Fiduciaries to manage the Plan

prudently and to not waste Plan participants' money. This they did not do. Indeed, for the period from January 1, 2009 to the present (the "Class Period"), Named Plan Fiduciaries breached their fiduciary duties by: (a) failing to prudently select and monitor the Plan's investment options, and failing to remove imprudent investments; (b) failing to prudently monitor and prudently manage the Plan's administrative expenses; (c) causing the Plan to enter into one or more prohibited transactions with a party-in-interest to the Plan; (d) failing to monitor their co-fiduciaries; (e) overpopulating the Plan with overpriced and poorly performing mutual funds, including a proprietary fund of Prudential (the Prudential Guaranteed Fund); (f) directing millions of dollars of Plan assets to pay conflicted Plan service providers excessive and unreasonable compensation which, in fact, was approximately four times more than these service providers received for the same services rendered to similarly sized plans; (g) secretly charging participants for these excessive fees; (h) affirmatively misleading Plan participants and/or intentionally concealing from them the information they needed to make informed investment decisions; (i) affirmatively and repeatedly making misrepresentations to participants and beneficiaries about the security of their investments, the reasonableness of the fees and expenses they and the Plan were being charged, and the competence of the service providers they selected and thereafter retained; and (j) hiding these facts and the conflicts of interests all Defendants suffered from the Department of Labor

("DOL"), Internal Revenue Service ("IRS"), and Plan participants and beneficiaries.

13.     Plaintiffs are not second-guessing Named Plan Fiduciaries' investment decisions in hindsight. The information that Named Plan Fiduciaries needed to make prudent decisions regarding the selection and retention of investment managers (including Defendant Investment Fiduciaries), and the selection and retention of investment funds, was readily available to them when they made those decisions.

14.     Each dollar that Named Plan Fiduciaries wasted was one less dollar in participants' accounts, dollars that would have generated returns and built participants' retirement savings. Those lost returns compound over time so each wasted dollar matters greatly.  In fact, the United States Department of Labor ("DOL"), which oversees ERISA, estimates that, over 35 years, a 1% increase in fees and expenses may reduce a participant's account balance by 28%.  U.S. DOL, EBSA, *A Look at 401(k) Plan Fees*, pp. 1-2 (Aug. 2013), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

15.     The prohibited transactions in which Defendants engaged and/or caused the Plan to engage during the Class Period, and the Named Plan Fiduciaries' breaches of duty during the Class Period, both of which are summarized above and set forth in more detail below, alienated the trust and dissipated millions of dollars in Plan assets and, in doing so, proximately caused loss to the Plan and Plan

participants.

16.     Named Plan Fiduciaries could have easily stopped these abuses at any time during the Class Period by replacing the unreasonably high-fee, underperforming funds in the Plan's investment menu with more reliable, lower-fee funds offered by numerous mutual fund families and investment managers which, unlike Defendant Investment Fiduciaries here, were untainted by self-interest.

17.     Named Plan Fiduciaries' actions during the Class Period were contrary to actions of a reasonable fiduciary, cost the Plan and its participants millions of dollars, and ran directly counter to ERISA's fiduciary duties of prudence and loyalty, undermining the purpose of 401(k) plans – *i.e.,* to maximize participants' retirement savings.  Defendants are liable to the Plan and participants for these losses, which continue to accrue. That on-going loss is significant.

18.     Through this action, Plaintiffs seek equitable relief under ERISA, including but not limited to a surcharge; the disgorgement of improper profits realized by Named Plan Fiduciaries as a result of their breaches of duty; the restoration of losses to them, the Class and the Plan; and an award of reasonable attorney fees under ERISA § 502(g).

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

20.     This Court has personal jurisdiction over Defendants because, among other reasons, Defendants transact business in and have significant contacts with this District and ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

21.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is and, at the relevant times, was administered in this District, the breaches and violations giving rise to Plaintiffs' claims occurred in this District, and one or more of the Defendants may be found in this District.

22.     Venue is also proper under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and one or more of the Defendants reside in this District.

### III.   THE PLAN, TRUST, PARTIES, AND STANDING

### A.   The Plan and Plan Sponsor, Trust, and Trustee

23.     Rollins, a closely held, publicly traded company which provides residential and commercial pest control services through more than 900 subsidiaries and franchises worldwide, and which generates more than $1.8 billion in annual revenue nationwide, sponsors and maintains the Plan on behalf of its eligible employees. A copy of the Plan is attached as **Exhibit 1.**

24.     As the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), Rollins, a resident of this District, is and, at all relevant times during

the Class Period, was a party in interest under ERISA § 3(14)(C), 29 U.S.C. §

1002(14)(C).  Rollins also was (and remains) a Plan fiduciary under ERISA §

3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the

Administrative Committee and Investment Managers for the Plan; selected and

monitored Prudential, Defendant Investment Fiduciaries, and the investment funds

under the Plan; and otherwise exercised discretion or control over the administration

and management of the Plan and Plan assets.

25.    Indeed, Rollins, under section 13.1 of the Plan, had the duty:

(1)    To appoint the Trustee, the Administrative Committee and the
       Investment Committee and to monitor each of their
       performances;

(2)    To communicate such information to the Trustee, the
       Administrative Committee and/or the Investment Committee as
       each needs for the proper performance of its duties;

(3)    To provide channels and mechanisms through which the
       Administrative Committee and/or the Trustee can communicate
       with Participants and Beneficiaries; and

***

[to] perform such duties as are imposed by law or by regulation[.]

26.    The Plan, which is administered in this District, is a defined

contribution, individual account, employee benefit plan under 29 U.S.C. §

1002(2)(A) and § 1002(34).  The Plan was established and maintained under a

written document in accordance with 29 U.S.C. § 1102(a).  The stated purpose of

the Plan, which was adopted in 1983 and restated on January 1, 2009, is to recognize the contributions made to Rollins and its participating affiliates by employees and to reward those contributions by providing eligible employees with an opportunity to accumulate savings for their future security.

27.    During the Class Period, per section 7.3 of the Plan:

> [e]ach participant or Beneficiary generally may direct the manner in which his Accounts and Contributions will be invested in and among the Investment Funds described in Section 7.2. Participant investment directions will be made in accordance with the following terms:

> (a)    <u>Investment of Contributions.</u> Except as otherwise provided in this Section, each Participant may elect, on a form provided by the Administrative Committee, … the percentage of his future Contributions that will be invested in each Investment Fund…. <u>In the event a Participant never makes an investment election or makes an incomplete or insufficient election in some manner, the Trustee, based on authorized directions from the Administrative Committee, will direct the investment of the Participant's future Contributions.</u>

(*Id.*) (Emphasis added.)

28.    At all relevant times, Plan assets were held in a trust (the "Trust") pursuant to a Trust Agreement executed by Rollins and the Trustee.  A copy of the Trust Agreement is attached as **Exhibit 2.**  The Trust Agreement states that, in the event of conflict between the Plan and the Trust Agreement, the terms of the Trust Agreement controlled. (*See id.*, § 12(g).)

29.    At all relevant times, Prudential Bank & Trust, FSB was the Trustee appointed by the Administrative Committee and, in this capacity, and to the extent

that it engaged in transactions with the Plan and Named Plan Fiduciaries, and received direct and indirect compensation from the Plan, was and is a party in interest under ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), whose services and compensation Rollins and the Administrative Committee had a duty to monitor. Moreover, to the extent it exercised discretion or control over the administration and management of the Plan and Plan assets, Prudential also was a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

30.     During the Class Period, the Trust was required to hold <u>only those assets accepted by the Trustee</u> and which are specified on Exhibit A to the Trust Agreement. (*See* the Trust Agreement, Exh. 2, § 1(b).) Exhibit A to the Trust Agreement specified four categories of Plan assets: (a) a group annuity contract "issued by an affiliate of the Trustee;" (b) "Plan assets invested in <u>investment options offered through an affiliate of the Trustee;</u>" (c) promissory notes given in connection with loans to participants and beneficiaries; and (d) Rollins stock. (Emphasis supplied.)   Upon information and belief, the only affiliate of the Trustee that provided services to the Plan during the Class Period was Prudential.

31.     Section 7.2(a) of the Plan required the Trustee,

[i]n accordance with instructions from the Investment Committee and the terms of the Plan and the Trust, … [to] establish and maintain Investment Funds for the investment of the assets of the Trust Fund. Such Investment funds will be established and modified from time to time without necessity of amendment to the plan and will have the investment objectives prescribed by the Investment Committee….

**B.    The Named Plaintiffs**

32.    Plaintiff Marcia G. Fleming ("Fleming"), as a former employee of Rollins who is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations, is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Fleming, a resident of this District, used GoalMaker and, therefore, was invested in one or more of the imprudent funds at issue, and paid excessive fees charged to her individual account.

33.    Plaintiff Casey Freeman ("Freeman"), as a former employee of Rollins who is or may become eligible to receive additional benefits under the Plan, is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).  Freeman is a resident of this District. At relevant times during the Class Period, Freeman used GoalMaker and, therefore, was invested in one or more of the imprudent funds at issue, and paid excessive fees charged to her individual account.

34.    Plaintiff David Guyon ("Guyon"), as a former employee of Rollins who is or may become eligible to receive additional benefits under the Plan, is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Guyon is a resident of this District. At relevant times during the Class Period, Guyon, upon information and belief, was invested in one of or more of the imprudent funds at issue and paid excessive fees charged to his individual account.

35.    Plaintiff Anthony Loscalzo ("Loscalzo"), as a former employee of Rollins who is or may become eligible to receive additional benefits under the Plan, is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).  Loscalzo is a resident of this District. At relevant times during the Class Period, Loscalzo was invested in two of the imprudent funds at issue (American Funds Capital World Growth and American Funds EuroPacific) and paid excessive fees charged to his individual account.

36.    Plaintiff Patrick Roseberry ("Roseberry"), as a former employee of Rollins who is or may become eligible to receive additional benefits under the Plan, is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Roseberry is a resident of this District. At relevant times during the Class Period, Roseberry was invested in one or more of the imprudent funds at issue (Vanguard Windsor II, Franklin Growth, and Victory Sycamore) and paid excessive fees charged to his individual account.

37.    Plaintiff Julio Samaniego, a resident of this District and as a former employee of Rollins who is or may become eligible to receive additional benefits under the Plan, is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Samaniego, upon information and belief, was charged grossly excessive fees for administrative services rendered to the Plan.

38.    ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), confer

standing on a "participant" to bring claims for ERISA violations, including but not limited to claims under ERISA § 409(a), 29 U.S.C. § 1109(a), for breach of fiduciary duty.

39.    At all relevant times during the Class Period, each of Plaintiffs was a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).  Therefore, each of Plaintiffs have statutory standing to bring claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2), (3).

40.    Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail below, the Plan suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

41.    Each of Plaintiffs also has constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because each Plaintiff personally suffered concrete and particularized injuries in many ways, including but not limited to the following:

   a. The named Plaintiffs and all Plan participants suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Named Plan Fiduciaries' inclusion of those options deprived participants of the

opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Named Plan Fiduciaries had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b. The named Plaintiffs and all participants in the Plans were financially harmed by Prudential's and Named Plan Fiduciaries' improper bundling of some of the Plan's investment products, improperly allowing Prudential and Defendant Investment Fiduciaries to require inclusion of imprudent and excessively high-fee investment products in the Plan.

c. The named Plaintiffs and all participants in the Plans were financially harmed by Prudential's and Named Plan Fiduciaries' intentional concealment of illicit kickbacks and excessively high-fee and imprudent investment options from them.

d. The named Plaintiffs and all participants in the Plans were financially harmed by Named Plan Fiduciaries' affirmative misrepresentations that their investments were secure, that Defendant Investment Fiduciaries were competent to provide services to them and the Plan, and that participants were not being unreasonably and unnecessarily charged for

fees.

42.    Each of the Plaintiffs, during the proposed class period, invested in one or more of the investments that paid hidden, unreasonable, and unnecessary revenue sharing to Prudential, the Trustee and Defendant Investment Fiduciaries, and that were selected and retained in the Plan by Named Plan Fiduciaries when past poor performance and their excessive fee structure rendered them imprudent investments.

43.    Each of Plaintiffs and participants lost significant retirement savings through their investments in these imprudent funds, through other investments and the fees charged on their investments in those funds, and by paying a portion of the Plan's excessive administrative and recordkeeping fees, none of which would have been incurred had Defendants discharged their fiduciary duties to the Plan.

44.    Thus, Plaintiffs have Article III standing to bring these claims.

**C.    The Administrative Committee**

45.    Defendant, the Administrative Committee of the Plan (the "Administrative Committee"), a resident of this District, at all relevant times, was and remains the named fiduciary of the Plan, the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16), a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), the *de facto* Investment Committee of the Plan, and also a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it selected and monitored Prudential and the Trustee, Defendant Investment

Fiduciaries, and investment Funds under the Plan, and to the extent it otherwise exercised discretion or control over the administration and management of the Plan and Plan assets.

46.     Defendants Paul E. Northen, John Wilson, Jerry Gahlhoff, James Benton, A. Keith Payne, and John and Jane Does 1-10, as members of the Administrative Committee, are each a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they were authorized to act on behalf of the Administrative Committee and, in this capacity, exercised discretionary authority or discretionary control respecting the administration or management of the Plan, or exercised authority or control respecting the management or disposition of the Plan's assets.   Upon information and belief, one or more of the members of the Administrative Committee is a resident of this District.

47.     As Plan Administrator, the Administrative Committee had "complete control of the administration of the Plan hereunder, with all powers necessary to enable it properly to carry out its duties as set forth in the Plan and the Trust Agreement." (*See* the Plan, Exh. 1, § 12.3.)  The Administrative Committee, at all times during the Class Period, also had

> the power to delegate specific fiduciary… responsibilities (other than Trustee responsibilities) … to other persons all of whom will serve at the pleasure of the Administrative Committee. References in the Plan to the Administrative Committee is deemed to include any person

authorized to act on its behalf pursuant to this Section.

(*Id.*, § 12.4.)

48.     During the Class Period, the Administrative Committee, also was required to "establish and maintain, on behalf of each participant and beneficiary an Account" and, as such, had the corresponding duty to credit each account "with Contributions allocated to such Account and generally … with income on investments derived from the assets of such Accounts[.]" (*Id.*, §5.1.)  At all times, the Administrative Committee also was required to maintain "[e]ach Account of a Participant or Beneficiary … until the value thereof has been distributed to or on behalf of such Participant or Beneficiary." (*Id.*)

49.     As the *de facto* "Investment Committee" for the Plan, the Administrative Committee also made and effected investment decisions for the Plan during the Class Period.  In this role, the Administrative Committee also had the duty

(1)     To appoint one of more persons to serve as investment manager with respect to all or part of the Plan assets …;

(2)     To allocate the responsibility and authority being carried out by the Investment Committee among the members of the Investment Committee;

(3)     To take any action appropriate to ensure that the Plan assets are invested for the exclusive purpose of providing benefits to Participants and beneficiaries in accordance with the Plan and defraying reasonable expenses of administering the Plan, subject to the requirements of any applicable law; and

22

> (4)    To employ one or more persons to tender advice with respect to any responsibility or authority being carried out by the Investment Committee.

(*See* Plan, Exh. 1, § 12.7.)

50.    As the *de facto* Investment Committee, the Administrative Committee further had "the power to provide the Trustee with general investment policy guidelines and directions to assist the Trustee respecting investments made in compliance with, and pursuant to, the terms of the Plan." (*See* Plan, Exh. 1, § 12.8.)

51.    Section 7.8(a) of the Plan authorized the Investment Committee, *i.e.,* the Administrative Committee, to "appoint any one or more individuals or entities to serve as the investment manager or managers of the entire Trust or of all or any designated portion of a particular Investment Fund or Investment Funds."

52.    The Plan required each investment manager to "certify it is qualified to act as an 'investment manager' within the meaning of ERISA Section 3(38)[.]" (*Id.* § 7.8(a).)  An ERISA § 3(38) investment manager is "any fiduciary (other than a trustee or named fiduciary …

> (A)    who has the power to manage, acquire, or dispose of any asset of a plan;

> (B)    who (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.]; [or] (ii) … is registered as an investment adviser under the laws of the State …; and

(C)     has acknowledged in writing that he is a fiduciary with respect to the plan.

## D.     Defendant Investment Fiduciaries

53.     Defendant Alliant Insurance Services, Inc. ("AIS"), as an investment manager for the Plan appointed by the Administrative Committee, at all relevant times, at relevant times during the Class Period, was a fiduciary under ERISA § 3(38), 29 U.S.C. § 1002(38)(A) and remains a party in interest under ERISA §§ 3(14)(A), (B), 29 U.S.C. §§ 1002(14)(A), (B), whose services and compensation Rollins and the Administrative Committee had a duty to monitor.

54.     Defendant Alliant Retirement Services, LLC ("ARS), as an investment manager for the Plan appointed by the Administrative Committee, at all relevant times, at relevant times during the Class Period, was a fiduciary under ERISA § 3(38), 29 U.S.C. § 1002(38)(A) and remains a party in interest under ERISA §§ 3(14)(A), (B), 29 U.S.C. §§ 1002(14)(A), (B), whose services and compensation Rollins and the Administrative Committee had a duty to monitor.

55.     Defendant LPL Financial LLC ("LPL"), as an investment manager for the Plan appointed by the Administrative Committee, at all relevant times, at relevant times during the Class Period, was a fiduciary under ERISA § 3(38), 29 U.S.C. § 1002(38)(A) and remains a party in interest under ERISA §§ 3(14)(A), (B), 29 U.S.C. §§ 1002(14)(A), (B), whose services and compensation Rollins and the Administrative Committee had a duty to monitor.

## E.     The Recordkeeper and Asset Allocation Manager

56.     Prudential, at all relevant times during the Class Period, was the recordkeeper for the Plan appointed by the Administrative Committee.  In providing recordkeeping and asset allocation services to the Plan and, as such, was and is a party in interest under ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), whose services and compensation Rollins, the Administrative Committee, and its members had a duty to monitor. Moreover, to the extent it exercised discretion or control over the administration and management of the Plan and Plan assets, Prudential also was a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

## IV.   CLASS ALLEGATIONS, TIMELINESS, AND EXHAUSTION

## A.     Class Action Allegations

57.      Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following Class:

Participants and beneficiaries of the Plan from January 1, 2009 through the date of judgment, excluding Defendants and (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Rollins or is or was a partner, officer, director, or controlling person of Rollins; (b) the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Rollins; (c) Plaintiffs' counsel; (d) judges of the Court in

which this case is pending and their current spouse and children; and,

(e) the legal representatives, heirs, successors and assigns of any such

excluded person.

58.     The members of the Class are so numerous, consisting of thousands of

members, not including their spouse beneficiaries, who, upon information and belief,

are sufficiently dispersed geographically such that joinder of all members is

impracticable. The issues of liability are common to all members of the Class and

are capable of common answers as those issues primarily focus on Defendants' acts.

The common issues include whether Defendants breached fiduciary duties to the

Plan and Plan participants, whether Defendants engaged in prohibited transactions,

and the appropriate relief for Defendants' violations of ERISA.

59.     Plaintiffs' claims are typical of the claims of other members of the Class

because their claims arise from the same event, practice and/or course of conduct,

*i.e.* a scheme to misrepresent to and conceal from participants and beneficiaries the

prohibited transactions in which each engaged and their respective breaches of

fiduciary duty at all times during the Class Period.

60.     Plaintiffs' claims are also typical of the claims of other members of the

Class because the relief sought consists of requiring Defendants to make the Plan

whole for any losses caused by their fiduciary breaches and to disgorge their profits

to the Plan. Any such recovery from Defendants will be paid to the Plan and any

relief will flow to all Class Members through their accounts in the Plan.

61.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

62.     Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

63.     Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

64.     Plaintiffs are represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

65.     The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

66.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated

participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

67.     The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transactions, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited transactions or breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

68.     The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants engaged in prohibited transactions or breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by

those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

69.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result inconsistent judgments about Defendants' duties with regard to the Plan.

70.    The following factors set forth in Rule 23(b)(3) also support certification:

a.    The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.    No other litigation concerning this controversy has been filed by any other members of the Class.

c. This District is the most desirable location for concentrating this litigation because (i) Rollins is located in this District; (ii) the Plan is administered in this District; (iii) one or more Defendants are located in this District; (iv) a significant number if not the majority of the Class members are located in this District, and (v) a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.

d. There are no anticipated difficulties in managing this case as a class action.

**B.     Timeliness**

71.     Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation ...."  29 U.S.C. § 1113.  *See also Tibble, supra* ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely.").

72.     Indeed, even after making initial investment decisions, Named Plan Fiduciaries had (and still have) a duty to continue to monitor the Plan investments

and remove imprudent ones. This duty required them to systematically consider all Plan investments at regular intervals to ensure the investments are appropriate.

73.     The continuing duty doctrine applies to "monitoring and reviewing" duties even with respect to Investment Funds placed into the Plan more than six years before the filing of the lawsuit if, as here, they remained in the Plan during ERISA's six-year limitation period. Therefore, the Class includes any Plan participant who held imprudent funds during the six-year period, regardless of when those funds were added to the Plan. The Class also includes those participants who suffered damages prior to six years from filing of this action as Named Plan Fiduciaries had a duty to repair and make whole the participants' losses during the six-year period.

74.     The continuing duty doctrine applies to "monitoring and reviewing" the Trustee, Prudential, and Defendant Investment Fiduciaries, all of whom provided advice or other services within six years of the filing of this action.

75.     At all relevant times during the Class Period, Named Plan Fiduciaries chose to ignore the conflicts of interest inherent in Prudential's self-interested asset allocation scheme from which they, the Trustee, and Defendant Investment Fiduciaries also secretly profited.

76.     At all relevant times during the Class Period, Named Plan Fiduciaries also made affirmative misrepresentations to participants about the security of their

investments, the competence of the Defendant Investment Fiduciaries, and the independence of the Trustee, Prudential, and Defendant Investment Fiduciaries.

77.     At all relevant times during the Class Period, Named Plan Fiduciaries intentionally concealed their fiduciary breaches and prohibited transactions with Prudential, the Trustee, and Defendant Investment Fiduciaries to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

78.     In this case, Named Plan Fiduciaries had and have an ongoing duty to rectify its deficiencies and make whole losses that creates a continuing duty and ongoing breaches, or alternately tolls the statute, so the Class Period will ultimately begin when the Plan began committing the breaches described herein, as the damages continued and should have been repaired during the six-year period.

79.     Because Named Plan Fiduciaries affirmatively concealed the violations of ERISA alleged in this Amended Complaint and their participation in them, and because Plaintiffs did not acquire actual knowledge of these violations until late 2019, within three years of the filing of this action, Plaintiffs' claims in this action are timely.

## C.     Exhaustion of Administrative Remedies

80.     On December 10, 2020, Plaintiffs, pursuant to Section 11.7 of the Plan, submitted claims with respect to the violations and breaches alleged here (the "Administrative Claims") to the Administrative Committee.

81.     On March 1, 2021, the Administrative Committee denied the Administrative Claims.

82.     On March 9, 2021, Plaintiffs, pursuant to Section 11.7(c) of the Plan, filed an appeal of the Administrative Claims.

83.     On May 6, 2021, the same members of the Administrative Committee denied the Administrative Claims on Plaintiffs' appeal and notified Plaintiffs of their right to bring this suit under the terms of the Plan.

84.     At all times before and during Plaintiffs' administrative appeal, the Administrative Committee was aware of the conduct of Prudential, the Trustee, and the Defendant Investment Fiduciaries alleged in this Amended Complaint, but made it clear, both in denying Plaintiffs' claims and in subsequent communications, including their Motion to Dismiss in this action, that it does not plan to pursue any claims against Defendant Investment Fiduciaries or any of the Defendants.

85.     Consequently, further attempts by Plaintiffs to redress their complaints through the administrative process would be futile.

86.     This and all other conditions precedent to this action have been satisfied or waived.

## V. SPECIFIC FACTUAL ALLEGATIONS

### A.    The Investment Menu

87.     At all relevant times during the Class Period, the Plan, upon information

and belief, was structured as a cafeteria plan.  Participants could choose from a menu of investment options, but those options were selected and maintained by Rollins, the Administrative Committee, and its members, with input from and advice by Prudential and Defendant Investment Fiduciaries.

88.    The relevant investment funds had specific asset classes. An "asset class" is a grouping of similar investments, *e.g.,* equities (stocks), fixed income (bonds) or cash.  Classes are often further divided into sub-classes, such as "large cap," "small cap," "growth," "international" and so forth.  In the context of mutual funds, the asset class typically is defined by reference to a broad market index generally reflecting the market sector in which the fund invests (*e.g.,* the S&P 500, the Russell 1000 and the NASDAQ Composite).

89.    While participants could choose which asset classes in which to invest, they had no control over the cost or performance of the funds selected by Named Plan Fiduciaries within each asset class. Indeed, participants were captive investors whose choices were limited by the investment decisions made by Named Plan Fiduciaries.  The value of their individual accounts depended in large measure upon the decisions Named Plan Fiduciaries and Defendant Investment Fiduciaries made.

**B.    Conflicted Named Plan Fiduciaries Selected and Retained High Fee, Poorly Performing, Imprudent Investments in GoalMaker.**

90.    At all relevant times during the Class Period, Prudential not only served as the recordkeeper for the Plan, but also provided the GoalMaker asset allocation

service to the Plan.

91.     An asset allocation program can be a benefit to participants – especially those with limited investment experience or time – in selecting a portfolio from a plan's investment menu. However, such service must be prudently monitored by a fiduciary to ensure it has the participants' best interests in mind. Regrettably, such was not the case with the use of GoalMaker by Defendants.

92.     At all relevant times during the Class Period, GoalMaker was the <u>default</u> investment option for the Plan (*i.e.,* the investment option chosen for participants who do not choose an allocation for themselves). In fact, during the Class Period, <u>over 70%</u> of participants invested in GoalMaker portfolios.

93.     The Administrative Committee intentionally populated GoalMaker with poorly performing, high fee mutual funds which paid illicit kickbacks and other forms of indirect compensation to Prudential, Defendant Investment Fiduciaries, and the Trustee. As consideration for doing so, the Administrative Committee was able to pass the Plan's administrative and investment fees to participants and beneficiaries without having to specifically delineate and disclose those fees to them.

94.     Using the investment options offered through the Plan, GoalMaker purported to allocate participants' retirement savings to model portfolios based upon the participant's age (or expected retirement date) and risk tolerance (high, moderate, or low).

95.     Importantly, participants enrolled in the GoalMaker service could not change the recommended allocations without being disenrolled in the service.

### 1.     Named Plan Fiduciaries' Active Management Strategy in GoalMaker

96.     <u>All</u> of the investment options in GoalMaker, consisted of actively managed mutual funds.

97.     "Active investment management" and similar terms refer to investment strategies that try to achieve above average market returns over time, that is, actively managed funds try to "beat the market." That is, active managers try to identify and exploit market inefficiencies. *See* Restatement (Third) of Trusts § 90 cmt. h(2) (active management involves "searching for advantageous segments of a market, or for individual bargains in the form of under-priced securities."). The search for potential market inefficiencies requires research and analysis, which increases investment management costs.  *See id.*

98.     With actively managed mutual funds, the funds' respective investment managers charged fees based on a percentage of the fund's total assets.   The investment management fees are deducted from investment returns, thus reducing the net returns on participants' investments, often without their knowledge.

99.     While prudent investment principles allow for active management strategies in appropriate circumstances, the additional risks and costs involved "must be justified by realistically evaluated return expectations. Additionally, "[a] trustee's

approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution."  Restatement (Third) of Trusts cmt. f.

100.   Thus, in deciding whether to pursue an active management strategy, a fiduciary should determine that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks." *Id.* at cmt. h(2). That is, prudence requires a fiduciary to have a realistic expectation that an active management strategy will generate net returns equal to or greater than reasonable alternatives, such as investing in low-cost index funds (a "passive" strategy).

101.   A passive management strategy "aim[s] to maximize returns over the long run by not buying and selling securities very often.  In contrast, an actively managed fund often seeks to outperform a market (usually measured by some kind of index) by doing more frequent purchases and sales." U.S. Sec. and Exch. Comm'n, Investor Bulletin: Index Funds (Aug. 6, 2018).  *See also A Look at 401(k) Plan Fees, supra*, at 7 ("Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index.").

102.   Whether an active or passive strategy ultimately is chosen, prudence requires the plan fiduciary to avoid any investment that is not reasonably expected

to generate returns sufficient to cover its costs.

103.   Here, Named Plan Fiduciaries not only breached their duties by failing to have a prudent, reasoned process for deciding upon and carrying out their investment strategy, but also, they failed to monitor the funds and assets they selected for the Plan menu and failed to replace their imprudent selections with prudent ones.

104.   Named Plan Fiduciaries selected and retained only actively managed funds in GoalMaker that paid excessively high revenue sharing and kickbacks to Prudential, the Trustee, and Defendant Investment Fiduciaries but that did not perform as well as other funds which were available to the Administrative Committee at the time of its investment decisions.   No index or other passive investment options were made available to participants in GoalMaker.

105.   As noted above, in deciding whether to pursue such an expensive and risky active management strategy, Named Plan Fiduciaries were obligated, first, to determine that "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks."  Restatement (Third) of Trusts § 90 cmt. h(2).

106.   Named Plan Fiduciaries' active management strategy was not justified because they knew or should have known that there was no realistic expectations of recouping returns sufficient to cover the substantial additional costs and risks of the

strategy.

107.   Empirical data at the time that Named Plan Fiduciaries made their investment selections and retention decisions demonstrated that, over time and across market sectors, the actively managed funds they selected consistently failed to outperform the market. This failure was most pronounced in asset classes demonstrating a high degree of market efficiency.

108.   Faced with this data, Named Plan Fiduciaries should have proceeded with great caution, knowing that an active management strategy was a high-stakes, low-percentage bet.  Nevertheless, Named Plan Fiduciaries heedlessly made that bet while playing with participants' money.

109.   The annual dollar cost to the Plan's participants of Named Plan Fiduciaries' decision to pursue an active investment strategy, compared to the cost of comparable but less expensive investment products was significant (in the multi-millions of dollars).

### 2.   Named Plan Fiduciaries Failed to Use Expense Ratios to Understand Investment Fees and Costs in GoalMaker

110.   To manage operating expenses, a plan sponsor must understand and continually evaluate the plan's expenses, fees and service providers.   The Department of Labor advises:

> As the sponsor of a retirement plan ... you, or someone you appoint, will be responsible for making important decisions about the plan's management. Your decisionmaking will include selecting plan

investments or investment options and plan service providers.  Many of your decisions will require you to understand and evaluate the costs to the plan....  Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable....  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing.

U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses*, 1-2 (Dec. 2011).

111.  Stated simply, to determine whether reasonably expected returns justified the costs of their active management strategy, Named Plan Fiduciaries had to understand those costs.  The best tool for that was the "expense ratios" of the mutual funds they selected.

112.  A mutual fund's annual expense ratio is calculated by dividing the fund's operating expenses by the average dollar value of its assets.  Expense ratios are strong predictors of performance. In fact, the SEC requires every mutual fund to disclose its expense ratio in a standardized format in the fund's prospectus.

113.  In addition to investment management fees, the expense ratio also reflects certain other fees that may be paid by the mutual fund to other service providers (a practice known as "revenue sharing"), such as "distribution" fees (or "12b 1 fees"), "sub-transfer agency" fees and other costs, such as for accounting and

legal services.  The mutual fund passes along these costs to investors by deducting them from investment returns.

114.   The leading mutual fund investment research and services firm, Morningstar, emphasizes the effect of expenses on fund performance and advises investors to rely on expense ratios when choosing mutual funds:

> If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision.  In every single time period and data point tested, low-cost funds beat high-cost funds.... Expense ratios are strong predictors of performance…. Investors should make expense ratios a primary test in fund selection. They are still the most dependable predictor of performance.

Russel Kinnel, *How Expense Ratios and Star Ratings Predict Success* (Aug.  9, 2010), *available at* https://www.morningstar.com/articles/347327/how-expense-ratios-and-star-ratings-predict-success.

115.   Named Plan Fiduciaries, however, did not make expense ratios a primary test in fund selection. Instead, Named Plan Fiduciaries approved the use of high-fee, actively managed funds for GoalMaker and intentionally excluded lower fee, similarly or better performing funds, including significantly cheaper share classes of the more expensive funds they retained.

116.   In some cases, the average annual expense ratios for multiple investment options in GoalMaker were six times higher than the average expense ratios for lower-cost, similarly or better performing Vanguard index funds invested in the same asset classes ("Vanguard comparable funds"). Because every mutual

fund's expense ratio is published at the front of its prospectus, this information was readily available to Named Plan Fiduciaries at the time they made their investment decisions.

117.   For example, in 2016, all of the mutual funds in GoalMaker (Franklin Growth Adv, Vanguard Windsor II Adm, Victory Sycamore Established Value A, T. Rowe Price New Horizons, American Funds Europacific Growth R4, and Metropolitan West Total Return Bond Plan) had a combined expense ratio of approximately 0.70%, while their Vanguard comparables (Vanguard Growth Index Adm, Vanguard Index Adm, Vanguard Mid Cap Index Adm, Vanguard Total Int'l Stock Market Index Adm, and Vanguard Total Bond Market Index Adm) had an expense ratio of 0.08%, a difference of 0.62%.

118.   Throughout the Class Period, the investment management fees charged by the Plan's fund managers were millions of dollars higher than the investment management fees for comparable Vanguard funds would have been.

119.   Prior to having their hands forced by highly publicized revenue-sharing lawsuits in 2018, neither Named Plan Fiduciaries nor Defendant Investment Fiduciaries compared the performance of the GoalMaker funds to the performance of Vanguard comparable funds, among other passively managed target date index funds.

120.   Failure to include Vanguard comparable funds in GoalMaker resulted

in over $50 million in plan participants' retirement savings.

121.   Named Plan Fiduciaries' failure to proceed with great caution further caused them to ignore that actively managed funds typically charge higher fees than passively managed funds. *See* A Look at 401(k) Plan Fees, *supra*, at 7. These costs are significant.  As the Department of Labor reports, investment management fees are "by far the largest component" of all ERISA plan fees and expenses. *See id.* at 2

122.   The additional investment management fees charged by the Plan's fund managers were not justified because, at the time they made their investment decisions, the Named Plan Fiduciaries knew or should have known that the funds, based on their historic performance and other market factors, would not generate returns that compensated for those additional fees.

123.   Had Defendant Investment Fiduciaries and Named Plan Fiduciaries simply compared the expense ratios of the Plan's funds with the expense ratios of the Vanguard comparable funds' benchmarks, they would have known that participants could have invested in essentially the same underlying assets simply by choosing the lower-cost, similarly or better performing Vanguard comparable funds (or similar funds) and thereby saved the Plan participants millions of dollars.

124.   In short, at the time they made their investment decisions, Named Plan Fiduciaries knew or should have known that the returns from the actively managed

funds selected by Named Plan Fiduciaries would fall far short of recouping the millions of dollars those funds cost.

125.   Named Plan Fiduciaries easily could have determined the costs of the Plan's investments by comparing their expense ratios to those of Vanguard comparables or other index funds invested in the same asset classes.  This they did not do.

### a.   Distribution ("12b-1") fees

126.   The expense ratios of the funds in GoalMaker included substantial "distribution" fees.  In a mutual fund, distribution fees (*i.e.,* fees that cover the marketing, advertising and sales of the fund, and that compensate brokers for selling fund shares) are pure waste because participants do not obtain benefits in the form of lower average expenses or lower flow volatility. Instead, they pay the costs to grow the fund, while the fund adviser is the primary beneficiary of the fund's growth.

127.   For example, Named Plan Fiduciaries, during the Class Period, selected and thereafter retained the R4 version of the American Europacific Growth Fund (REREX) in GoalMaker. This is so even though the REREX fund paid 25 basis points in 12b-1 fees and 10 basis points in subtransfer fees to Prudential. The identical fund was available to the Plan in an R-6 share class, which paid no 12b-1 or sub-TA fees to Prudential, at an average cost of 0.49% per year over the Class Period, a difference of 0.35%.

128.   Plan participants investing in this fund received no benefit from the distribution fees.  In fact, the 0.35% difference noted above resulted in the waste of $1.5 million in participants retirement savings over the Class Period, before compounding.

129.   But even if distribution fees somehow were defensible, the Plan did not need to incur them.  This is especially so given that the corresponding Vanguard funds, which were available at the time Named Plan Fiduciaries selected and retained the more expensive, worse performing funds in GoalMaker, had no distribution fees.

130.   Named Plan Fiduciaries alternatively could have negotiated better pricing that did not include distribution fees.  Their failure to do so simply wasted participants' money.

131.   These fees were wasted because Named Plan Fiduciaries did not have a viable process for monitoring them. There was no performance-based justification or other reason for Named Plan Fiduciaries to waste plan participants' retirement savings on these additional fees.

### b.    Transaction Costs

132.   Transaction costs result from the purchase and sale of investments such as stocks and bonds by mutual fund companies. These costs are not included in a fund's expense ratio and are often hidden from participants.

133.   For example, the SEC requires mutual funds to disclose their annual "turnover ratio," the percentage of the fund's holdings that have changed over the year.  It is a measure of trading activity: the more trading, the higher the costs.

134.   The GoalMaker funds' average transaction costs during the Class Period were in the range of 80 to 95 basis points per 100% of fund turnover, which was material to the fund's performance. Upon information and belief, these costs were materially higher than those of their Vanguard comparables.

135.   Critically, the funds that Named Plan Fiduciaries excluded from GoalMaker had low trading costs.

136.   The process used by Named Plan Fiduciaries to select and retain these high turnover funds in GoalMaker was imprudent because it did not rely on an honest evaluation of the merits of the funds themselves, but on the need to pay revenue share to Prudential. This was a fee-driven, not a sound investment policy driven, fund selection process that was manifestly imprudent.

137.   Named Plan Fiduciaries knew or should have known at all times during the Class Period that high turnover would increase transaction costs borne needlessly by participants.

138.   There is no question that the additional costs that the Plan and Plan participants incurred were substantial. Named Plan Fiduciaries wasted tens of millions of participants' retirement savings (before compounding).

139.   ERISA required Named Plan Fiduciaries to determine whether these substantial additional costs were in fact justified by realistically evaluated return expectations.  This duty Named Plan Fiduciaries violated.

140.   Named Plan Fiduciaries simply were not up to the task of implementing a low-cost, high-return investment strategy. ERISA's prudent investor standard required them to have a prudent methodology for ensuring participants' money was spent wisely – that is, Named Plan Fiduciaries needed to evaluate and affirmatively determine that the Plan and the participants would be compensated for the additional costs by a justifiable expectation of additional returns – net of fees – over what participants could have earned simply by investing in lower-cost funds.  This Named Plan Fiduciaries did not do.

141.   While Rollins did not have a well-defined investment policy, the Administrative Committee was, nonetheless, aware that the funds were not performing in accordance with participants' or fiduciaries' expectations.

142.   It should have been clear to Defendant Investment Fiduciaries and Named Plan Fiduciaries that the cost of the GoalMaker funds was not justified by a reasonable expectation of excess returns. The funds should have been removed from the investment menu.

143.   Instead, Named Plan Fiduciaries misrepresented to participants and beneficiaries that they had taken steps to control trading costs when they had not.

### 3.      A Prudent Fiduciary Would Have Considered Adding Index Funds to GoalMaker.

144.    While expense ratios are not the only consideration a plan sponsor should take into account when making investment decisions, a prudent plan sponsor, knowing the risks of an active management strategy and seeing that the costs of the funds it selected were significantly higher on average than comparable index funds, would have considered populating GoalMaker with one or more index funds.

145.    Index funds allow investment in efficient broad markets without incurring unnecessary fees.  According to Morningstar research, in 2019, the asset-weighted average expense ratio for actively managed U.S. mutual funds was 0.66%, while the asset-weighted average expense ratio for passive funds was one-fifth of that, 0.13%.  *See* Morningstar Manager Research, *2019 U.S. Fund Fee Study*, 1 (June 2020), https://www.morningstar.com/lp/annual-us-fund-fee-study.

146.    The index fund approach to investing and controlling costs is fundamentally sound from a trust law perspective.  *See* Restatement (Third) of Trusts § 90 Reporter's General Note on Comments e through h (research supports the use of passive strategies such as index funds); *id*. at cmt. h(1) ("Investing in index funds that track major stock exchanges or widely published listings of publicly traded stocks is illustrative of an essentially passive but practical investment alternative to be considered by trustees seeking to include corporate equity in their portfolios."). Even the Restatement notes, "[c]urrent assessments of the degree of efficiency

support the adoption of various forms of passive strategies by trustees, such as reliance on index funds." Restatement (Third) of Trusts § 90 General Note on Comments e through h.

147. Importantly, index fund returns account for fees and costs so that participants know what they are being charged for their investments. Named Plan Fiduciaries intentionally failed to incorporate any passive strategies, like index funds, into GoalMaker.

148. At the time Named Plan Fiduciaries made their investment decisions during the Class Period, index funds comparable to each of the Plan's funds were readily available from Vanguard and other reputable providers, including Fidelity, Schwab, and others. These index funds historically performed as well or better than the funds the Named Plan Fiduciaries selected and retained in GoalMaker and also charged significantly fewer fees.

149. Named Plan Fiduciaries, at all relevant times during Class Period, failed to timely investigate and add less costly index funds to the investment bond category. This is so even though they knew that the index option had low expense ratios and would give aging participants another option in the category.

150. Named Plan Fiduciaries' investment strategy was imprudent when made. By heedlessly pursuing a strategy they should have known was imprudent, and then, not changing course as that strategy failed, Named Plan Fiduciaries wasted

millions of dollars of Plan participants' money.

### 4.    High-Priced Share Classes.

151.   Prudence requires plan fiduciaries to monitor both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

152.   Shares of a single mutual fund may be offered in different "classes" (for example: retail v. institutional) which correspond to different shareholder rights and costs, such as different fee and "load" (*i.e.*, sales) charges. All share classes of mutual funds charge fees for the management of the assets of the fund. Indeed, a single mutual fund may have multiple share classes with different levels of advisory or shareholder services, thereby resulting in different expense ratios and different revenue sharing for the various share classes.

153.   Importantly, while the costs for the different asset classes may differ, the investment product, the managers, investment styles, and stocks are <u>identical</u>.

154.   The two most common types of mutual funds are retail funds and institutional funds. Retail class shares – such as class A, B, and C shares – are available to a broad spectrum of investors, including individuals, while institutional class shares – such as class I and R6 shares – are typically only sold to larger investors, including 401(k) plans.

155.   "[I]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

156.   The significant differences in the expense ratios between and among the institutional share classes to which retirement plans have access typically appear in the mutual fund prospectus descriptions, "Annual Fund Operating Expenses," relating to the investment management fees, 12b-1 and sub-TA fees, and other fees. The Annual Fund Operating Expenses often are different for different classes of shares, depending on the type of distribution, 12b-1, and other fees included in the expense ratio.

157.   By virtue of their size, large retirement plans have substantial bargaining power to obtain low, institutional share class pricing. Here, Named Plan Fiduciaries, despite having access to professional advice and the responsibility to manage a $1+ billion retirement plan, repeatedly failed to invest in the lower cost share classes available to it in order to properly reduce fees and costs associated with fund management.

158.   To comply with their duties under ERISA, Named Plan Fiduciaries had a duty to investigate the best share class pricing available. This they did not do.

159.   Instead, Named Plan Fiduciaries intentionally populated GoalMaker with a series of high-fee, underperforming investment funds, to the exclusion of prudent, cheaper, and equally or better performing funds. The additional fees charged by these imprudent funds were not justified by realistically evaluated return expectations, and the cost of the funds were substantially more expensive (often by a factor of 10 or more) than readily available low-cost, similarly or better performing funds in the same asset classes.

160.   Named Plan Fiduciaries' failure to follow a prudent process in investigating and periodically monitoring their selection of investment funds in GoalMaker, and their failure to act exclusively for the benefit of the Plan participants and beneficiaries, allowed Prudential, the Trustee, and Defendant Investment Fiduciaries to take kickbacks from the mutual funds in GoalMaker (*e.g.,* 12b-1, sub-TA, and other fees).

161.   At the time Named Plan Fiduciaries made their investment decisions during the Class Period, they knew or should have known that the funds in the asset classes selected for and retained in GoalMaker consistently underperformed their own chosen benchmarks.

162.   Named Plan Fiduciaries regularly and imprudently selected and retained high-cost share classes when it could have obtained similarly or better performing low-cost share classes.

### a.   Franklin Growth Fund

163.   Named Plan Fiduciaries failed to monitor and imprudently retained the Franklin Growth fund even though a cheaper, better performing share class, at all relevant times during the Class Period, was available. Not only that, but this fund was also an imprudent choice and violated the Plan's Investment Policy Statement by earning on average significantly less each year it was retained during the Class Period than its benchmark performed.

164.   During the 2016 monitoring period, Named Plan Fiduciaries and Defendant Investment Managers knew or should have known that this Franklin fund's average alpha was a negative 1.56% per year for the three earlier years and a negative 1.83% for the prior five years.

165.   Upon information and belief, Named Plan Fiduciaries also were aware that Prudential had similar selling agreements with other funds, such as Franklin, which also paid finder fees charged to participants' accounts without their knowledge.

166.   By retaining even this one underperforming fund and failing to monitor and remove it from the GoalMaker investment line up, Named Plan Fiduciaries and Defendant Investment Fiduciaries cost the Plan and Trust approximately $33 million.

### b.     Metropolitan West Total Return Bond

167.   In 2015, Named Plan Fiduciaries selected and thereafter retained the Metropolitan West Total Return Bond fund even though it paid excessive fees to Prudential and/or Defendant Investment Fiduciaries out of Plan assets and placed more risk on participants.

168.   In fact, this fund held less than 30% in government bonds and the corporate bonds held an average credit rating of "BBB" --  the lowest investment grade rating before "junk" status.

### c.     Victory Sycamore Established Value A Fund

169.   In 2016, Named Plan Fiduciaries selected and thereafter retained the Victory Sycamore Established Value A ("VETAX") fund to the Plan's portfolio solely because it paid revenue sharing fees of 0.35% per year. Named Plan Fiduciaries did so even though a different share class of that fund, the Victory Sycamore Established Value I ("VEVIX") fund, had the same holdings and same management, and generated a higher annual yield at a significantly reduced cost.

170.   Named Plan Fiduciaries did so because the VETAX fund paid revenue sharing fees to Defendant Investment Fiduciaries.

171.   Named Plan Fiduciaries' selection and retention of the VETAX fund resulted in a compounded loss of at least 51 basis points (0.51%) in annual returns that would have been generated by the VEVIX fund.

### d.    Other Funds

172.   Named Plan Fiduciaries also imprudently failed to monitor and, as a result, retained retail shares class of multiple funds of American Funds Europacific Growth, and American Funds Capital World Growth and Income instead of switching to identically performing but less costly alternative institutional share class of the same fund.  Only when highly publicized lawsuits involving these funds forced their hand did Named Plan Fiduciaries make the switch.

173.   Named Plan Fiduciaries' failure to investigate and select the best available share class pricing for identically performing funds wasted millions of dollars in participants' retirement savings on excessive fees during the Class Period. To save that money, Named Plan Fiduciaries did not have to change investments; they merely had to insist on the pricing their market power gave them.

### 5.    Named Plan Fiduciaries Failed to Appropriately Select and Monitor the Stable Value Fund in GoalMaker.

174.   The single largest fund in GoalMaker was Prudential's Guaranteed Income Contract (the "Prudential GIC"), a "stable value fund" provided by Prudential.  A prudent fiduciary, recognizing the importance of the fund in the Plan's investment lineup, would have taken great care in selecting and monitoring this investment option.  Named Plan Fiduciaries did not.

175.   Stable value funds are unique investments available only in ERISA defined contribution plans and certain other tax-advantaged plans.  A stable value

fund is a conservative, capital preservation investment product typically composed of high quality, low risk investments.  Stable value funds are designed to provide steady, positive returns and pay a contractually guaranteed return known as a "crediting rate."  The crediting rate is set by the contract and may be reset at predetermined intervals.

176.  By 2013, there were 229 participants using the Prudential Guaranteed Fund as their sole investment. Little did these participants know that Defendants agreed to a significant increase of basis points for this fund and, as such, that they were being unduly, inequitably, and unknowingly burdened to pay for Plan costs.

177.  The Prudential GIC was subject to the terms of an investment contract between Named Plan Fiduciaries and Prudential.  The Prudential GIC also was subject to the single entity credit risk of Prudential, the issuer of the contract. The crediting rate, set in advance by Prudential and reset from time to time in Prudential's sole discretion, was not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.

178.  Prudential pooled the assets of the Plan's stable value fund with those of other, unaffiliated retirement plans and invested them.  For its fee, Prudential kept the "spread," *i.e.,* the difference between the crediting rate amounts Prudential paid to participants and the returns generated on the pooled assets. Higher spread fees result in lower crediting rates.

179.   This difference, almost 1% per year on average, is the excess spread that Named Plan Fiduciaries failed to monitor.

180.   Because Named Plan Fiduciaries had the opportunity and duty to evaluate the investment in advance, this is not a case of judging an investment with the benefit of hindsight. Named Plan Fiduciaries failed to monitor the fees and performance of the Prudential GIC and to remove or replace it even though substantially identical investment options were available to Named Plan Fiduciaries from Prudential and other stable value providers with higher crediting rates and lower spread fees.

181.   The amount of money invested in the Prudential GIC was a direct result of the manner in which the Plan was structured and of Named Plan Fiduciaries' decision to use GoalMaker. Indeed, GoalMaker made large allocations to GIC, even at moderate risk levels with several years until retirement.

182.   Named Plan Fiduciaries did not have to scour the marketplace to find a better performing fund; rather, they simply had to make a minimal effort to determine whether the same fund was available at a lower cost. This they failed to do.

183.   This breach of fiduciary duty alone resulted in millions of dollars in loss (before compounding) of participants' retirement savings. This loss is something a competent, prudent, and diligent fiduciary would have known was

happening in advance and would have been able to avoid.

184.   The fact that the Prudential GIC performed poorly, both at the time Named Plan Fiduciaries selected and at all subsequent times during the Class Period, magnifies the fiduciary breaches here.   Because of the way crediting rates are calculated, a stable value fund like the Prudential GIC is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. Conversely, a stable value product that performs poorly, such as the Prudential GIC, generally continues to perform poorly, in a stable manner.

185.   Had Named Plan Fiduciaries prudently researched and monitored the Prudential GIC, and had Defendant Investment Fiduciaries done the same, they both would have known at the time of their fiduciary acts that the fund likely would underperform and continue to underperform.

186.   Defendant Investment Fiduciaries missed (if not ignored) the spread fees and, as such, did not provide an accurate accounting of the Prudential GIC fees to Named Plan Fiduciaries.  As a result, the information provided to participants to make their fund choices were incomplete and misleading.

187.   The consequence of failing to monitor the cost of Prudential GIC was particularly significant in the case of the Plan here. As noted above, Prudential, the stable value provider, was also the Plan's recordkeeper and the supplier of the

GoalMaker product, which Prudential applied in a self-dealing manner to steer Plan participants to its product.

188.   The excessive spread in this case resulted in a windfall to Prudential and Trustee, whose compensation Named Plan Fiduciaries and Defendant Investment Fiduciaries had a legal duty to monitor but failed to discharge.

189.   Based on the excessive spread fees alone, the Prudential GIC was an imprudent investment which should have been removed from GoalMaker and the Plan. Not only were participants charged excessive fees, but they also lost the opportunity to invest their money in asset classes that delivered higher returns. The millions of dollars in participants' retirement savings that GoalMaker allocated to the Prudential GIC during the Class Period would have been invested in funds with substantially higher returns if the Plan had been prudently managed.

190.   Named Plan Fiduciaries did not have a prudent process for selecting or monitoring the costs of the Prudential GIC.  Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants.

191.   A plan with a $100 million stable value fund like the Prudential GIC has considerable bargaining power in the marketplace. At all times during the Class Period, there were multiple stable value products available to similar sized plans with lower fees and higher crediting rates.

192.   To take advantage of this bargaining power, Named Plan Fiduciaries, through Defendant Investment Fiduciaries, should have submitted requests for proposal to other stable value fund providers. For example, the Vision Service Plan, comparable to the Plan here, had bid out its Prudential general account stable value fund to obtain a superior product with higher crediting rates in the three percent range. To obtain better rates, all that Named Plan Fiduciaries had to do was ask.  This they did not do.

193.   Plaintiffs estimate that Prudential received over $5 million in excess spread fees during the Class Period.  This excess cost was entirely foreseeable.  The future return on a stable value product is known in advance, set by the crediting rate. Named Plan Fiduciaries knew the crediting rate when it selected and thereafter retained the Prudential GIC.

194.   A prudent fiduciary would have known that the Prudential GIC would underperform and that, being a stable value product, it would continue to underperform. Named Plan Fiduciaries should not have selected the Prudential GIC. Certainly, as the Prudential GIC continued to underperform, Named Plan Fiduciaries should have removed and replaced it.

195.   The funds invested in the Prudential GIC, in violation of ERISA § 1104(a)(1)(C), also were not adequately diversified. The Prudential GIC is a contract, a piece of paper, subject to the single entity credit risk of Prudential, as the

issuer of the contract. The return of the investment depends on crediting rates set at the discretion of a single provider, Prudential. The crediting rate, set by Prudential alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Simply stated, the risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, Prudential. Upon information and belief, Prudential pocketed more than 70 basis points in excess fees and failed to provide the rate of return that would ordinarily compensate for the Plan's failure to fully diversify its investments.

196.   Not surprisingly, following the high-profile failure or near failure of several stable value providers during the credit crisis of 2008-09, the trend among fiduciaries in large plans was to avoid general account stable value funds because of credit risk concerns and to select more diversified stable value products.

197.   While there may be circumstances under which it may be prudent not to diversify the assets of a plan invested in a stable value fund, this is not such a case.

198.   At a June 2017 meeting, Named Plan Fiduciaries acknowledged that the Prudential GIC was flexible in the revenue sharing that could be generated, that they had the ability to demand a reduction of revenue sharing to 10 basis points, and that such reduction would provide a direct increase in crediting rate to the participants who invested in this fund. Despite these acknowledgements, Named Plan Fiduciaries, as they had done throughout the Class Period, chose to keep the

existing investment options and revenue sharing agreements as is, without further discussion or reason.

199.   Prudential concealed and Defendant Investment Fiduciaries and Named Plan Fiduciaries failed to investigate the actual underlying cost of the GIC. On the notices provided to participants, the underlying expense ratio of the GIC was omitted. Furthermore, the GIC's net expense ratio (%) was left blank in participant statements, despite the disclosure of all other funds' expense ratios.

200.   Meanwhile, the GIC's actual 0.50% underlying expense ratio generated between $450,000 and $615,000 each year in additional undisclosed revenue to Prudential between 2013 and 2020. This expense does not include the 0.20% recordkeeping fee added to the expense ratio to cover Prudential's "required revenue deficit" that inequitably burdened participants who actively invested in or were defaulted into the product.

201.   In short, the Prudential GIC was imprudent and should have been removed from the Plan.

**6.     Wasting Participants' Money through GoalMaker.**

202.   As most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement, and because "[w]asting beneficiaries' money is imprudent[,]" Uniform Prudent Investor Act (the "UPIA") § 7, a plan fiduciary should minimize costs of investments.

203.   The day-to-day operation of an ERISA plan requires certain basic administrative functions, such as recordkeeping and accounting, and other discretionary services, such as providing customer service representatives, online account management, and educational programs. *See A Look at 401(k) Plan Fees, supra*, at 3.  The fees for these services, as well as the fees charged by investment advisors to the plan, are components of administrative expenses.

204.   ERISA specifically requires a plan sponsor to "defray[ ] reasonable expenses of administering the plan ...." 29 U.S.C. § 1104(A)(ii).  That is, in investing and managing Plan assets, Named Plan Fiduciaries must minimize costs.

205.   Every ERISA plan incurs administrative expenses for recordkeeping and various professional services.  The underlying cost to a recordkeeper of providing recordkeeping services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

206.   The incremental cost for a recordkeeper to provide recordkeeping services for a participant's account does not materially differ from one participant to another; it is generally not dependent on the balance of the participant's account.

207.   Recordkeeping and other Plan expenses also can be prudently selected, monitored, and retained based on offering less expensive, equal or better performing share classes of the same fund.  Investment managers use tiered expense ratios,

several share classes with institutionally priced shares the least expensive. Plan fiduciaries have a responsibility to consider the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan. This is especially so because, on average, there are lower expense ratios for 401(k) participants than those for other investors.

### a.    "Revenue sharing" Hid the Plan's True Costs.

208.   Named Plan Fiduciaries schemed with Prudential and Defendant Investment Fiduciaries to make GoalMaker a revenue sharing plan. Revenue sharing is the practice of mutual funds paying other service providers' fees (*e.g.*, as here, recordkeeping and investment advisory fees), and passing the cost on to participants through the mutual funds' expense ratio.

209.   Revenue sharing is often touted by the mutual fund industry as a way of controlling expenses. More often, it drives up administrative expenses while obscuring their true cost.

210.   Not surprisingly, revenue sharing is widely known as "the dirty little secret of the mutual fund industry," accounting for more than $2 billion annually by the industry. See, e.g., John P. Freeman, *The Mutual Fund Distribution Expense Mess*, 6/28/2007, The Journal of Corporation Law.

211.   Plan fiduciaries generally decide how to pay the negotiated fee for recordkeeping services. In a direct fee arrangement, the fiduciary contracts with a

recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants. Under this type of arrangement, each participant, regardless of his or her investments or balance will incur the same fee. For those participants invested in funds that are paying revenue sharing, revenue can be credited back to those participants to ensure that each participant is paying the same fee. *See* Sheldon Geller, "Understanding the Various Kinds of 401(k) Service Fee Arrangements," CPA Journal (Jul. 2016).

212.   Revenue sharing arrangements are often preferred by many plan fiduciaries because they do not receive a bill for the recordkeeping expenses and, therefore, can pass on the expenses to plan participants, many times (as here) without the participant's knowledge that they are being charged.

213.   Revenue sharing arrangements likewise are generally preferred by recordkeepers, because they readily can obtain an increase in revenue without having to ask their plan clients to take affirmative steps to pay a higher fee, and without them having to do additional work.

214.   The amount of revenue sharing varies from fund to fund. As a practical matter, participants whose accounts are invested in funds that pay revenue sharing subsidize the administrative costs for participants who have invested in the investments that do not pay revenue sharing.  Plaintiffs here fall into both categories of participants.

215.   The nature of revenue sharing arrangements exposes plan fiduciaries to self-dealing and conflicts of interest, as well as to causing the plan to engage with self-dealing and/or conflicted service providers. For example, in providing advice, an investment fiduciary theoretically could influence the decision-making process and cause the plan to invest in funds which pay higher revenue sharing payments relative to cheaper and similarly or better performing alternative investments. Likewise, inherent conflict of interest in such situations can cause plan fiduciaries to select and retain funds that benefit them and plan service providers even though they are not the most prudent investment option. This is exactly what happened here.

216.   Decisions about whether to select funds that pay revenue sharing, how to pay for recordkeeping services, and how to allocate those payments are fiduciary in nature and, thus, subject to ERISA's duties of prudence and loyalty.  That is, plan fiduciaries, in all cases, must engage in a process to make these decisions and must consider the impact on the participants.

217.   Plan fiduciaries have an obligation under ERISA to understand and monitor revenue sharing payments made to covered service providers to ensure that the total amount of such payments, together with any other sources of compensation received by the provider, are not excessive.  This Named Plan Fiduciaries did not do during the Class Period.

218.   While revenue sharing is not necessarily improper, it was abused here

and, of equal import, intentionally concealed from Plan participants.

### b.    Investment Advisory Expenses

219.    Defendant Investment Fiduciaries provided investment advisory services to Named Plan Fiduciaries, including recommendations respecting mutual funds and the Plan's investment menu. With respect to all the mutual funds in GoalMaker, Defendant Investment Fiduciaries were compensated, at least in part, with revenue sharing.

220.    Named Plan Fiduciaries' compensation was not clearly stated in Named Plan Fiduciaries' statutory disclosures.

221.    Based on publicly available data reported by similarly sized ERISA plans, and upon information and belief, the fees that Defendant Investment Fiduciaries charged the Plan and Plan participants were grossly excessive.

222.    Named Plan Fiduciaries failed to monitor and control the investment advisory fees charged by Defendant Investment Fiduciaries, resulting in substantial losses to Plan participants.

### c.    Recordkeeping expenses

223.    Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fee paid to the recordkeeper is reasonable for the level of services provided. However, a recordkeeping provider receives its compensation, whether through direct payments, indirect compensation such revenue sharing, or a

combination of both, the plan fiduciaries must ensure that the that the total compensation received by the provider is reasonable for the services provided. To determine reasonability, plan fiduciaries must understand the total dollar amounts being paid to the recordkeeper as well as understanding the marketplace rates for the recordkeeping services received by the Plan.

224. To prudently manage and control a plan's recordkeeping costs, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the Plan. A prudent fiduciary tracks fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

225. To make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and indirect compensation (like revenue sharing) being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

226. A plan fiduciary also must remain informed about overall trends in the

marketplace regarding the fees being paid by other plans, particularly comparably sized plans, as well as the recordkeeping rates that are or may be available to the plan. This will generally include conducting a bid process at reasonable intervals, and immediately upon discovery that a plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, a bid process should happen at least every three years as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or if every-other-year fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

227.   Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping services by soliciting competitive bids from several service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process, and prudent plan fiduciaries perform it regularly. Plan fiduciaries need only request a bid, a request for proposal ("RFP"), from salespeople at other service providers. For plans with as many participants as the Plan, most recordkeepers would require only the number of participants to provide a quote.

228.   The fees paid to recordkeepers should be evaluated and compared by the plan fiduciaries on a dollar per participant basis, because the compensation can come from multiple sources, as described above. By merely soliciting bids from other providers, a prudent plan fiduciary can quickly and easily gain an

understanding of the current market for similar recordkeeping services and have an idea of a starting point for negotiation.

229.   The market for recordkeeping services is highly competitive. There are numerous high quality recordkeepers that will readily respond to a request for proposal from a large defined contribution plan, like this Plan.  These recordkeepers differentiate themselves primarily on price and vigorously compete for business.

230.   The recordkeeper's costs are a function of the number of plan participants, not the value of their accounts.  The cost of providing recordkeeping services to a participant with a small account balance is the same for a participant with a large balance.

231.   Plans with large numbers of participants can take advantage of economies of scale: a plan with 1,000 participants can negotiate a lower per participant fee than a plan with 100 participants.

232.   Given the number of participants in the Plan during the Class Period, and the average account balance in the Plan, Named Plan Fiduciaries, had they been prudent, would have given serious consideration to pricing recordkeeping services on a per capita basis, rather than an asset basis, to avoid being overcharged.

233.   Importantly, as part of the bidding process, the plan sponsor must require the recordkeeper to identify not only the level of recordkeeping services and their cost, but also the cost of any proprietary investment products offered by the

recordkeeper or its affiliates that the Plan must select (a "bundling" arrangement). In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, not only direct payments, but from bundled products and services, fees from separate accounts, and revenue sharing as well.

234.  During the Class Period, Named Plan Fiduciaries did not implement a prudent process for bidding out recordkeeping services or benchmarking the recordkeeping costs. Nor did Named Plan Fiduciaries "benchmark" Prudential's fees at relevant times during the Class Period to make sure they are reasonable.  As intimated above, benchmarking is necessary both when a recordkeeper is selected, to verify that the initial fees are reasonable, and regularly thereafter, typically once a year.

235.  Named Plan Fiduciaries and Defendant Investment Fiduciaries, upon information and belief, neglected to solicit nor submit bid proposals for more than 10 years during the Class Period.  Named Plan Fiduciaries and Defendant Investment Fiduciaries were incentivized not to participate in such bid process, as they knew that any new fee policy would expose the errors in their past practices. Named Plan Fiduciaries also were concerned about the manner in which the changes would be communicated to participants.

236.  Based on information currently available to Plaintiffs regarding the

Plan's features, the nature of the administrative services provided by Prudential, the Plan's participant level, and the recordkeeping market, failure to have monitored and solicited bid proposals for recordkeeping services cost the Plan and Plan participants millions of dollars during the Class Period.

237.   Based on publicly available information reported by similarly sized ERISA plans, Prudential's recordkeeping fees charged to the Plan and Plan participants were grossly excessive considering the value of the services it provided, including both recordkeeping and the stable value fund.  This is especially so given that this was not the only compensation Prudential received. Indeed, Prudential also was compensated indirectly by bundled fees from its stable value fund and other illicit kickbacks not disclosed to Plan participants.

238.   The potential for this sort of abuse is precisely why parties-in-interest (such as recordkeepers) are presumptively prohibited from entering into contracts with the plan for other services, such as the stable value fund contract. *See* 29 U.S.C. § 1106(a) (prohibited transactions between plan and a party-in-interest).

239.   Upon information and belief, Prudential, during the Class Period, received approximately 10 times the amount of what reasonable fees would have been.

240.   In determining whether Prudential's recordkeeping fees were reasonable, Named Plan Fiduciaries, particularly in light of Prudential's bundling

arrangement, Named Plan Fiduciaries should have scrutinized its total compensation.   Named Plan Fiduciaries failed to do that, and the participants suffered for it.

241.   Whether Plan participants paid Prudential's excessive fees directly through deductions from their individual accounts, or indirectly as cost of revenue sharing and the bundling arrangement, they were harmed all the same.  Every dollar of unreasonable recordkeeping fees cost participants a retirement dollar that was no longer available for investment.

242.   Upon information and belief, the Plan's actual administrative expenses for recordkeeping and investment advisory services were millions of dollars more than they should have been.

243.   At all relevant times during the Class Period, Named Plan Fiduciaries easily could have received a quote from other service providers to determine if the level of fees charged by Prudential and Defendant Investment Fiduciaries. This they did not do.

244.   In short, Named Plan Fiduciaries failed to monitor and control total administrative expenses, resulting in significant losses to Plan participants.

### 7.   The Why: Defendants' Conflicts of Interest

245.   While the same investment options in GoalMaker were available to participants who did not use GoalMaker, not all of the options available outside

GoalMaker were available in GoalMaker.  This was intentional.

246.   Because GoalMaker was the default investment option for participants, Named Plan Fiduciaries, at the insistence of Prudential and Defendant Investment Fiduciaries, purposely populated it only with funds that, unbeknownst to participants, paid hidden, excessive revenue sharing fees.

247.   The hidden fees paid by these funds, and the revenue sharing agreement between Prudential and the Defendant Investment Fiduciaries, directly benefitted Named Plan Fiduciaries. So long as they agreed to populate GoalMaker with these funds, Prudential did not send them a bill for recordkeeping services.  Instead, the expenses were taken out of the revenue generated by the investment funds, *i.e.,* out of participants' benefits.

248.   Had Prudential, instead, invoiced the Plan for its recordkeeping services, Named Plan Fiduciaries would have been forced to disclose the excessively high fees Prudential charged to participants. This transparency would have enabled participants to challenge such expenses as unreasonable.

249.   At all relevant times, Named Plan Fiduciaries knew that they were putting their own interests ahead of plan participants.

250.   Participants who, like Fleming, defaulted to GoalMaker, unknowingly were charged for these unreasonable fees and kickbacks, which were not reflected in their account statements.

251.   Concealing these expenses and revenue sharing from participants allowed Defendants to continue benefitting from their illicit revenue sharing arrangements.

252.   At all relevant times, Named Plan Fiduciaries failed to follow the terms of the Plan, which required them to restore (regardless of closed years) the account balances for those participants using GoalMaker who were harmed by being required to invest in the more expensive share classes (with lower yields and total returns).

253.   The selection and retention of investment funds in GoalMaker were made by Named Plan Fiduciaries during the Class Period in a fiduciary capacity. Named Plan Fiduciaries, however, did not have the competence, exercise the diligence, or have in place a viable methodology to monitor either the competence of Prudential and Defendant Investment Fiduciaries, or the prudence of selecting and retaining the investment options in GoalMaker.

254.   At all relevant times during the Class Period, Plan fiduciaries knew, or should have known, that Prudential and Defendant Investment Fiduciaries designed the Plan's investment platform to steer participants' retirement savings in GoalMaker to investment options that paid unreasonable, secret, and indirect compensation to Prudential, the Trustee, and Defendant Investment Fiduciaries.

255.   Up through at least June 2017, Prudential's increased revenue sharing during the Class Period had reduced the crediting rate to every one of the

approximately 7,000 participants invested in the GoalMaker program.

256.   Such investment expense adversely affected the Plan's mutual funds' performance and income (yields).  Specifically, the expenses were taken daily from each of the Plan's mutual funds based on the prospectus (commensurately reducing each mutual fund's net asset value).  Because trading in a 401(k) plan is done on an omnibus, not individual level, the mutual fund companies then sent their collected, aggregated revenue sharing amounts back to Prudential for each specific fund periodically based on their fund selling agreement, which Plaintiffs did not receive.

257.   The affected individual participants in the Plan, however, received their "credits" more than 90 days later.   Plus, their "credits" were deemed only "estimates," which prevented them from compounding as quickly as those of cheaper equivalent funds (the "Missed Monthly Yields").

258.   As Fund yields on the more expensive share classes were often depleted by more than 30%, the Missed Monthly Yields also directly harmed every investor in the affected mutual fund dramatically more than the revenue sharing credit's true worth.

259.   Furthermore, upon information and belief, if and/or when Plan participants/beneficiaries changed their investment elections and/or separated from service, they did not receive any "credits" at all.

260.   The Plan's participants/beneficiaries' revenue-sharing deductions and

crediting amounts also varied dramatically by each fund chosen and kept by Named Plan Fiduciaries.

261.   The reason why the Plan (especially GoalMaker) included high fee funds and excluded cheaper and similarly or better performing funds is simple. The high-fee funds made payments to Prudential and Defendant Investment Fiduciaries as a result of being included in the Plan's investment lineup. The lower-fee funds did not.

262.   In 2009, Named Plan Fiduciaries realized that they did not have sufficient funds to offset Prudential's recordkeeping expenses. Named Plan Fiduciaries, putting their own interests ahead of participants, decided to pass on the deficit to participants without their knowledge. Indeed, Named Plan Fiduciaries expressly instructed Defendant Investment Fiduciaries not to disclose this deficit in future participant account statements.   Defendant Investment Fiduciaries, at all relevant times during the Class Period, heeded this instruction without further debate or discussion.

263.   In 2010, Prudential and Defendant Investment Fiduciaries, because of the substantial revenue sharing fees it generated, pushed Prudential's proprietary fund, the Prudential Guaranteed Income Contract fund, on Named Plan Fiduciaries. Named Plan Fiduciaries agreed to include this fund in the Plan's investment menu. Of greater import, Named Plan Fiduciaries affirmatively allowed an increase to 20

basis points for revenue sharing in the Prudential GIC. This was so even though the fund had provided for only 5 basis points in revenue sharing for this fund since 2009 or before.

264.   By 2012, the Plan had a surplus from the revenue sharing fees unknowingly paid for by participants. Rather than disclose or rebate that surplus (even in part) to participants, Named Plan Fiduciaries, after discussions with Prudential and Defendant Investment Fiduciaries, decided to conceal it from participants and to continue the existing revenue sharing arrangement with Prudential and Defendant Investment Fiduciaries.

265.   Named Plan Fiduciaries imprudently selected the Hartford Midcap fund in 2016, which (upon information and belief) paid fees charged by Prudential and/or Defendant Investment Fiduciaries out of Plan assets, to replace an equally performing institutional fund that did not charge such fees. Moreover, Named Plan Fiduciaries selected this share class even though a cheaper, better performing class of this fund had been available since November 2014.  Upon information and belief, based on an analysis of the Forms 5500 filed by the Plan and a comparison with the benchmark, The Hartford Midcap fund underperformance in the period from 2016 through 2021 cost the Plan approximately $8.5M.

266.   At all relevant times during the Class Period, Named Plan Fiduciaries intentionally concealed from participants the benefits that they, Prudential, and

Defendant Investment Fiduciaries received from the poorly performing funds which provided unreasonably high revenue sharing fees and illicit kickbacks.

267.   At all relevant times during the Class Period, Named Plan Fiduciaries affirmatively endorsed these investment funds to participants even though they knew, or should have known, that the majority of these funds failed to outperform relevant benchmarks and, at the same time, depleted participant accounts by charging excessively high fees to their accounts without their knowledge.

268.   Because of their conflicts of interest, Named Plan Fiduciaries, at all relevant times during Class Period, never considered selecting institutional share classes, which paid significantly lower fees and performed as well or better than their retail share counterparts.

269.   The revenue sharing provided by the Metropolitan West and Oakmark funds recommended by Defendant Investment Fiduciaries and Prudential and selected and retained by Named Plan Fiduciaries caused the Plan's strategy and risk profile to dramatically shift. Whereas, in 2014, nearly the entire 40% fixed income portion of the portfolio was invested in highly rated U.S. Bonds, by 2019, up to 20% of the fund's portfolio consisted of high yield (junk) bonds. Named Plan Fiduciaries, in violation of their ERISA duties, failed to address the significant shift in investment strategy and risk as mandated by the Plan's Investment Policy Statement.

270.   Named Plan Fiduciaries' reckless practice of reducing participants'

total returns by the revenue sharing amounts to pay bills from covered service providers such as Prudential and Defendant Investment Fiduciaries was mathematically flawed.  For every $1,000 of wages invested by a participant in a fund (selected and retained by Named Plan Fiduciaries), over 80% had at least 25 basis points in revenue sharing deductions. This means that, at all relevant times during the Class Period, Named Plan Fiduciaries, without the participant's knowledge, knowingly directed $2.50 for every $1,000 invested by a participant to Prudential and Defendant Investment Fiduciaries. This arrangement directly harmed participants, as they earned on average significantly less than what they would have earned without this arrangement.

271.   These harms were experienced by participants and beneficiaries immediately.  Because revenue sharing is taken each day of the year, it compounds negatively in an exponential manner (not arithmetically).

272.   The payment, and compounding, of revenue sharing fees paid to Prudential, by decreasing the net asset value ("NAV") (*i.e.,* the price of the affected funds), resulted in additional lost opportunity costs to the Plan's participants/beneficiaries.

273.   But for Named Plan Fiduciaries' breaches of their duties of prudence and loyalty, and their failure to follow the terms of the Plan, participants and beneficiaries lost the opportunity to have their benefits grow significantly.

274.   At all relevant times during the Class Period, Plan fiduciaries knew, or should have known, that Prudential and Defendant Investment Fiduciaries designed the Plan's investment platform to steer participants' retirement savings to investment options that paid unreasonably high fees and kickbacks to Prudential and Defendant Investment Fiduciaries.

275.   Only because of three highly publicized revenue sharing abuse lawsuits, Named Plan Fiduciaries, for the first time in 2018, were forced to change their selection and monitoring processes of covered service providers, reduce recordkeeping fees, add index funds, and improve many of the share class funds in the investment menu.

276.   Of all Plan assets invested in mutual funds in 2020, 80% had often not been timely invested during the Class Period into identical, cheaper, similarly or better performing share classes.

277.   At all relevant times during the Class Period, Named Plan Fiduciaries knew or should have known that a plan with more participants, such as the Plan, can receive a lower effective per participant fee when evaluated on a per participant basis. Named Plan Fiduciaries also knew or should have known that the Plan should have received lower effective per participant fees than were actually paid.

278.   In devising and implementing strategies for the investment and management of trust assets, Named Plan Fiduciaries, as trustees of the Plan, had a

duty to minimize costs. Restatement 3d of Trusts, § 90 (2012).

279.   Named Plan Fiduciaries had a duty to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." *Id*.

280.   Adherence to this duty required the regular performance of an "adequate investigation" of existing investments in the Plan to determine whether any of the Plan's investments were "improvident" or if there was a "superior alternative investment" to any of the Plan's holdings. *Id*.

281.   At all relevant times during the Class Period, Fiduciaries knew or should have known that they must regularly monitor the Plan's recordkeeping fees paid to covered service providers, including but not limited to Prudential.

282.   At all relevant times during the Class Period, Named Plan Fiduciaries failed to regularly monitor the Plan's recordkeeping fees paid to Prudential.

283.   At all relevant times during the Class Period, Named Plan Fiduciaries knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers to avoid paying objectively unreasonable fees for recordkeeping services.

284.   At all relevant times during the Class Period, Named Plan Fiduciaries knew or should have known that it was in the best interests of the Plan's participants to ensure that the Plan paid no more than a competitive and reasonable fee for the

recordkeeping services.

285.   At all relevant times during the Class Period, and unlike a prudent fiduciary, Named Plan Fiduciaries failed to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping services. Doing so breached Named Plan Fiduciaries' duty to act with a degree of care that could be expected under all circumstances by reasonable beneficiaries and participants and cost the Plan and participants millions of dollars.

286.   At all relevant times during the Class Period, and unlike a prudent fiduciary, Named Plan Fiduciaries did not have a process in place to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping services. Alternatively, to the extent there was a process in place that Named Plan Fiduciaries followed, they acted ineffectively, given the objectively unreasonable fees paid for recordkeeping services.

287.   At all relevant times during the Class Period, and unlike a prudent fiduciary, Named Plan Fiduciaries did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping services.

288.   Upon information and belief, at all relevant times during Class Period, because Named Plan Fiduciaries failed to regularly monitor the Plan's recordkeeping fees paid to Prudential, the Plan's recordkeeping service fees were significantly

higher than they would have been had Named Plan Fiduciaries engaged in this process.

289.  At all relevant times during the Class Period, because Named Plan Fiduciaries did not regularly solicit quotes and/or competitive bids from covered service providers, the Plan's recordkeeping service fees were significantly higher than they would have been had Named Plan Fiduciaries engaged in these processes. Alternatively, to the extent there was a process in place that Named Plan Fiduciaries followed, Named Plan Fiduciaries acted ineffectively, given the objectively unreasonable fees paid for recordkeeping services.

290.  At all relevant times during the Class Period, because Named Plan Fiduciaries did not engage in any objectively reasonable and/or prudent efforts when paying fees for recordkeeping services to Prudential, Prudential 's fees were significantly higher than they would have been had Named Plan Fiduciaries engaged in these efforts.

291.  Named Plan Fiduciaries wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.

292.  Named Plan Fiduciaries also hid the true share cost of the Plan's funds from the Plan's participants/beneficiaries in participant statements, in Form 5500s filed with the DOL, and in employee communications and, in doing so, prevented

participants from demanding that these ERISA violations be cured, and prevented their access to an investment menu of faster compounding and cheaper yet identical mutual funds.

293.   Plan participants, at all relevant times during the Class Period, were unable to discern from their account statements how much of their contributions actually were put into the Plan.

294.   Based on the information available to Plaintiffs, Named Plan Fiduciaries permitted the Plan to pay Prudential excessive and unreasonable recordkeeping and other administrative costs during the Class Period.

295.   At all relevant times during the Class Period, Named Plan Fiduciaries, based upon the information available to them, and annual recordkeeping fees paid by plans of comparable size, could have negotiated recordkeeping fees for significantly less than what was charged per participant.

296.   Even to the extent that Named Plan Fiduciaries did undertake a review of the Plan's recordkeeping expenses, the process they used to evaluate fees was so deeply flawed that Plan participants continued to pay significantly more than what they should have been for substantially similar recordkeeping services.

297.   Had Named Plan Fiduciaries, at all relevant times during Class Period, acted in the exclusive best interest of the Plan and/or employed a robust process to gather appropriate information and evaluate recordkeeping fees and services, the

Plan and Plan participants would have paid significantly less in recordkeeping fees.

298.   If Named Plan Fiduciaries had been acting in the exclusive best interest of the Plan and Plan participants, and/or employed a robust process to gather appropriate information and evaluate recordkeeping fees and services, the Plan and Plan participants would have paid significantly less for recordkeeping services.

299.   During the entirety of the Class Period, unlike prudent fiduciaries, Named Plan Fiduciaries did not regularly and/or reasonably assess the recordkeeping fees paid to Prudential and did not engage in regular and/or reasonable examination and competitive comparisons of the fees paid Prudential vis-à-vis the fees that other recordkeeping providers would charge for the same services.

300.   During the entirety of the Class Period, Named Plan Fiduciaries knew or should have known that they must engage in regular and/or reasonable examination and competitive comparison of the Plan's recordkeeping fees, but discovery will show Named Plan Fiduciaries intentionally failed to do so.

301.   Had Named Plan Fiduciaries engaged in any regular and/or reasonable examination and competitive comparison of the recordkeeping fees paid, they would have realized that Prudential was being compensated unreasonably and inappropriately for the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Class. The fees were also excessive relative to the recordkeeping services received.

302.   Named Plan Fiduciaries, at all relevant times during the Class Period, affirmatively endorsed the selection of these excessively high-fee, poorly performing funds to Plan participants to avoid receiving a bill for the services of Prudential and Defendant Investment Fiduciaries.

303.   During the entirety of the Class Period, by failing to recognize that the Plan and its participants were being charged much higher recordkeeping fees than they should have been charged and/or by failing to take effective remedial actions as described herein, Named Plan Fiduciaries breached their fiduciary duties to Plaintiffs and the Class.

304.   At all relevant times during the Class Period, Defendants did not follow the terms of the Plan, did not have adequate procedures in place to monitor Plan service providers and investments, and did not act in the best interests of the Plan participants.

305.   Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries endorsed and affirmatively concealed from participants and beneficiaries Prudential's selling agreements with default investment funds in the Plan, revenue sharing agreements between Prudential and Defendant Investment Fiduciaries, and their own conflicts of interest.  As a result, Plan participants were unaware of the excessive and unreasonable fees

secretly charged to their accounts by Prudential and Defendant Investment Fiduciaries.

306.   Named Plan Fiduciaries affirmatively reassured participants that they would keep their retirement goals on track.  However, this representation was false. Instead, Named Plan Fiduciaries, recordkeeper Prudential, and the Defendant Investment Fiduciaries served their own self-interests by funneling participants' retirement savings into overpriced investment products and into investments that paid finder fees and other kickbacks to them.  In doing so, Named Plan Fiduciaries affirmatively disfavored reliable, higher performing, and lower-cost funds available from reputable providers that did not pay such kickbacks. This resulted in the participants' paying excessive investment management fees, administrative expenses, and other costs, which over the Class Period cost participants millions of dollars in retirement savings.

307.   At all relevant times, Named Plan Fiduciaries knew that they were putting their own interests ahead of plan participants.  In fact, at a June 2017 meeting, Named Plan Fiduciaries acknowledged that a reduction of recordkeeper fees would result in an increase of the revenue generated by the lineup and, therefore, inure to the benefit of participants and beneficiaries.

308.   The payment of administrative fees is a matter which must also be addressed separately on the merits. Advising a client to retain a fund that the client

believes is imprudent for the purpose of paying recordkeeping fees is itself imprudent.

309.   Named Plan Fiduciaries should have asked for competitive proposals for recordkeeping fees and treated the payment of recordkeeping fees and the selection of investments as separate and unrelated. This they did not do.

### C.   Named Plan Fiduciaries Also Selected and Retained High Fee, Poorly Performing, Imprudent Investments Outside of GoalMaker.

310.   Named Plan Fiduciaries' conflicts of interest and breaches of prudence and loyalty carried over to investments offered to participants outside GoalMaker as well.

### 1.   Oakmark Equity and Income Fund

311.   In 2009, Named Plan Fiduciaries sold all of the Dodge & Cox Balanced Fund's assets, then the default fund and representing the entire trust corpus' shares of this security worth an estimated $19 million of the accounts of participants and beneficiaries, and put the resulting cash into the lower-yielding, more costly Oakmark Equity and Income Fund.  Named Plan Fiduciaries did so because the Oakmark Equity and Income Fund paid 300% more in revenue sharing than the Dodge & Cox Balanced Fund.

312.   Named Plan Fiduciaries did so even though the Dodge Balanced fund earnings were $2,714,021.18 greater than the Oakmark Equity and Income Fund

throughout the Class Period.

313.   Named Plan Fiduciaries did this even though they knew that the Oakmark fund historically performed, and at all relevant times during the Class period continued to perform, poorly, and ranked in the bottom 15th percentile.

314.   In fact, at the February 5, 2013, meeting, the Administrative Committee acknowledged that if it "were to grade the [Oakmark] fund, it would receive an 'F.'"

315.   Nevertheless, Named Plan Fiduciaries, knowing that it did not meet the requirements per the Plan's Investment Policy Statement, kept the Oakmark Equity and Income Fund on its existing line-up and hid from participants its poor performance and excessive revenue sharing fees.

316.   Named Plan Fiduciaries did not evaluate this fact at any point in making their investment decisions.  Nor did Named Plan Fiduciaries investigate why it was prudent to replace the better performing, lower fee Dodge Balanced fund with the Oakmark fund.  Named Plan Fiduciaries made the switch because they put the interests of Defendants ahead of those of participants and beneficiaries.

317.   The decision to finally remove the Oakmark Equity and Income Fund from the Plan occurred on September 14, 2020, after a decade with significant periods on the watch list, bottom-quartile returns, and investment style and risk profile changes that Named Plan Fiduciaries failed to prudently monitor.

318.   Upon information and belief, Named Plan Fiduciaries' conflicted

decisions and imprudent processes during the Class Period will require another $23+ million to make the Plan and Plan participants whole.

### 2.  Goldman Sachs Mid Cap Value A Fund

319.   At all relevant times during the Class Period, the Goldman Sachs Mid Cap Value A fund held a large portion of the Plan's assets.

320.   While they knew that at least two identical, less costly, better performing, and higher-yielding funds (Goldman Sachs Mid Cap Value Instl and "True No-Load" Goldman Sachs Mid Cap Value Instl fund) were available, Named Plan Fiduciaries neither offered nor disclosed it to Plan participants. This is so even though the alternative fund appeared on the same page as the Goldman Sachs Mid Cap Value A fund's prospectus, was run by the same management company, and had the same managers with the same start dates.

321.   Named Plan Fiduciaries chose the more costly Goldman Sachs Mid Cap Value A fund to generate revenue sharing, instead of being directly billed by Prudential for its services.

322.   When Named Plan Fiduciaries replaced the Goldman Sachs Mid Cap Fund with the Victory Fund, they affirmatively chose to conceal from Plan participants the facts that Prudential had a selling agreement with Victory, that the Victory Fund paid finders fees, and that these excessively high fees were passed on to participants.

323.   In fact, and unbeknownst to Plan participants, replacing the Goldman Sachs Mid Cap Fund with the Victory Fund triggered compensation to the Defendant Investment Fiduciaries in violation of trust law's "impartiality rule" and their duty of loyalty under ERISA.

### 3.   Hartford MidCap fund

324.   In 2016, Named Plan Fiduciaries replaced Morgan Stanley Inst Mid Cap Growth (added in the 2011 plan year) with the Hartford MidCap fund because of the revenue sharing it provided the other Defendants.

325.   Named Plan Fiduciaries, without further evaluation or discussion, retained the Hartford fund over the next five years even though it earned 15.3% per year while the replaced Morgan Stanley fund earned 26.2% per year.

326.   The standard for determining the impact of underperforming mutual funds is the comparison of the investment performance of the assets of the Plan invested in high-fee funds in the plan to the investment performance that assets of the Plan would have had if invested in low-cost index funds. *Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17 (1st Cir. 2018). This can be estimated by taking the weighted average of the mutual funds from the plan's investment menu and using publicly available data on mutual fund returns.

327.   Based upon the information presently available, Plaintiffs estimate that the Plan participants lost over $50 million of their retirement money as a result of

Defendants' ERISA violations during the Class Period.

### D.     Named Plan Fiduciaries Did Not Hire Competent Professionals to Provide Investment Advice or Asset Allocation Services.

328.   A principal duty of an ERISA fiduciary is to be competent.  *See* 29 U.S.C. § 1104 (a fiduciary shall discharge his duties with "care, skill, prudence, and diligence").  "A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged according to the standards of others 'acting in a like capacity and familiar with such matters.'"  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (applying ERISA).

329.   Where the plan fiduciary lacks the requisite knowledge and experience, it may engage professional advisors.  *See, e.g.,* Restatement (Third) of Trusts § 90 cmt. d.  But hiring an outside advisor is not a magic wand that satisfies a fiduciary's duties to the Plan and Plan participants.  *See id.* cmt. j.  Rather, prudence requires that the fiduciary investigate the background and competence of the advisor before selecting him/her. *Id.*

330.  Rollins  and  the  Administrative  Committee  hired  and  retained Defendant Investment Fiduciaries during the Class Period Plan to advise them on investment strategy and to recommend mutual funds for the plan's investment menu. However,  Named  Plan  Fiduciaries  never  evaluated  nor  monitored  whether Defendant Investment Fiduciaries had the competence to provide such fiduciary services.

331.   Not surprisingly, every one of the Defendants' actively managed funds selected for participants since January 1, 2009, failed to beat their prospectus benchmark with statistically significant alpha. This is not surprising because virtually no actively managed funds beat the market consistently. *Accord* S&P Dow Jones Indices, SPIVA Statistics & Reports (June 30, 2020), *available at* https://www.spindices.com/spiva/#/reports/regions.

332.   Even a comprehensive study published in the *Journal of Finance* surveyed investment advisors having a 91% share of the U.S. consulting market and found "no evidence" that the advisors' recommendations of funds added value, "suggesting that the search of winners, encouraged and guided by investment consultants, is fruitless." Tim Jenkinson *et al., Picking Winners? Investment Consultants' Recommendations of Fund Managers*, 71 The Journal of Finance 2333, 2333 (October 2016).

333.   While it may be prudent under certain circumstances for a plan sponsor to engage investment professionals to pursue an active management strategy, prudence requires the sponsor to determine that the professionals are competent to do so successfully.   At a minimum, a prudent sponsor should confirm that the professionals to have a track record of choosing actively managed funds that outperform lower cost alternatives.   As set forth below, this the Named Plan Fiduciaries here did not do.

1.    **Named Plan Fiduciaries, in Selecting and Retaining Defendant Investment Fiduciaries, Did Not Follow the Plan's Investment Policy Statement.**

334.    The Plan's Investment Policy Statement provided that "[t]he Administrative Committee will evaluate investment managers" and that "manager[s] will be reevaluated [in case of] [m]isconduct, misrepresentation or lapse in integrity." A copy of the Plan's Investment Policy Statement, as amended, is attached as **Exhibit 3.**

335.    Fiduciaries did not possess a viable, documented process and methodology for prudent and skilled selection and monitoring of either the Plan's investments and related expenses, or the Defendant Investment Fiduciaries and their affiliates. Nor did they follow the terms of the Plan or Investment Policy Statement in selecting and retaining Defendant Investment Fiduciaries and their affiliates.

336.    At all relevant times during the Class Period, Named Plan Fiduciaries selected and, within six years of the filing of this action, retained Defendant Investment Fiduciaries, and their affiliates and representatives, including Sean P. Waggoner ("Waggoner") and James E. Bashaw & Co. ("Bashaw"), both to provide investment advice to the Plan and Plan participants and to draft the Plan's Investment Policy Statement.

337.    Named Plan Fiduciaries, however, admittedly failed to prudently investigate Waggoner and the Defendant Investment Fiduciaries before directing

payments to them.

338.   Named Plan Fiduciaries caused the Plan to alienate Trust assets through the payment of excessive fees to Defendant Investment Fiduciaries, especially because Defendant Investment Fiduciaries were serving only as "pass-through" entities and, therefore, their services were not necessary for the operation of the plan.

339.   Further, Named Plan Fiduciaries intentionally ignored and concealed from participants information that they knew or should have known proving that Waggoner and Defendant Investment Fiduciaries were both tainted by conflicts of interest and was otherwise incompetent to provide investment services to the Plan.

## 2.   Incompetence of Defendant Investment Fiduciaries

340.   At all relevant times during the Class Period, Named Plan Fiduciaries knew or should have known that AIS was never licensed as a Registered Investment Adviser ("RIA") with SEC. Similarly, ARC was not licensed as an RIA with the SEC prior to 2013.

341.   Competency as an ERISA § 3(38) investment manager, at a minimum, required AIS and ARC to be licensed as an RIA and registered with the SEC at all times.

342.   At relevant times during the Class Period, Named Plan Fiduciaries also knew or should have known that Waggoner, despite his misrepresentation, was not affiliated with Alliant. Rather, his investment advisor license was with LPL or

Bashaw for much of this time. Named Plan Fiduciaries, nevertheless, misrepresented to Plan participants which RIA was servicing the Plan.

343.   At relevant times during the Class Period, Named Plan Fiduciaries also knowingly allowed LPL and Bashaw to receive compensation even though neither was specifically hired by Named Plan Fiduciaries to serve the plan and participants.

344.   Upon information and belief, Named Plan Fiduciaries knew or should have known that Bashaw was a flow through or "shell" company that served as a pass-through firm to pay both James Bashaw and Waggoner individually.

345.   Plan participants knew or should have known all of this information about Waggoner, Bashaw, and the Defendant Investment Fiduciaries because the Administrative Committee, in light of multiple class action lawsuits then filed alleging Waggoner's wrongdoing, actively investigated his qualifications during the Class Period beginning in late 2016.

346.   In light of this investigation, Named Plan Fiduciaries also knew or should have known through their review of the funds' prospectuses and fee disclosures that Waggoner, Bashaw, and the Defendant Investment Fiduciaries received significant indirect compensation, including but not limited to finder's fees, SEC Rule 12b-1 and/or "sub-transfer agency" fees, and soft dollar pay, and large bonuses, through revenue sharing agreements with Prudential and also through their recommendations of funds to the Plan for inclusion in the investment fund menu.

347.   Named Plan Fiduciaries even caused Bashaw and ARS to be paid out of Plan assets for identical services each supposedly provided to the Plan. Doing so rendered their receipt of Plan assets unreasonable and excessive under ERISA as well as a prohibited transaction.

348.   Based on their record of ERISA and security violations, Waggoner, Bashaw, and the Defendant Investment Fiduciaries were self-interested and otherwise not qualified to recommend investment advice to the Plan and Plan participants.

349.   In violating their fiduciary duties under ERISA, Named Plan Fiduciaries failed to ensure that Waggoner, Bashaw, and the Defendant Investment Fiduciaries offered independent and impartial advice.

350.   Named Plan Fiduciaries' actions with respect to Waggoner and Defendant Investment Fiduciaries caused the Plan to violate the terms of the Plan and its Investment Policy Statement.

351.   Named Plan Fiduciaries' lack of oversight and inappropriate delegation of compensation to Waggoner, Prudential, and Defendant Investment Fiduciaries allowed for the overcharging of recordkeeping expenses for years and enabled the continued use of expensive and imprudent funds and share classes.

352.   Named Plan Fiduciaries' authorization and/or ratification of the revenue sharing agreements among Prudential, Waggoner, and Defendant

Investment Fiduciaries effectively decreased the accrued benefits of Plan participants and, in doing so, violated the Internal Revenue Code and ERISA.

### 3. Defendant Investment Fiduciaries and Prudential Breached Their ERISA Obligations to the Plan.

353. At all relevant times during the Class Period, Named Plan Fiduciaries and Defendant Investment Fiduciaries did not monitor the performance of the investment portfolios for the Plan in and outside GoalMaker to determine whether they performed as expected.

354. Named Plan Fiduciaries were entitled to contemporaneous advice from Defendant Investment Fiduciaries on whether the funds were performing in accordance with expectations.

355. Defendant Investment Fiduciaries, however, failed to provide the information that Named Plan Fiduciaries needed to have to perform timely review and monitoring of the investment portfolios.

356. Defendant Investment Fiduciaries knew or should have known that, by failing to provide this information, they placed Named Plan Fiduciaries in a position which would prohibit them from discharging their fiduciary duties to the Plan and the participants.

357. Likewise, Prudential did not provide the requisite benchmarking information sufficient to compare the performance of the GoalMaker portfolios to the performance of equivalent target date funds.

358.   Named Plan Fiduciaries' belated decision to replace imprudent funds in and outside GoalMaker with similarly or better performing, lower cost alternative funds cost the Plan and Plan participants in excess of $50 million.

**E.     Named Plan Fiduciaries Failed to Disclose to Participants the Information They Needed to Make Informed Investment Decisions.**

359.   Plan administrators have a duty to provide participants with material information respecting the plan, investment options and fees and expenses, on a regular basis.

360.   Under ERISA's "exclusive benefit rule," plan fiduciaries have affirmative duty to disclose material facts to participants and beneficiaries when they know, as Named Plan Fiduciaries did here, that silence might be harmful, including a duty to disclose any and all conflicts of interest. ERISA §§ 404(a)(1)(A), 502(a)(2), 29 U.S.C.A. §§ 1104(a)(1)(A), 1132(a)(3); Restatement (Second) Trusts § 173 comment.

361.   "[A]n ERISA participant has a right to accurate information, and that an ERISA administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty." *Jones v. American General Life and Accident Insurance Co.*, 370 F.3d 1065, 1072 (11th Cir. 2004) (citation omitted).

362.   Importantly, Plaintiffs do not allege that Named Plan Fiduciaries withheld non-public, "inside," information.  Rather, Plaintiffs allege that Named

Plan Fiduciaries failed to disclose the excessive fees being charged participants, as well as their own imprudent practices and methodology in administering the Plan.

363.   Named Plan Fiduciaries had a fiduciary obligation "to deal fairly and to communicate to the [participants] all material facts" it knew or should have known respecting their investments. See Restatement (Third) of Trusts § 78; see also Jones, 370 F.3d at 1072.

364.   This duty required Named Plan Fiduciaries to clearly disclose all revenue sharing arrangements and other indirect compensation arrangements with Plan service providers to Plan participants, separate and apart from the disclosure of investment management and recordkeeping fees.

365.   When recordkeeping and other service provider fees are bundled or commingled, as was the case here, Plan fiduciaries must ensure that the bundled service provider give a good faith estimate of the breakdown. This Named Plan Fiduciaries did not do. Instead, Named Plan Fiduciaries misled participants about and intentionally concealed from them the excessive fees being charged.

366.   The disclosures Named Plan Fiduciaries did provide to participants consisted of incomplete and vague boilerplate furnished by the very same service providers that benefitted from the excessive fees and kickbacks.

367.   To compound their breaches of duty under ERISA, Named Plan Fiduciaries intentionally misrepresented to and concealed from the DOL, IRS, and

Plan participants the fact that Waggoner and the Defendant Investment Fiduciaries, at all times during the Class Period, were not licensed as RIAs and registered with the SEC.

368.   Named Plan Fiduciaries also misrepresented to the IRS, DOL, and Plan participants that Waggoner, at all relevant times during the Class Period was licensed as an investment advisor for AIS and ARC when, in actuality, he was not.

369.   Named Plan Fiduciaries also intentionally concealed from the IRS, DOL, and Plan participants that Waggoner was licensed to work as an investment advisor for Bashaw.  Indeed, Named Plan Fiduciaries knew or should have known that Bashaw also had a record of disciplinary actions, including securities and ERISA violations, such as conflicts of interest and breaches of fiduciary duty, dating back to 1988.  In fact, LPL terminated Bashaw in 2014 for participating in private securities transactions without providing written disclosure to and obtaining written approval from the firm, improper borrowing from a client, and engaging in self-interested transactions – facts which Named Plan Fiduciaries concealed from Plan participants.

370.   Similarly, Named Plan Fiduciaries concealed from Plan participants their knowledge that, in June 2017, LPL terminated Waggoner for multiple instances of wrongdoing.  They further concealed from Plan participants their knowledge that, while he performed services for them and the Plan, Waggoner violated multiple

NASD and FINRA rules and was investigated for such violations.

371. Plan participants likewise concealed from Plan participants their knowledge that Waggoner, after he left LPL, was suspended by FINRA and the Insurance Commissioner of the State of California for additional wrongdoing.

372. Plan participants further concealed from Plan participants the fact that Waggoner failed to register as an investment advisor with the State of Georgia, in violation of the mandatory registration required under O.C.G.A. § 10-5-33.

373. Named Plan Fiduciaries affirmatively concealed these conflicts of interest from participants and, in doing so, put Waggoner's, Prudential's, and Defendant Investment Fiduciaries' financial interests ahead of the Plan and Plan participants, to the detriment of the Plan and Plan participants.

374. In making these misrepresentations and concealing the true information about Bashaw, Waggoner, and Defendant Investment Fiduciaries from Plan participants, Named Plan Fiduciaries purposely led participants into a false belief that their investments in the Plan were prudent, secure, untainted by self-interest, and cost-efficient when, in reality, they were not.

375. Named Plan Fiduciaries' concealments, misrepresentation, and their selection and continued retention of Waggoner, Bashaw, and Defendant Investment Fiduciaries violated DOL guidelines, which provide that: (i) when selecting a service provider, "a plan fiduciary must engage in an objective process"; (ii) such a process

must be "designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided"; and (iii) "such process should be designed to avoid self-dealing, conflicts of interest or other improper influence." *See* https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03.

376.   To conceal these revenue sharing arrangements from Plan participants, Named Plan Fiduciaries falsified Form 5500s to indicate that there were no prohibited transactions or transactions with related entities.

377.   To further conceal the revenue sharing arrangements from Plan participants, Named Plan Fiduciaries amended the Plan's Investment Policy Statement to allow the primary criteria for selection and removal of a registered security in the Plan to be based on "past performance."  Doing so violated SEC Rule 156 and 17 C.F.R. § 230.156, deeming it misleading to convey to an investor that a mutual fund's past performance can predict future performance.

378.   Amending the Investment Policy Statement further resulted in a cycle of Named Plan Fiduciaries: (i) repeatedly approving/adding new funds; (ii) forcing participants/beneficiaries' money into the new funds; (iii) watching the fund underperform; and (iv) making excuses for their lagging returns or ultimately removing the fund from the Plan's portfolio.

379.   At all relevant times during the Class Period, Named Plan Fiduciaries told participants that GoalMaker, based on objective, scientific models developed by the investment research and management firm Morningstar, would take into account the historic returns of different asset class and invest participants' contributions in a portfolio that matched their unique investor style and years to retirement. Named Plan Fiduciaries did not disclose to participants and beneficiaries that Morningstar disclaimed all responsibility for the GoalMaker service.

380.   Named Plan Fiduciaries did not disclose the indirect compensation that Prudential and the Trustee derived from having the Prudential GIC in GoalMaker, or the fact that Prudential could earn a return from any investment earnings on assets above the interest credited to investors.

381.   Named Plan Fiduciaries also did not disclose the indirect compensation that Defendants derived from having the revenue sharing funds in and outside GoalMaker.

382.   As a result of their failure to make proper disclosures to participants, and because of their affirmative misrepresentations about the competence of Defendant Investment Fiduciaries and the conflicts of interest all Defendants had, Named Plan Fiduciaries' wasting of Plan assets went unchecked, costing the participants millions of dollars in retirement savings.

### F.    The Damage Done

383.    A plan fiduciary that breaches any of the duties and obligations imposed by ERISA is liable to make the plan whole for all losses resulting from the breach. 29 U.S.C § 1109.  The "remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust."  *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (citing Restatement (Second) of Trusts § 205(c) (1959)).

384.    Under ERISA, losses are measured according to "the 'total return' measure of loss and damages for breach of trust." *Brotherston v. Putnam Invs., L.L.C.,* 907 F.3d 17, 31 (1st Cir. 2018) (citing Restatement (Third) of Trusts § 100). Thus, the recoverable loss is the amount necessary to restore to the plan to the value it would have had if the plan's assets had been properly administered.  *Id*. (citing Restatement (Third) of Trusts § 100).

385.    Specifically, the calculation of loss "requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place." *See Bierwirth*, 754 F.2d at 1057.

386.    In calculating losses, district courts should presume that the plan's funds would have been used in the most profitable of any reasonable and alternative investment strategies. *Bierwirth*, 754 F.2d at 1056.

387.    "When precise [loss] calculations are impractical, trial courts are

permitted significant leeway in calculating a reasonable approximation of the damages suffered.... Any doubt or ambiguity should be resolved against the breaching fiduciaries." *Id*. (citations omitted).

388. Here participants' losses continue to compound at the rate their investments would have earned had they been prudently invested. The Restatement (Third) of Trusts "specifically identifies as an appropriate comparator for loss calculation purposes 'return rates of one or more ... suitable index mutual funds or market indexes (with such adjustments as may be appropriate).'" *Brotherston*, 907 F.3d at 31 (quoting Restatement (Third) of Trusts, § 100 cmt. b (1)).

389. Plaintiffs estimate that the losses suffered by them, the Plan, and the rest of the class exceeds $50 million.

## VI.   CAUSES OF ACTION

### <u>COUNT I</u>
### Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105
### (Against all Defendants)

390. Plaintiffs re-allege and incorporate in Count I the allegations in paragraphs 1 through 389 above.

391. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

392. In determining whether an ERISA fiduciary breached its duty of

prudence, courts focus on

> whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity....... ERISA requires fiduciaries to employ appropriate methods to investigate the merits of the investment and to structure the investment as well as to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity.

*Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). *Accord Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

393.   In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523.   To satisfy its duties under ERISA, a fiduciary simply may not argue that other funds, in combination, theoretically create a prudent portfolio. *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007).

394.   At all relevant times, Defendants were named and/or *de facto* fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

395.   At all relevant times during the Class Period, Rollins and the Administrative Committee, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the Plan, and retaining Prudential, the

Trustee, and Defendant Investment Fiduciaries rather than soliciting requests for proposal, were ERISA fiduciaries.

396. At all relevant times during the Class Period, Prudential, in recommending the Prudential GIC to Named Plan Fiduciaries for valuable consideration, and in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, and in having sufficient influence over Named Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

397. At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Named Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

398. At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Named Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to Prudential and Defendant Investment Fiduciaries, was an ERISA fiduciary.

399. As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of prudence.

400. Defendants breached this fiduciary duty in multiple respects as discussed throughout this Amended Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services. Moreover, Defendants failed to investigate the competence of and periodically monitor Prudential and the Defendant Investment Fiduciaries, which they had selected to provide services to the Plan and Plan participants.

401. Based on reasonable inferences from the facts set forth in this Amended Complaint, at all relevant times during Class Period, Named Plan Fiduciaries failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; (c) Prudential, the Trustee, and Defendant Investment Fiduciaries were competent and free from self-interest; (d) and that Plan expenses were reasonable and necessary; and (e) they placed the interests of Plan participants and beneficiaries over the

interests of Prudential, Defendant Investment Fiduciaries, and themselves. Additionally, Named Plan Fiduciaries failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

402.  At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

403.  The United States Supreme Court held in *Tibble* that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." 575 U.S. at 529. "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.*

404.  Thus, to discharge this duty, Named Plan Fiduciaries must have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments. As set forth below, this the Named Plan Fiduciaries here did not have.

405.  Plan fiduciaries are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the

plan are reasonable in light of the of level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See A Look at Fee, supra*.

406.   Prudence requires plan fiduciaries to monitor both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

407.   Likewise, Named Plan Fiduciaries must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees from any plan service provider, including the plan fiduciaries themselves.

408.   Named Plan Fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select investment options for the plan which include a remittance of a fee to the Plan sponsor, administrator, or investment advisor, or another party otherwise affiliated with the Plan sponsor.

409.   Given the vulnerability of plan participants, who are dependent on the retirement income earned by their plan investment choices, Named Plan Fiduciaries also must be particularly vigilant about evaluating whether lower-expense share classes are available to participants.

410.   Named Plan Fiduciaries had a fiduciary duty to monitor and evaluate the performance of the Plan's investments they selected and retained in GoalMaker, and to remove and replace imprudent investments.

411.   Named Plan Fiduciaries did not have a prudent process for monitoring and evaluating the performance of the Plan's investments.

412.   At all relevant times during the Class Period, the Plan's mutual funds significantly underperformed their benchmarks and Vanguard comparables.

413.   If Named Plan Fiduciaries had monitored and evaluated the performance of the Plan's mutual funds, it would have known that those funds were consistently underperforming both their benchmarks and comparable index funds. Named Plan Fiduciaries did not know about, did not correct, and did not prevent, the resulting losses to Plan participants.

414.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

415.   Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

416.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

417. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

418. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

419. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105
### (Against all Defendants)

420. Plaintiffs re-allege and incorporate in Count II the allegations in paragraphs 1 through 389 above.

421.  ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

422.  "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

423.  At all relevant times, Defendants were named and/or *de facto* fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

424.  At all relevant times during the Class Period, Rollins, the Administrative Committee, and its individual members, when selecting and

retaining the Plan's investment lineup, deciding which funds to populate GoalMaker, and retaining Prudential and Defendant Investment Fiduciaries rather than soliciting requests for proposal, were ERISA fiduciaries.

425.   At all relevant times during the Class Period, Prudential, in recommending the Prudential GIC to Named Plan Fiduciaries for valuable consideration, and in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, and in having sufficient influence over Named Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

426.   At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Named Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

427.   At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Named Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to Prudential and Defendant

Investment Fiduciaries, was an ERISA fiduciary.

428.   As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of loyalty.

429.   Defendants breached their fiduciary duty of loyalty in multiple respects as discussed throughout this Amended Complaint. At all relevant times during the Class Period, Defendants made investment decisions and/or provided investment advice and/or managed Plan assets while tainted with self-interest.

430.   At all relevant times during the Class Period, Named Plan Fiduciaries put the interests of Prudential and Defendant Investment Fiduciaries ahead of those of the Plan and Plan participants by choosing investment products and pension plan services offered by Prudential and Defendant Investment Fiduciaries and managed by Defendant Investment Fiduciaries and affiliates, which generated substantial revenues for Prudential, the Trustee, and Defendant Investment Fiduciaries, at great cost to the Plan and Plan participants.

431.   Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries endorsed and affirmatively concealed from participants and beneficiaries Prudential 's selling agreements with default investment funds in the Plan, revenue sharing agreements between Prudential, the Trustee, and Defendant Investment Fiduciaries, and their own

conflicts of interest.  As a result, Plan participants were unaware of the excessive and unreasonable fees secretly charged to their accounts by Prudential and Defendant Investment Fiduciaries.

432.   As a result of their conflicts of interest, Named Plan Fiduciaries selected and retained in the Plan many investment funds that were more expensive than necessary and otherwise were not justified on the basis of their historical performance.  Named Plan Fiduciaries, moreover, hid these facts and the conflicts of interests Prudential Defendant Investment Fiduciaries from the DOL, IRS, and Plan participants and beneficiaries.

433.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

434.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.

435.   In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

436.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other

fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

437. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## **COUNT III**
**Failure to Monitor Other Named Plan Fiduciaries**
**(Against Rollins, the Administrative Committee and Its Individual Members)**

438. Plaintiffs restate and incorporate in Count III the allegations in alleged in paragraphs 1 through 389 above.

439. Defendants each had the authority to appoint and remove members of the Committee.

440. Defendants also each had the authority to select service providers for the Plan.

441. In light of this authority, Defendants each was a fiduciary of the Plan.

442. As the appointing/selecting fiduciaries, Defendants had a duty to

monitor their appointees and providers they selected to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

443.   Defendants also had a duty to ensure that their appointees and Plan service providers they selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

444.   Defendants breached their fiduciary monitoring duties by, among other things:

a. Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions;

b. Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate the availability of lower-cost separate account and collective trust vehicles; and

c. Failing to remove Committee members and service providers who were incompetent, who charged excessive fees, and/or whose performance

was inadequate.

445.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

446.   Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

447.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to monitor.

448.   In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

449.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

450.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and

knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT IV
### Failure to Follow Terms of the Plan in Violation of 29 U.S.C. § 1104(a)(1)(D)
### (Against the Named Plan Fiduciaries and Defendant Investment Fiduciaries)

451.   Plaintiffs restate and incorporate in Count IV the allegations in alleged in paragraphs 1 through 389 above.

452.   A fiduciary must discharge his duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions" of ERISA. ERISA § 404(a)(1)(D). These documents include the Plan's investment management agreements and any investment guidelines.

453.   At all relevant times, Defendants were named and/or *de facto* fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

454.   At all relevant times during the Class Period, Rollins, the Administrative Committee, and its individual members, when selecting and retaining the Plan's investment lineup, deciding which funds to populate GoalMaker,

and retaining Prudential and Defendant Investment Fiduciaries rather than soliciting requests for proposal, were ERISA fiduciaries.

455.   At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Named Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

456.   Defendants were fiduciaries subject to ERISA § 404(a)(1)(D).

457.   The Plan required each investment manager to "certify it is qualified to act as an 'investment manager' within the meaning of ERISA Section 3(38)[.]" (*See* the Plan, Exh. 1, § 7.8(a).)   This the Named Plan Fiduciaries and Defendant Investment Fiduciaries did not (and factually could not) do.

458.   The Plan required the Named Plan Fiduciaries to make sure Plan expenses were reasonable.  This the Named Plan Fiduciaries did not do.

459.   Given their many violations alleged above, in directly and/or indirectly causing the Plan and Plan participants to pay unreasonable and unnecessary investment and administrative expenses, and in participating in transactions causing those expenditures, Defendants violated the terms of the Plan, Trust Agreement, and Investment Policy statement.

460.   A fiduciary can ensure that directions are proper and not contrary to ERISA if it follows procedures to ensure that the plan's provisions are fairly implemented, that participants have not been subjected to coercion or undue pressure in making their decisions, that necessary information is provided to participants, and that clearly false information is not disseminated, and if it determines that following the direction would not violate ERISA.

461.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

462.   Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

463.   In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

464.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

465.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT V
### Action Based on Prohibited Transactions in Violation of 29 U.S.C. §§ 1106(a)(1)(C), (D)
### (Against All Defendants)

466.   Plaintiffs restate and incorporate in Count V the allegations in alleged in paragraphs 1 through 389 above.

467.   ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

468.   ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are

covered by such plan," and "(H) any employee, officer, or director of such employer."

469.   ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

470.   Certain exemptions are made where the party-in-interest is paid "no more than reasonable compensation," 29 U.S.C. § 1108(b)(2), but "an ERISA plaintiff need not plead the absence of exemptions to prohibited transactions.  It is the defendant who bears the burden of proving a section 408 exemption...." *Allen v. GreatBanc Trust Co.*, 835 F. 3d 670, 676 (7th Cir. 2016) (citations omitted).

471.   Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(a)(1)(C), (D).

472.   At all relevant times during the Class Period, Defendants improperly caused the Plan to engage in a transaction that they knew or should have known constituted a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest in violation of ERISA § 406(a)(1)(C).

473.   At all relevant times during the Class Period, Defendants improperly caused the Plan to engage in a transaction that they knew or should have known constituted a direct or indirect transfer of Plan assets to and use by a party in interest in violation of ERISA § 406(a)(1)(D).

474. To the extent any of them are not fiduciaries, Defendants, as parties-in-interest, may be held liable for knowing participation in these violations of ERISA §§ 406(a)(1)(C) and (D) pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

475. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## COUNT VI
**Action Based on Prohibited Transactions in Violation of 29 U.S.C. §§ 1106(b)**
**(Against All Defendants)**

476. Plaintiffs restate and incorporate in Count VI the allegations in alleged in paragraphs 1 through 389 above.

477. ERISA § 406(b), 29 U.S.C. § 1106(b), provides: "A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets

of the plan.

478.   Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(b).

479.   Certain exemptions are made to some of ERISA's prohibited action rules where the party-in-interest is paid "no more than reasonable compensation," 29 U.S.C. § 1108(b)(2).  However, "an ERISA plaintiff need not plead the absence of exemptions to prohibited transactions.  It is the defendant who bears the burden of proving a section 408 exemption. . . ."  *Allen v. GreatBanc Trust Co.*, 835 F. 3d 670, 676 (7th Cir. 2016) (citations omitted).

480.   As set forth below, Defendants violated each of the above prohibited transaction rules.

481.   At all relevant times during the Class Period, Defendants each acquired valuable consideration as a result of the investment options recommended, selected, and retained in the Plan and as a result of the revenue sharing agreements among them.

482.   Among this consideration was rebates of Plan expenses which belonged to Plan participants, as well as portions of participant contributions they individually retained for their own benefit.

483.   In doing so, Defendants dealt with the assets of the Plan in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. §

1106(b)(1).

484.   In doing so, Defendants also acted adverse to the interests of the Plan and Plan participants in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

485.   And in doing so, Defendants each received consideration for their personal account from a party dealing with the Plan, in a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

486.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(b).

## COUNT VII
### Breach of Fiduciary Duty by Omission
### (against Rollins, the Administrative Committee and Its Individual Members)

487.   Plaintiffs restate and incorporate in Count VII the allegations in alleged in paragraphs 1 through 390 above.

488.   As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

489.   Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations.

ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

490.   As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Amended Complaint.

491.   By virtue of the power pursuant to the Plan, Defendants had the authority to institute a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Amended Complaint.

492.   Each of them either knew (because they were parties to the transaction) or through a proper review would have discovered that Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Amended Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

493.   Defendants did not take any action, including any legal action, or exercised any other authority under the Plan or the Trust Agreement, to properly manage this choice in action.

494.   By failing to remedy these prohibited transactions on behalf of the Plan,

including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

495. Because their fiduciary duties included employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration of their specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

496. As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

497. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

498. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.

499. Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

500. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other

fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

501.  Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## VII.   ENTITLEMENT TO RELIEF

502.  By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

503.  By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to

redress the wrongs described above.

## VIII. PRAYER FOR RELIEF

Wherefore Plaintiffs, on behalf of themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint Paul J. Sharman, Esq. of The Sharman Law Firm LLC as Class Counsel;

B. Declare any transaction that constitutes a prohibited transaction void and (1) require each fiduciary and party-in-interest engaging in these transactions) to disgorge any profits made as a result of such transaction; (2) declare a constructive trust over the proceeds of any such transaction; or (3) order any other appropriate equitable relief, whatever is in the best interest of the Plan.

C. Require that the proceeds of any recovery for the Plan be allocated to the accounts of participants in the Plan, other than the Defendants and other individuals excluded from the Class.

D. Order the removal of the members of the Administrative Committee from their positions as fiduciaries of the Plan and enjoin them from acting as fiduciaries for any employee benefit plan that covers or includes any Rollins employees or any members of the Class.

E. Appoint an Independent Fiduciary to manage the Plan to be paid for by Defendants.

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiffs and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability.

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action.

H. Award pre-judgment and post-judgment interest.

I. Award any other such relief the Court determines Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Respectfully submitted this 18th day of April, 2022.

/s/ *Paul J. Sharman*
PAUL J. SHARMAN
Georgia State Bar No. 227207

The Sharman Law Firm LLC
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Phone: (678) 242-5297
Fax: (678) 802-2129
Email: paul@sharman-law.com

Jon D. Pels, Esq. (*pro hac vice*)
Email: jpels@pelslaw.com

The Pels Law Firm
4845 Rugby Avenue,
Third Floor
Bethesda, MD 20814
Phone: (301) 986-5570
Fax: (301) 986-5571

Counsel for Plaintiffs