# EXHIBIT 6

MEMORANDUM 

| | |
|---|---|
| Date: | February 15, 2021 |
| To: | Rollins, Inc. Administrative Committee |
| From: | Jeffrey S. Russell; W. Bard Brockman |
| Email: | jsrussell@bclplaw.com; bard.brockman@bclplaw.com |
| Re: | Rollins 401(k) Savings Plan: Response to Paul Sharman's Administrative Claim |

## INTRODUCTION

On December 10, 2020, W. Bard Brockman received an administrative claim from attorney Paul Sharman sent on behalf of David Guyon, Marcia Fleming, Casey Freeman, Anthony Loscalzo, Patrick Roseberry, and Julio Samaniego ("Claimants"). The claim was forwarded to Eddie Northen, as Chairman of the Rollins, Inc. Administrative Committee, and the Committee acknowledged receipt by response letter to Mr. Sharman on December 21, 2020. The administrative claim sets forth five claims relating to the administration of the Rollins 401(k) Savings Plan (the "Plan"):

1) breach of duties of loyalty and prudence for disloyal monitoring of Plan investments under 29 U.S.C. §§ 1132(a)(2) and (3) ("Claim 1");[1]
2) breach of the duties of loyalty and prudence for imprudent and disloyal monitoring of Plan service providers under 29 U.S.C. §§ 1132(a)(2) and (3) ("Claim 2");
3) breach of duties of loyalty and prudence for disloyal monitoring of plan fiduciaries under §§ 1132(a)(2) and (3) ("Claim 3");
4) failing to remedy breach of predecessor fiduciaries – failing to take adequate steps to remedy their predecessors' breaches in selecting the funds referenced in the first claim ("Claim 4"); and
5) violation of 29 U.S.C. § 1106 with regard to prohibited transactions between the plan and party in interest – the Plans used conflicted service providers which recommended investments that were detrimental to the Plans and trusts and harmed participants ("Claim 5," collectively with Claims 1 through 4, the "Claims").

Plan Section 11.7 provides participants the right to make a claim. Section 11.7(b)(1) provides that the Committee should respond within 90 days after the claim is filed and "In the event the claim is denied, the notice of the disposition of the claim will provide the specific reasons for the denial, cites of the pertinent provisions of the Plan, an explanation as to how the claimant can perfect the claim and/or submit the claim for review (where appropriate) and a statement of the claimant's right to bring a civil action under ERISA Section 502(a) following an adverse determination on review." Plan Section 12.3(a)(1) grants the Administrative Committee discretionary authority "[t]o construe the Plan and to determine all questions that arise hereunder.").

---

[1] Specifically, Mr. Sharman alleges that maintaining the following funds constituted a breach of fiduciary duty: Alger Mid Cap Growth Institutional I; American Funds Capital World Gr&Inc R4; American Funds EuroPacific Growth R4; American Funds Growth Fund of Amer R4; Franklin Growth Adv; Goldman Sachs Mid Cap Value A; Hartford MidCap Y; Metropolitan West Total Return Bd Plan; Morgan Stanley Inst Discovery I; Oakmark Equity and Income Investor; T. Rowe Price New Horizons; Victory Diversified Stock A; Victory Sycamore Established Value A; Victory Sycamore Small Company Opp I (collectively, the "Funds").

To: Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 2



Pursuant to your request, we have reviewed the Claim, the governing law, and the Committee's processes and decision-making relating to the subjects of the Claim. This memorandum summarizes the historical record regarding investment performance and plan expenses that relate to the Claim. You are also being provided with documents referenced in this memorandum, including Plan documents and Committee minutes. The Claim provides no detail beyond the assertions described above. Because Claimant Marcia Fleming previously filed a lawsuit asserting similar claims in greater detail, however, you may wish to consider the claims as framed by her complaint, and the following analysis addresses the Claim as though it encompasses her complaint. In considering the Claim and preparing for the upcoming Committee meeting, you should not hesitate to request any additional information you require either from us or company staff.

Pursuant to Plan Section 11.7(b)(1), a response to the Claim is due by March 10, 2021 (90 days following Mr. Brockman's receipt of the Claims).

## **LEGAL STANDARDS**

ERISA imposes certain fiduciary duties on persons responsible for the administration of such plans. These include duties to administer the plan solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits. With regard to investments, fiduciaries must act prudently, diversify the plan's investments so as to minimize the risk of large losses, and follow the terms of the plan documents unless doing so would be inconsistent with ERISA. With that said, ERISA affords fiduciaries considerable discretion in operating plans. Fiduciary decision-making is judged not in hindsight or against an ideal but rather is measured against "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." The duty of prudence focuses on the fiduciary's decision-making processes and diligence rather than results.

While ERISA does not define what constitutes a prudent process, there are certain recognized practices that evidence of prudence in connection with administering a defined contribution plan. Examples of these practices include the following:

- Meetings: Fiduciaries with investment responsibility should meet regularly and should maintain minutes documenting matters discussed and actions taken at the meeting. It is typical for administrative committees to meet quarterly. Meetings should follow an agenda, and written materials relevant to the meeting should be circulated to all attendees at or before the meeting.

- Committee structure: It is helpful to formalize the committee's structure, powers and responsibilities through a charter or similar document. Regardless of whether or not formal procedures are established for a particular task, fiduciaries should strive for consistency in carrying out that task.

- Investment review: The Plan's assets and investments should be reviewed on a quarterly basis for performance. A prudent fiduciary should consider the rate of return over multiple periods (e.g., 1-year, 3-year and 5-year), should compare the investment to a selected benchmark and similar investments, should monitor funds for changes in their investment style or objectives, and should review any major institutional changes such as new ownership or replacement of the fund manager. Monitoring may be performed by in-house staff or with the assistance of outside advisors.

To: Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 3



- Investment policy: Fiduciaries should maintain a written investment policy and regularly review the Plan's investments in light of that policy.

- Expenses: Fiduciaries should consider each investment manager's and service provider's fees. Monitoring may be performed by in-house staff or with the assistance of outside advisors.

- Monitoring of service providers: The Plan's market values and transaction activity should be reviewed routinely. Attention should be given to providers' status and reputation.

In making a claim, ERISA requires the claimant to set forth his or her basis for making a claim and to identify any materials that support the claim.

## BACKGROUND AND ANALYSIS

This memorandum sets forth a summary of historical facts regarding decision-making, investment performance and expenses for consideration in reviewing the Claim. The remaining sections of this memorandum are organized as follows:

I. Summary of the Claimants' Investment and Employment History;
II. Summary of the Administrative Committee's Processes
III. Analysis of Investment Performance and Administrative Committee's Review of Same (Claims 1, 4);
IV. Analysis of Administrative Committee's Review of Fees (Claim 2);
V. Analysis of Plan Administrator's Monitoring of Plan Fiduciaries (Claim 3);
VI. Analysis of Plan's Alleged Participation in Prohibited Transactions (Claim 5)
VII. Conclusion

### I. Summary of the Claimants' Investment and Employment History

#### A. David Guyon

Mr. Guyon was employed with Rollins from August 11, 2008, until November 23, 2020. Mr. Guyon was terminated for violation of company policy. As of January 4, 2020, his Plan account balance was $110,162.94.

Mr. Guyon is currently invested entirely in American Funds American Balanced Class R-6.

#### B. Marcia Fleming

Ms. Fleming was employed with Rollins from February 20, 2017, until February 15, 2019. Ms. Fleming was terminated for poor performance and violation of company policy. As of December 31, 2019, her Plan account balance was $12,562.39.

Ms. Fleming is invested in the GoalMaker fund lineup.

To: Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 4



### C. Casey Freeman

Mr. Freeman was employed with Rollins from May 28, 2013, until November 13, 2019. Mr. Freeman's termination was voluntary due to dissatisfaction with his job. As of November 8, 2020, his Plan account balance was $21,178.81.

Mr. Freeman is invested in the GoalMaker fund lineup.

### D. Anthony Loscalzo

Mr. Loscalzo was employed with Rollins from February 1, 2012, until January 29, 2020. Mr. Loscalzo was terminated due to a violation of company policy. As of November 8, 2020, his Plan account balance was $107,369.97.

Mr. Loscalzo is invested in the following funds: American Funds Capital World Growth (40%); American Funds EuroPacific (40%); and Rollins Stock (20%).

### E. Patrick Roseberry

Mr. Roseberry was employed with Rollins from November 13, 2010, until July 12, 2016. Mr. Roseberry's termination was voluntary. As of November 8, 2020, his Plan account balance was $0.00—he removed his assets in October of 2017.

While he was a participant, Mr. Roseberry was invested in the following funds: Vanguard Windsor II (5%), Franklin Growth (5%), Victory Sycamore (5%), Rollins Stock (85%).

### F. Julio Samaniego

Mr. Samaniego was employed with Rollins from July 19, 2007, until October 1, 2018. Mr. Samaniego's termination was voluntary due to his dissatisfaction with opportunities. As of November 8, 2020, his Plan account balance was $0.00—he removed his assets in October 2018, November 2018, and March 2019.

While a participant, Mr. Samaniego's account was invested exclusively in Rollins stock.

### G. Summary

A comparison of the claims to the Claimants' investment selections reveals that they did not invest in the funds complained of at all times or, in some instances, ever. None of the Claimants invested in certain of the Funds. Oakmark Equity and Income Fund, Victory Diversified Stock A, and Goldman Sachs Mid Cap Value A were never part of the GoalMaker fund lineup during the period that Ms. Fleming and Mr. Freeman (the Claimants invested in the GoalMaker fund lineup) were employed by Rollins, and the Claimants that did not use the GoalMaker fund lineup (Mr. Guyon, Mr. Loscalzo, Mr. Roseberry, and Mr. Samaniego) never invested in those funds. Finally, Mr. Samaniego (invested exclusively in Rollins stock) and Mr. Guyon (invested exclusively in American Funds American Balanced Class R-6) were not invested in any of the Funds. The lack of injury from the stated claims is sufficient reason to deny the claims in whole or in part.

The Claimants state that their Claims are made on behalf of "plans and participants." The Plan does not provide for one party to bring claims on behalf of another but we have considered the Claims as stated so the Committee may respond to the broader claims in the event it chooses to do so.

CONFIDENTIAL

ROLLINS_0000004

To:    Rollins, Inc. Administrative Committee
Date:  February 15, 2021
Page:  5



## II. Summary of the Administrative Committee's Processes

### A. Committee Meetings

The Committee is governed by a set of written bylaws first adopted in 2005 and has had between four and seven voting members. The voting members are Company executives and employees from a cross-section of departments.

The Committee has met typically between three and five times per year. Meetings were attended by the voting members of the Committee, the Retirement Plan Manager, and representatives from the Plan's independent employee benefits advisor, Alliant Insurance Services, and the Plan's recordkeeper, Prudential. The meeting minute describe the matters discussed and the information presented. The minutes reflect that meetings followed an agenda, and that the Committee reviewed and approved minutes from prior meetings. The meetings followed a consistent format which included a review of action items from the prior meeting and their status, an update on general economic conditions, a review of the Plan's investments, and a review of current Plan vital statistics such as market value, contributions and participant counts. The Committee also frequently reviewed regulatory and legal developments, participant communications, and plan design questions. Sean Waggoner of Alliant lead the presentations at the meetings.

For each meeting, Committee members received a "book" of meeting materials which typically includes the prior meeting's minutes, summary information about Plan assets and other details, a presentation on economic trends, a summary of fund performance showing 1-year, 3-year, 5-year and 10-year returns, a compilation of Morningstar reports for each of the Plan's funds, and various reports from the Plan's recordkeeper on transaction activity, contributions, investment diversification, and similar topics. The materials for each meeting also include the Plan's written Investment Policy Statement. These materials are assembled by Alliant based on its work and information from the recordkeeper. Committee members typically receive the materials by e-mail about a week in advance of the meeting. A sample of an Alliant report is included with the materials supplied with this memorandum, and additional reports are available from company staff. Mr. Waggoner also reported to the Committee on his on-going discussions with Prudential and the periodic adjustments to the Prudential fee schedule, which resulted in declining expenses over time.

Specifically with regard to the review of investments, the Committee maintains a "Watch List" of funds that receive additional monitoring due to factors identified by the IPS or for any other reason the Committee may determine. The list is assessed and updated at every meeting. In reviewing the Watch List, Committee members discuss the fund's use of revenue sharing and expense ratio, share class, overall performance, investment objectives, and any relevant changes to its management or strategies. Further detail regarding the Committee's review of certain specific investment decisions may be found in Part III below.

### B. Investment Policy Statement

The Committee's fund selection and review is guided by an Investment Policy Statement ("IPS"). The IPS sets forth the guidelines for the selection of funds offered in the Plan's investment lineup and outlines the Committee's and the investment advisor's authority and responsibilities. The IPS reflects the Committee's overall commitment to prudent process and to selecting appropriate options for the Plan's investment lineup. Among other provisions, the IPS identifies potential asset categories and provides guidance on the selection and monitoring investments.



To:    Rollins, Inc. Administrative Committee
Date:  February 15, 2021
Page:  6

The Committee has reviewed and updated the IPS over time. The Committee updated the IPS in 2009 at its February meeting, and later worked with Alliant to update the IPS in 2013. At the August, 2014 meeting, the Committee reviewed and adopted the updated IPS. At the June, 2015 meeting, a Review of Best Practices for ERISA Plan Fiduciaries was presented by Bruce D. Ruud, CFP, CEBS, president of an employee benefits consulting firm. Mr. Ruud recommended a review of plan documents including Investment Policy Statement, and the Committee resolved to create a plan to address each of Mr. Ruud's recommendations. At the September, 2015 meeting, the Committee reviewed a draft of a revised IPS and noted some minor typographical errors to be corrected before the final draft would be presented to the Committee. At the March, 2016 meeting, the IPS language was finalized and adopted by the Committee.. At the November, 2020 meeting, the Committee decided that Alliant and company staff would work with David Putnal to review and update its by-laws and the IPS.

### III. Analysis of the Funds and Administrative Committee's Review of Same

#### A. Overview

In Claims 1 and 4, Mr. Sharman alleges that Plan fiduciaries breached their duties by selecting and retaining the Funds (*see* footnote 1 above). Claim 1 specifies that the fees charged by the Funds were too high. Neither Claim 1 nor Claim 4 specifically allege how and to what extent any Fund underperformed. The Plans' ERISA §§ 404(a)(5) and 408(b)(2) disclosures from 2012 through 2020 detail the Funds' respective expense ratios and relevant performance metrics as of the dates of the disclosures. The Committee's meeting minutes from 2009 through present record the Committee's deliberations regarding specific Funds during that period. The reports provided to the Committee by Alliant provide extensive detail on the Funds' performance and other information.

#### B. Analysis of Committee and Plan Records

##### 1. Fees

The fees charged by the Plans' Funds over time, as disclosed in the Plans' ERISA §§ 404(a)(5) and 408(b)(2) disclosures, are summarized in the chart attached as Exhibit A. This chart also indicates which Funds used revenue sharing.

Exhibit A shows that the expense ratios dropped over time. Out of all of the Funds, only the Morgan Stanley Institutional Discovery I fund did not lower its expense ratio over time, and the Committee removed that fund from the Plan's investment lineup in 2015. Additionally, the fees demonstrate that more favorable share classes were offered when available. For example, the American Funds Capital World Growth/Income Fund moved from class R4 to class R6 in 2018. The decision to use revenue sharing or a per-participant charge are both permissible under ERISA and provide different advantages for participants. Revenue sharing, for example, can reduce fees for participants with lower account balances and reduce costs in a declining market while per-participant fees can keep expenses fixed in a rising market. Whether a fund or a specific share class pays revenue sharing to offset administrative expenses may be considered in fund selection. Exhibit A shows that as a result of Committee decision-making, there is a trend towards offering funds that do not use revenue sharing, a matter that is within the discretion of fiduciary decision-makers.

The Committee's meeting minutes also reflect the Committee's regular review of fees. For example, during the June, 2017 meeting, the Committee noted that "[u]pon a reduction of record-keeper fees...[t]here are funds on the lineup that have multiple share classes that provide for lower revenue share," and went on to identify potential funds that might be invested in a more favorable share class.

To: Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 7



Later, during the August, 2017 meeting, the Committee reported that a change to the recordkeeping fee structure "will then allow for [certain] funds to have lower expense ratios and revenue share." The Committee's meeting minutes reflect no decision-making based on conflicted or self-interested motives. The record shows repeated examples of the Committee considering an investment fund's merits and ensuring that funds included in the Plan's investment lineup were reviewed thoroughly and regularly (as described more fully in Section II.B.2. below).

Finally, a review of the Plan's ERISA §§ 404(a)(5) and 408(b)(2) disclosures demonstrates that the Plan as a whole offered a wide variety of fund types, including funds with low expense ratios. While the Claims focus only on the specifically-identified Funds, and the Funds' expenses lowered over time, the Plan's disclosures make clear that the Committee made inexpensive funds available (for example, the Vanguard 500 Index Fund), and participants were free to select those funds.

In summary: (1) the overall trend towards lower fees; (2) the Committee's regular review of fund performance and efforts to lower fees where possible; (3) the Plan's varied investment offerings as a whole; and (4) the Committee's use of an independent advisor to assist in gathering and presenting information, all support a conclusion that the Committee complied with its ERISA fiduciary duties with respect to the selection and retention of the Funds and, more generally, with respect to all funds in the Plan's investment lineup.

### 2. Performance

The performance of the Plans' Funds during the relevant period, as detailed in the Plans' ERISA §404(a)(5) disclosures, is summarized in Exhibit B, attached hereto. The record of Committee monitoring and decision-making as to each Fund is summarized below.

**American Funds Capital World GR&Inc R4 ("American Funds Capital")**

After noting American Funds Capital's strong performance in 2009, the Committee discussed American Funds Capital's performance in two 2010 meetings. At the June, 2011 meeting, the Committee discussed American Funds Capital's underperformance against its benchmark but determined not put American Funds Capital on the watch list because of its strong long-term performance, having outperformed its category average in 14 of the 16 calendar years since its 1993 inception. At the August, 2011 meeting, the Committee added American Funds Capital to the watch list. At subsequent meetings, the Committee reevaluated American Funds Capital's performance and kept American Funds Capital on the watch list until August, 2013, at which point the fund was removed from the watch list. At the August, 2017 meeting, the Committee elected to change American Funds Capital's share class to lower the expense ratio. At the September, 2019 meeting, the Committee recognized American Funds Capital's underperformance against its benchmark but explained its decision to retain it in the plan because its performance with respect to three- and five-year timeframes remained acceptable, and because the Fund's tilt towards the international market, as compared to its peers' 50/50 US/International asset allocation, influenced the underperformance relative to its benchmark.

**American Funds EuroPacific Growth R4 ("American Funds Europacific")**

Between September, 2009 and March, 2011, the Committee noted the American Funds EuroPacific's strong performance. At the March, 2016 meeting, the Committee added American Funds EuroPacific to the watch list due to underperformance compared to its benchmark. At the July, 2016 meeting, the Committee kept American Funds EuroPacific on the watch list, but after improved performance,

To:    Rollins, Inc. Administrative Committee
Date:  February 15, 2021
Page:  8



the Committee removed American Funds EuroPacific from the watch list in November, 2017. At the August, 2017 meeting, the Committee elected to change American Funds EuroPacific share class to lower the expense ratio. When American Funds Europacific was underperforming against its benchmark as of May, 2020 the Committee discussed its disadvantages and risks and decided to add American Funds EuroPacific to the watch list. The Committee discussed American Funds Europacific's performance and decided to keep it on the watch list at the August, 2020 and November, 2020 meetings.

**American Funds Growth Fund of Amer R4 ("American Funds Growth")**

In May and September of 2009, the Committee noted American Funds Growth's top half rankings, but at the December, 2009 meeting, the Committee discussed American Funds Growth's mediocre performance compared to its benchmark and determined to continue monitoring performance without adding American Funds Growth to the watch list. At the February, 2010 meeting, the Committee noted mixed performance results from American Funds Growth. In May, 2010, American Funds Growth continued underperforming relative to its benchmark, and the Committee added it to the watch list. At each of six meetings between October, 2010 and January, 2012, the committee reviewed American Funds Growth's performance and kept it on the watch list. At the June, 2011 meeting, the Committee explained its retention of American Funds Growth after considered discussion, but it decided to consider alternative investments. At the August, 2011 meeting, the Committee removed American Funds Growth from the GoalMaker portfolio. At the January, 2012 meeting, the Committee discussed removing American Funds Growth from the plan. At the February, 2012 meeting, the Committee acted to remove American Funds Growth from the Plan's investment lineup.[2]

**Franklin Growth Adv ("Franklin")**

The Committee added Franklin as a large cap growth option at the August, 2011 meeting. A year later at the August, 2012 meeting, the Committee assessed the Fund manager' approach and determined Franklin was meeting the Plan's performance requirements. At the August, 2020 meeting, the Committee noted Franklin's underperformance relative to its benchmark, discussed its attributes that were affecting performance, and added Franklin to the watch list. At the November, 2020 meeting, the Committee discussed Franklin's performance and kept it on the watch list for continued monitoring.

**Goldman Sachs Mid Cap Value A ("Goldman")**

At the May, 2009 meeting, the Committee discussed Goldman's move away from its mandate. The Committee noted Goldman's top quartile ranking for 5 and 10 year time frames. At the September, 2009 meeting, the Committee noted Goldman had underperformed relative to its benchmark for the one-year time frame but was meeting standards for three- and five-year time frames. At the December, 2009 meeting, the Committee noted concern about Goldman's management but decided to monitor performance without adding Goldman to the watch list. At the February, 2010 meeting, Goldman's top half ranking for three- and five-year time frames was noted, and in May, 2010, the Committee discussed Goldman's strong performance. At the October, 2010 meeting, the Committee

---

[2] This fund's inclusion in the ERISA-required disclosures in 2013 and 2014 appears to be a clerical error by the Plan's third-party recordkeeping, Prudential, since the meeting minutes indicate that this fund was removed from the Plan's investment lineup in 2012.



discussed that Goldman's short-term performance was lagging relative to its benchmark but observed the strength of its long run fundamentals. In meetings in December, 2010 and March, 2011, the Committee reviewed Goldman's performance and found it to be consistently strong. In January, 2012, the Committee noted Goldman's underperformance compared to its benchmark, and at the February, 2012 meeting, the Committee added Goldman to the watch list where it remained through two additional meetings until it was removed from the watch list on March, 2013. At the June, 2013 meeting, the Committee decided to obtain more information on Goldman's management approach. At the August, 2013 meeting, the Committee noted Goldman's bottom half rankings and placed it on the watch list. At the March, 2014 meeting, the Committee kept Goldman on the watch list and decided to consider alternative options, which were introduced at the August, 2014 meeting. However, Goldman's performance rebounded, and the Committee removed Goldman from the watch list at the December, 2014 meeting. At the September, 2015 meeting, the Committee noted a change in Goldman's management and placed it on the watch list. Goldman was kept on the watch list at the December, 2015 meeting. By March, 2016, Goldman was underperforming against its benchmark over one-, three-, five-, and ten-year periods, and the Committee removed it from the GoalMaker portfolio while keeping it on the watch list. After continued underperformance relative to its benchmark, the Committee removed Goldman from the plan at the July, 2016 meeting.

**Hartford MidCap Y ("Hartford")**

The Committee added Hartford to the lineup at the December, 2015 meeting to replace the Morgan Stanley Institutional Discovery I fund and added it to the GoalMaker portfolio in March, 2016. At the December, 2019 meeting, the Committee elected to change the share class by April 1, 2020 to lower the expense ratio. At the August, 2020 meeting, the Committee noted Hartford's underperformance relative to its benchmark, discussed Hartford's attributes leading to the underperformance, and added Hartford to the watch list. At the November, 2020 meeting, the Committee again discussed Hartford's performance and kept it on the watch list for continued monitoring.

**Metropolitan West Total Return Bond Plan ("Metropolitan West")**

At the December, 2014 meeting, Metropolitan West was added to the lineup to replace the PIMCO fund. At the September, 2019 meeting, the Committee noted Metropolitan West's strong overall performance, discussed a change in its asset categories, and determined that no action was required.

**Morgan Stanley Inst Discovery I ("Morgan Stanley")**

The Committee added Morgan Stanley to the lineup at the December, 2010 meeting. At the December, 2012 meeting, the Committee noted that Morgan Stanley was not in line with criteria specified by the Plan's investment policy statement due to being highly concentrated with only 60 funds and potentially being out of step with the index and its peers in terms of management process. Because of these concerns, the Committee added Morgan Stanley to the watch list where it remained after review at two subsequent meetings before being removed from the watch list in August, 2013 due to improved performance. In August, 2014, the Committee placed Morgan Stanley on the watch list and kept it there through four subsequent meetings at which Morgan Stanley was monitored and alternatives were considered. At the December, 2015 meeting, the Committee removed Morgan Stanley from the lineup, replacing it with Hartford.

CONFIDENTIAL

ROLLINS_0000009

To: Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 10



### Oakmark Equity and Income Investor ("Oakmark")

In May and September of 2009, Oakmark was highly ranked and believed to be well positioned. However, at the December, 2009 and February, 2010 meetings, the Committee noted that Oakmark was defensively positioned and therefore was not keeping pace with the ongoing rally. In meetings between May, 2010 and March, 2011, the Committee monitored Oakmark, noting performance strengths and observing that some of Oakmark's missed recovery was explained by its orientation as a downside protector. At the January, 2012 meeting, the Committee noted that Oakmark was underperforming relative to its benchmark, but improvement was anticipated. At the next meeting in February, 2012, the Committee observed that Oakmark was performing as expected and again anticipated improved performance. At the August, 2012 meeting, Oakmark was underperforming compared to its benchmark, and the Committee added it to the watch list. At the December, 2012 meeting, the Committee kept Oakmark on the watch list, noting that Oakmark was under new management and was still underperforming relative to its benchmark. At three subsequent meetings, the Committee kept Oakmark on the watch list and considered alternative investment options, but Oakmark was removed from the watch list in March, 2014 when its performance against its benchmark improved. At the December, 2014 meeting, the Committee discussed Oakmark's underperformance relative to its benchmark and returned Oakmark to the watch list. At the next meeting Oakmark was removed from the watch list because of its improved category ranking and performance and more balanced positioning. At the August, 2017 meeting, the Committee elected to change Oakmark's share class to reduce the expense ratio. At the April, 2019 meeting, the Committee considered Oakmark's underperformance relative to its benchmark but explained its decision not to take action at that time. In August, 2019, the Committee considered Oakmark's performance on different metrics as well as the factors affecting its performance and placed Oakmark on the watch list. Oakmark was kept on the watch list at four subsequent meetings with the Committee ultimately removing Oakmark from the lineup in August, 2020.

### T. Rowe Price New Horizons ("T. Rowe Price")

At the May and October, 2009 meetings, the Committee noted T. Rowe Price's strong performance and the fact that it had the longest manager tenure in its category. At the December, 2009 meeting, the Committee again noted T. Rowe Price's strong performance but also discussed the fact that the fund's lead manager was stepping down from that role but would remain on the fund committee. The new lead would be an existing co-manager. The Committee noted that management changes are a reason for placing a fund on the watch list but since any changes in performance would not be apparent until mid-2010, the Committee elected to continue monitoring and revisit the matter at 2Q 2010 meeting. At the February, 2010 meeting, the Committee noted T. Rowe Price's top quartile rankings and upcoming management change. The Committee discussed placing T. Rowe Price on the watch list based on IPS qualitative criteria but elected to wait until the management change had taken effect. At the May, 2010 meeting, the Committee added T. Rowe Price to the watch list due to management change that had since take effect. At the October, 2010 meeting, the Committee noted that T. Rowe Price's performance was meeting IPS standards but the tenure of the new management was not and kept T. Rowe Price on the watch list as a result. At the December, 2010 meeting, the Committee observed that the management change was not affecting T. Rowe Price's performance and elected to remove it from the watch list. At the March, 2011 meeting, the Committee noted T. Rowe Price's strong performance. At the August, 2012 meeting, the Committee again noted T. Rowe Price's strong performance. At the April, 2019 meeting, the Committee discussed T. Rowe Price's strong performance but added the fund to the watch list because of a management change. At the July, 2019 meeting, the Committee discussed T. Rowe Price's new manager and elected to keep it on the watch list. At the September, 2019 meeting, the Committee noted that T. Rowe Price's

To:    Rollins, Inc. Administrative Committee
Date:  February 15, 2021
Page:  11



performance was meeting IPS standards but elected to continue monitoring the new manager and keep the fund on the watch list. At the December, 2019 meeting, the Committee elected to continue monitoring new manager and noted that T. Rowe Price was now in mid cap growth category because of increased asset level. The Committee therefore kept T. Rowe Price on the watch list and elected to consider small cap growth alternatives. At the February, 2020 meeting, the Committee elected to continue monitoring T. Rowe Price but removed it from the watch list.

**Victory Diversified Stock A ("Victory Diversified")**

Between May 2009 and October 2010, Victory Diversified's overall strong performance was noted by the Committee, but by October, 2010, the Committee noted Victory Diversified's short-term underperformance against its benchmark. At the December, 2010 meeting, the Committee observed that Victory Diversified was underperforming against its benchmark. The Committee discussed Victory Diversified's attributes at the March, 2011 meeting, and included Victory Diversified on the watch list for four subsequent meetings across 2011 and 2012 before removing Victory Diversified from the plan in August, 2012, citing Victory Diversified's two-year downward trend.

**Victory Sycamore Established Value A ("Victory Established")**

At the July, 2016 meeting, the Committee added Victory Established to the lineup to replace Goldman Sachs Mid Cap Value A. No instances of underperformance were identified.

**Victory Sycamore Small Company Opp I ("Victory Small Company")**

At the March, 2012 meeting, the Committee added Victory Small Company to the lineup to replace DWS Dreman Small Cap Value A. At the December, 2019 meeting, the Committee elected to change Victory Small Company's share class to lower the expense ratio. No instances of underperformance were identified.

The Committee's meeting minutes show that the Committee reviewed the investment selections at each meeting. This record also shows that the Committee reviewed expenses and endeavored to lower expenses ratios on many occasions. The record does not show any instance where funds were included and retained for improper reasons.

### 3. Selection

As illustrated in Exhibits A and B, several of the Funds were added to the Plan's investment lineup during the time period for which the Plan's ERISA §§ 404(a)(5) and 408(b)(2) disclosures are available. The Committee's meeting minutes demonstrate that the Committee considered the Plan's needs and various investment options when selecting the Funds. The Committee considered alternatives for fund replacement. In selecting the Funds, the Committee considered not only fund performance, but also fund management and expenses.

**Victory Sycamore Established Value A**

Victory Sycamore was selected to replace Goldman Sachs Mid Cap Value A at the July, 2016 meeting. The Committee considered alternatives and selected Victory Sycamore based on its award-winning management team, strong performance, and low expense ratio.

To: Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 12



### Hartford MidCap Y

Hartford was selected to replace Morgan Stanley Inst Mid Cap Growth at the December, 2015 meeting. At the March, 2015 meeting, the Committee determined that Alliant would provide alternatives if Morgan Stanley's performance did not improve. When Morgan Stanley's performance did not improve, the Committee considered alternatives in the mid cap growth category at the June, 2015 and September, 2015 meetings before selecting Hartford from a list of three options at the December, 2015 meeting. This selection was based on Hartford's management team, stock selections, and expense ratio.

### Metropolitan West Total Return Bond

Metropolitan West was selected from a list of three options to replace PIMCO Total Return at the December, 2014 meeting. The Committee selected Metropolitan West based on the management team's 20 years of experience, their valuation-focused approach that made the fund's risk profile less volatile, and the fund's strong rankings over different time frames.

### Victory Small Company Opportunity I

Victory Small Company was selected from a list of three options to replace DWS Dreman Small Cap Value A at the March, 2012 meeting. A different fund had been selected at a previous meeting but was then closed to new investors. The Committee selected Victory Small Company based on peer performance, a well below average expense ratio, and solid fundamentals and management.

### Morgan Stanley Inst Discovery I

Morgan Stanley was selected from a list of four options to replace Alger Mid Cap Growth at the December, 2010 meeting. The Committee considered a list of six options at the October, 2010 meeting. The Committee selected Morgan Stanley based on low expenses, management tenure and style, and consistency of performance.

### C. Conclusion

The Plan's disclosures and Committee's meeting minutes demonstrate that the Committee was involved in an ongoing review of the Plan's investment lineups. The Committee's meeting minutes demonstrate that the Committee sought to offer a strong and diverse investment lineup to the Plan's participants and does not include any evidence that investment lineup decisions were made for disloyal reasons and without taking into account the best interests of participants.

### IV. Analysis of Service Provider Fees and Administrative Committee's Review of Same

### A. Overview

In Claim 2, Mr. Sharman alleges that Plan fiduciaries breached their duties of loyalty and prudence "for imprudent and disloyal monitoring of plan service providers under 29 U.S.C. §§ 1132(a)(2) and (3), which caused losses to plans and participants." Although Mr. Sharman's letter does not elaborate as to when or how any such loss or breach occurred, Ms. Fleming's prior complaints alleged that Prudential, the Plan's recordkeeper, earned excessive fees since at least 2012 and was continuing to earn excessive fees. The complaints further alleged that the Committee had failed to conduct a competitive bidding process for the Plan's recordkeeping services for at least 10 years.

CONFIDENTIAL

ROLLINS_0000012



To:   Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 13

This allegation may be evaluated by reviewing Committee minutes and meeting materials to determine whether and when the Committee conducted a competitive process for the Plan's recordkeeping services. Also relevant to the claim are Prudential's historical fees in connection with the Plan and the services historically provided by Prudential. Since the initial contract with Prudential, the Committee monitored administrative expenses and considered options for payment of expenses, including revenue sharing and fixed per-participant fees. They also received information from their advisor regarding appropriate levels of fees. These matters were monitored and adjustments were made with Prudential periodically between 2007 and the RFP and renegotiation of the recordkeeper contract in 2017, and these adjustments resulted in reduction Prudential expenses on a per-participant basis over the period.

### B. Analysis of Committee and Plan Records

#### 1. Prudential

The Committee regularly reviewed Prudential fees from revenue sharing and otherwise with assistance from Alliant. Alliant discussed fees with Prudential and successfully negotiated lower fees over time. In 2010, for example, Mr. Waggoner negotiated a more favorable fee schedule with lower revenue sharing.

The Committee held an RFP for the Plan's recordkeeper in 2017. Alliant, together with Rollins' internal procurement department, conducted the RFP. Alliant reviewed the results with the Committee at its June, 2017 quarterly meeting. The Committee determined to retain Prudential at that time.

Alliant's files related to the RFP confirm that the RFP was thorough and competitive. Alliant reached out to eleven different providers, all well-known banks and investment companies with a significant track record in the retirement services industry. The RFP contained approximately 300 questions on a broad range of topics including the bidders' recordkeeping and administration capabilities, client service and quality control functions, regulatory and compliance capabilities, technologies and security protocols, and fee structure. Nine of the eleven providers submitted a bid. Alliant prepared a summary of the nine bids in which it identified the four strongest bids by price. The summary was included in the materials for the June, 2017 meeting, and the minutes indicate that there was a thorough discussion. According to the minutes, the Committee's decision to retain Prudential was largely due to two factors. First, Prudential's proposed pricing would result in a reduction of fees, which would allow for the reduction in expense ratios for the Plan's funds. Alliant's materials confirm that Prudential's pricing was superior to or materially the same as the pricing offered by the other bidders. Second, the Committee found that Prudential's stable value offering, the Prudential Guaranteed Fund, offered a superior crediting rate to the comparable products offered by other bidders. The Committee calculated that losing the Prudential Guaranteed Fund could cost participants approximately $235,000 in interest income. These facts reflect the Committee's attention to these issues and is consistent with good practice.

The contract with Prudential provides for a range of services for the benefit of plan participants. These services include: support for participants seeking to explore different investment options, make rollovers, or make hardship withdrawals; incentives for Prudential to increase participation in the Plan; and customized account statements mailed to participants' homes. The Committee meeting minutes bear out Prudential's level of service, evidencing instances in which Prudential worked with the Plan to provide education and communication pieces to participants on topics ranging from loans, diversification, and participant life milestones.

ERISA does not require fiduciaries to solicit bids from service providers according to any particular schedule, but instead leaves that matter to the fiduciaries' discretion. Factors that affect whether to solicit bids include the satisfaction with current services, and the risk that a new recordkeeper will not

To:   Rollins, Inc. Administrative Committee
Date: February 15, 2021
Page: 14



provide better service and the likelihood that lower expenses can be achieved. Regarding Prudential's fees, the record shows that prior to 2017, Prudential's fees were paid primarily through revenue sharing, which the Committee monitored and on which the Committee received advice from its independent advisor. The Claim provides no evidence that the fees earned by Prudential were objectively unreasonable or excessive in light of the range of services provided by Prudential. The Committee received advice from Alliant regarding fees on an on-going basis. And the fact that none of the eight other competitors in the 2017 RFP offered superior pricing further indicates that Prudential's fees were competitive.

### 2. Other Providers

In addition to the 2017 recordkeeper RFP, the minutes show that the Committee conducted an RFP for the Plan's advisor in 2016. Alliant, the incumbent advisor, was retained. Rollins' files relating to the RFP indicate that Rollins sent bidders a questionnaire containing approximately 100 questions on a broad range of topics including their range of services, experience, compliance program and disciplinary history, and fee structure. The Committee considered bids from at least two firms other than Alliant. Alliant's proposed pricing was slightly higher than the other bidders, but not materially so. Additionally, Rollins has had a successful relationship with Alliant's main contact, Sean Waggoner, who played an important role in favorably resolving a dispute between Rollins and a prior service provider (Hewitt) in the 2000s. In light of these facts, the record supports a conclusion that the Committee has employed a reasonable process to monitor its advisor fees.

Finally, Ms. Fleming's lawsuit had alleged that the Committee breached duties with respect to a former advisor, James E. Bashaw, and his firm LPL Financial. The Complaints alleged that Mr. Bashaw and LPL Financial were paid excessive fees between 2009 and 2013. We have located no evidence that Mr. Bashaw was personally involved in any matters for the Plan and, in any event, no fees were paid to his company or affiliates after 2013. The prior allegations regarding Mr. Bashaw were centered on his alleged disciplinary record. Bryan Cave reviewed publicly available information maintained by FINRA which confirmed that Mr. Bashaw was the subject of a customer complaint in 1998 and was terminated by his firm in 2014. The record shows no evidence that these incidents were in any way related to, or had any impact on, the Plan. In addition, ERISA breach of fiduciary duty claims are subject to a six-year statute of repose. Because there is no evidence of any payments made to Mr. Bashaw in the last six years, there can be no timely claim for breach of fiduciary duty arising from fees paid to him.

### C. Conclusion

The Committee's minutes and materials support a conclusion that the Committee monitored service providers prudently and independently, seeking to reduce costs where appropriate and without compromising the quality of services provided by the Plan's service providers.

## V.   Analysis of Plan Administrator's Monitoring of Plan Fiduciaries

### A. Analysis of Plan Documents

Claim 3 does not identify which fiduciaries failed to monitor other fiduciaries. Claim 3 likewise does not identify the improperly monitored fiduciaries. Consequently, the failure to monitor must stem from the other fiduciary breaches alleged. As described in Sections II and III, the evidence does not support an underlying breach of fiduciary duty claim based on investment fees, investment performance, or service provider fees.

To:     Rollins, Inc. Administrative Committee
Date:   February 15, 2021
Page:   15



### B. Conclusion

In order to successfully allege a claim for failure to monitor claim in court, an underlying breach must exist. Because the record supports denying Claims 1, 2, and 4, there is likewise no support for any monitoring claim.

## VI. Analysis of Plan's Alleged Participation in Prohibited Transactions

### A. Analysis of Plan Documents

Claim 5 is premised on finding that Claims 1 and 2 had merit because Claim 5 alleges that the Plan used conflicted service providers (Claim 2) which recommended investments that were detrimental to the Plan (Claim 1). The evidentiary record, specifically the Plan's disclosures and Committee meeting minutes, support denial of Claims 1 and 2 and likewise support denial of Claim 5.

### B. Conclusion

The Plan's disclosures and the Committee meeting minutes provide no support for the prohibited transaction allegations in Claim 5.

## VII. Conclusion

The facts regarding the Committee's processes and decision-making do not show support for Mr. Sharman's claims, but rather demonstrate that the Committee employed prudent processes and made prudent decisions consistent with ERISA's duties. There is no evidence of disloyal motives or actions by the Committee. Because the record demonstrates the Commitee complied with its fiduciary duties under ERISA, it is within the Committee's discretion to deny the Claims in their entirety.

CONFIDENTIAL

# EXHIBIT A

# ROLLINS ADMINISTRATIVE CLAIM: EXPENSE RATIOS

| FUND | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Alger Mid Cap Growth Institutional I | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| American Funds Capital World GR&Inc R4 | 0.80% | 0.80% | 0.80% | 0.79% | 0.79% | 0.80% | 0.45% | 0.44% | 0.42% |
| American Funds EuroPacific Growth R4 | 0.85% | 0.85% | 0.85% | 0.84% | 0.84% | 0.85% | 0.5% | 0.49% | 0.46% |
| American Funds Growth Fund of Amer R4 | N/A | 0.69% | 0.68% | N/A | N/A | N/A | N/A | N/A | N/A |
| Franklin Growth Adv | 0.69% | 0.71% | 0.68% | 0.65% | 0.63% | 0.65% | 0.63% | 0.59% | 0.59% |
| Goldman Sachs Mid Cap Value A | 1.16% | 1.15% | 1.14% | 1.14% | 1.15% | N/A | N/A | N/A | N/A |
| Hartford MidCap Y | N/A | N/A | N/A | N/A | 0.76% | 0.76% | 0.77% | 0.85% | 0.75% |
| Metropolitan West Total Return Bd Plan | N/A | N/A | N/A | 0.39% | 0.40% | 0.38% | 0.38% | 0.37% | 0.38% |
| Morgan Stanley Inst Discovery I | 0.70% | 0.71% | 0.71% | 0.75% | N/A | N/A | N/A | N/A | N/A |
| Oakmark Equity and Income Investor | 0.77% | 0.78% | 0.77% | 0.74% | 0.75% | 0.89% | 0.69% | 0.69% | 0.73% |
| T. Rowe Price New Horizons | 0.81% | 0.81% | 0.80% | 0.80% | 0.79% | 0.79% | 0.65% | 0.65% | 0.65% |
| Victory Diversified Stock A | 1.11% | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Victory Sycamore Established Value A | N/A | N/A | N/A | N/A | N/A | 0.95% | 0.54% | 0.54% | 0.58% |
| Victory Sycamore Small Company Opp I | 1.06% | 1.02% | 0.99% | 0.98% | 0.97% | 0.96% | 0.90% | 0.88% | 0.87% |

RED = fund used revenue sharing

# EXHIBIT B

# ROLLINS ADMINISTRATIVE CLAIM: PERFORMANCE V. BENCHMARK

| FUND | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Alger Mid Cap Growth Institutional I | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| American Funds Capital World GR&Inc R4 | • 1: +2.01%<br>• 5: +1.4%<br>• 10: +3.12% | • 1: +2.22%<br>• 5: -0.03%<br>• 10: +2.67% | • 1: +2.65%<br>• 5: -0.48%<br>• 10: +1.77% | • 1: -0.37%<br>• 5: +0.57%<br>• 10: +1.36% | • 1: -0.16%<br>• 5: +1.01%<br>• 10: +1.16% | • 1: -0.96%<br>• 5: +0.88%<br>• 10: +0.87% | • 1: +2.18%<br>• 5: +0.94%<br>• 10: +0.8% | • 1: -2.82%<br>• 5: -0.29%<br>• 10: +0.08% | • 1: -1.08%<br>• 5: -1.03%<br>• 10: -0.08% |
| American Funds EuroPacific Growth R4 | • 1: +0.09%<br>• 5: +1.46%<br>• 10: +0.25% | • 1: +0.84%<br>• 5: +1.2%<br>• 10: +0.52% | • 1: +5.27%<br>• 5: +0.02%<br>• 10: +1.15% | • 1: +0.75%<br>• 5: +0.99%<br>• 10: +1.37% | • 1: -2.5%<br>• 5: +0.83%<br>• 10: +0.87% | • 1: +3.08%<br>• 5: +1.44%<br>• 10: +1.26% | • 1: +1.27%<br>• 5: +1.97%<br>• 10: +1.62% | • 1: -1.61%<br>• 5: +0.26%<br>• 10: +0.47% | • 1: -2.57%<br>• 5: -1.08%<br>• 10: +0.41% |
| American Funds Growth Fund of Amer R4 | N/A | • 1: +4.13%<br>• 5: -2.84%<br>• 10: +0.77% | • 1: +1.19%<br>• 5: -2.17%<br>• 10: +0.18% | N/A | N/A | N/A | N/A | N/A | N/A |
| Franklin Growth Adv | • 1: -1.77%<br>• 5: -0.18%<br>• 10: +1.64% | • 1: -1.14%<br>• 5: -0.11%<br>• 10: +1.46% | • 1: -0.30%<br>• 5: -0.69%<br>• 10: +1.12% | • 1: +0.21%<br>• 5: -1.72%<br>• 10: +0.24% | • 1: -3.38%<br>• 5: -1.43%<br>• 10: -0.4% | • 1: +1.61%<br>• 5: -0.7%<br>• 10: -0.59% | • 1: -1.55%<br>• 5: -0.77%<br>• 10: -0.43% | • 1: -3.23%<br>• 5: -1.36%<br>• 10: -1.04% | • 1: -12.12%<br>• 5: -3.41%<br>• 10: -2.56% |
| Goldman Sachs Mid Cap Value A | • 1: -5.23%<br>• 5: -0.05%<br>• 10: -0.50% | • 1: -3.45%<br>• 5: -1.45%<br>• 10: +0.32% | • 1: -1.10%<br>• 5: -3.88%<br>• 10: -0.78% | • 1: -0.44%<br>• 5: -1.8%<br>• 10: -0.89% | • 1: -8.32%<br>• 5: -3.45%<br>• 10: -1.51% | N/A | N/A | N/A | N/A |
| Hartford MidCap Y | N/A | N/A | N/A | N/A | • 1: +1.36%<br>• 5: +0.18%<br>• 10: +0.6% | • 1: +3.76%<br>• 5: +1.92%<br>• 10: +0.77% | • 1: +1.79%<br>• 5: +1.51%<br>• 10: +0.55% | • 1: -3.95%<br>• 5: +0.12%<br>• 10: -1.17% | • 1: -17.41%<br>• 5: -3.83%<br>• 10: -1.77% |
| Metropolitan West Total Return Bd Plan | N/A | N/A | N/A | • 1: -0.11%<br>• 5: +1.91%<br>• 10: +1.74% | • 1: -0.63%<br>• 5: +1.04%<br>• 10: +1.59% | • 1: +0.59%<br>• 5: +1.41%<br>• 10: +1.42% | • 1: -0.02%<br>• 5: +0.25%<br>• 10: +1.63% | • 1: +0.32%<br>• 5: +0.03%<br>• 10: +2.21% | • 1: +1.41%<br>• 5: +0.04%<br>• 10: +0.76% |
| Morgan Stanley Inst Discovery I | • 1: -5.24%<br>• 5: +2.72%<br>• 10: +1.99% | • 1: -11.08%<br>• 5: -0.63%<br>• 10: +1.62% | • 1: +2.57%<br>• 5: +0.22%<br>• 10: +1.91% | • 1: -11.3%<br>• 5: -3.51%<br>• 10: +0.31% | N/A | N/A | N/A | N/A | N/A |
| Oakmark Equity and Income Investor | • 1: +2.61%<br>• 5: +2.73%<br>• 10: +1.22% | • 1: -3.60%<br>• 5: -0.46%<br>• 10: -0.63% | • 1: +1.60%<br>• 5: -5.36%<br>• 10: -0.03% | • 1: +1.23%<br>• 5: -0.72%<br>• 10: +0.85% | • 1: -2.11%<br>• 5: +0.07%<br>• 10: +1.02% | • 1: +3.95%<br>• 5: +1.47%<br>• 10: +1.28% | • 1: -0.74%<br>• 5: +1.7%<br>• 10: +0.5% | • 1: -2.86%<br>• 5: -0.41%<br>• 10: -0.08% | • 1: -8.42%<br>• 5: -2.26%<br>• 10: -0.41% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| T. Rowe Price New Horizons | • 1: +9.53%<br>• 5: +4.01%<br>• 10: +3.16% | • 1: -0.89%<br>• 5: +4.71<br>• 10: +2.69% | • 1: +6.52%<br>• 5: +5.30%<br>• 10: +3.18% | • 1: -1.07%<br>• 5: +4.14%<br>• 10: +2.41% | • 1: +6.03%<br>• 5: +4.56%<br>• 10: +3.06% | • 1: +0.73%<br>• 5: +2.37%<br>• 10: +3.39% | • 1: +8.41%<br>• 5: +4.22%<br>• 10: +4.46% | • 1: +6.89%<br>• 5: +3.4%<br>• 10: +4.54% | • 1: +24.91%<br>• 5: +8.35%<br>• 10: +6.41% |
| Victory Diversified Stock A | • 1: -8.07%<br>• 5: -1.37%<br>• 10: -0.36% | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Victory Sycamore Established Value A | N/A | N/A | N/A | N/A | N/A | • 1: +1.79%<br>• 5: +0.39%<br>• 10: +2.38% | • 1: +2.72%<br>• 5: +2.22%<br>• 10: +1.47% | • 1: +0.68%<br>• 5: +2.44%<br>• 10: -0.48% | • 1: +2.27%<br>• 5: +1.95<br>• 10: +1.12% |
| Victory Sycamore Small Company Opp I | • 1: +7.02%<br>• 5: +4.99%<br>• 10: +2.22% | • 1: -3.82%<br>• 5: +1.87%<br>• 10: +2.62% | • 1: +1.12%<br>• 5: +1.08%<br>• 10: -15.51% | • 1: +1.72%<br>• 5: +1.13%<br>• 10: +2.01% | • 1: +7.01%<br>• 5: +2.31%<br>• 10: +3.23% | • 1: -2.1%<br>• 5: +1.12%<br>• 10: +2.78% | • 1: +5.5%<br>• 5: +2.97%<br>• 10: +2.41% | • 1: +2.76%<br>• 5: +3.25%<br>• 10: +2.24% | • 1: +1.95%<br>• 5: +3.14%<br>• 10: +2.47% |

CONFIDENTIAL

ROLLINS_0000018